## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

_____

|  |  |  |
|---|---|---|
| FAIR HOUSING CENTER OF CENTRAL INDIANA, INC., | ) ) ) | |
| MARIA GASPAR, | ) ) | |
| MORY KAMANO, | ) ) | |
| FRANKLIN PAZ, | ) ) | Case Number 1:17-cv-1782-RLM-TAB |
| CORDELL SPENCER, | ) ) | |
| and | ) ) | JURY TRIAL DEMANDED |
| NORMA TEJEDA, | ) ) | **THIRD AMENDED CLASS ACTION COMPLAINT** |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| RAINBOW REALTY GROUP, INC., | ) ) | |
| EMPIRE HOLDING CORP., | ) ) | |
| SHORE WATERS DEVELOPMENT, LLC, | ) ) | |
| ALLEY CAT TRUST, | ) ) | |
| SPORTING TRUST, | ) ) | |
| SUNFLOWER TRUST, | ) ) | |
| SUNSHINE TRUST, | ) ) | |
| REDSKINS TRUST, | ) ) | |
| and | ) ) | |
| JAMES R. HOTKA, | ) ) | |
| Defendants. | ) ) | |

_____)

## NATURE OF THE ACTION

1.      There are thousands of empty, dilapidated houses in Marion County, Indiana.

Defendants James R. Hotka, Rainbow Realty Group, Inc. ("Rainbow"), Empire Holding Corp.,

Shore Waters Development, LLC, Alley Cat Trust, Sporting Trust, Sunflower Trust, Sunshine

Trust, and Redskins Trust (collectively, "Defendants") have purchased over 1,000 of them to

perpetrate a predatory and unlawful "rent-to-own" scheme.  Using the promise of

homeownership, Defendants lure their victims into paying inflated prices and exorbitant interest

rates for these rundown houses, and into investing their own money and time into repairs.  But

the promise is false: "buyers" (the term Defendants use) earn no equity in this scheme and when

they fall behind, as most do, Defendants evict them using fast proceedings reserved for rental

housing.  Defendants profit because they retain the down payment, all the monthly payments, all

the equity, and any improvements that the buyer made, and resell the house to the next victim.

Defendants also profit in the few cases, if any, where a buyer is able to pay off the house because

they reap the benefit of having sold it for multiples of their purchase price, and without investing

a penny in improvements.  Every outcome is a win for Defendants, and it is always at the

expense of their customers.

2.      This scheme revives predatory land contract practices that during much of the

twentieth century were targeted at African-American neighborhoods and denied African

Americans the same opportunity as whites to accumulate wealth through housing.  Land

contracts are seller-financed sales.  There is no transfer of ownership under a land contract, and

no acquisition of equity by the buyer, until the last payment is made.  The coupling of land

contracts with above-market sales prices and usurious interest rates flourished during decades of

public and private redlining.  Defendants have brought back this toxic combination and, like their

predecessors, are targeting their scheme at minority neighborhoods.[1]  In one major respect Defendants have made the practice even worse:  they conceal from buyers the true extent of the problems at these houses, saddling buyers with even greater costs than expected to make their homes livable.  Few of Defendants' victims have the financial resources to keep up.

3.       Targeting a deceptive, harmful, predatory housing scheme on the basis of race, color, and national origin, as Defendants do, constitutes "reverse redlining" and violates the federal Fair Housing Act ("FHA"), 42 U.S.C. § 3601 *et seq.*, and the federal Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691 *et seq.*  Defendants' practices also independently violate the federal Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.*, the Indiana Home Loan Practices Act ("HLPA"), Indiana Code § 24-9-1-1 *et seq.*, and Indiana Code § 32-31-8-5. Plaintiffs Maria Gaspar, Mory Kamano, Franklin Paz, Cordell Spencer, and Norma Tejeda ("Individual Plaintiffs") and Plaintiff Fair Housing Center of Central Indiana, Inc. ("FHCCI") (collectively, "Plaintiffs") bring claims for violation of these statutes.  They seek damages, injunctive relief, and declaratory relief.  The Individual Plaintiffs bring this Complaint as a class action on behalf of themselves and all others similarly-situated.

## SUMMARY OF FACTS AND CLAIMS

4.       The houses Defendants use in their rent-to-own scheme are in such poor condition that they may not lawfully be rented under Indiana law.  Defendants buy them at very low prices, as little as $10,000 and possibly even less.  The houses are referred to as "Rainbow houses" herein because Defendant Rainbow Realty Group is the public face of the operation.  Major components of the Rainbow houses, such as electrical, plumbing, and heating systems, typically

---

[1] "Minority" is used throughout to indicate individuals who identified as non-Hispanic black or African-American and individuals who identified as Hispanic.  "White" is used to indicate non-Hispanic white.

are missing or do not function.  Defendant Hotka (the founder, president, manager, and owner of the other Defendants) admits, "I don't think any of them are livable."

5.      Defendants would be required to repair the houses to rent them legally.  But Defendants do not want to bear those costs because rents in the neighborhoods where they find these inexpensive houses are not high enough.  Ordinary mortgage-financed sales are not a good option because there is not enough demand for these houses from people who qualify for regular mortgages.  Ordinary seller-financed sales are not attractive to Defendants because buyers would gain equity and, when they fall behind, could only be removed through lengthy and costly foreclosure proceedings.  Defendants do not want that either since, as they well know, most of their buyers eventually come up short (70% in just the first six months of these ostensibly 30-year transactions).  Defendants would be left with too many properties not producing revenue. With no good reputable option, Defendants instead require their victims to assume responsibility for all repairs, and then evict them through fast and cheap landlord-tenant proceedings when they fall behind.

6.      What this means is that buyers are saddled with all the responsibilities of ownership but get none of the benefits.  They must live in a house so rundown it is not legally rentable, must invest their own money to make it any better, and lose everything in an eviction if and when they cannot keep up with both the monthly payments to Defendants and the cost of repairs.

7.      Defendants, on the other hand, are enriched no matter the outcome.  They collect payments based on a high sales price (*e.g.*, buying a house for $10,000 and quickly selling it to an unsuspecting victim for $40,000 despite making no improvements) and a high interest rate (*e.g.*, the rates charged to the Individual Plaintiffs range between 9.87% and 18.00%).  If the

buyer cannot keep up and is evicted, then Defendants also get the benefit of any improvements the buyer made.

8.    Defendants rely on deception to persuade people to enter this predatory arrangement.  They make their victims believe they are becoming homeowners and will build equity over the years, but then treat them like renters when it is more convenient and profitable. For example, Defendants make each victim sign their contract under the header "BUYER" and initial a box that says, "I am not renting the property," and include a thirty-year amortization schedule.  Defendant Hotka admits to telling everyone "they are buying it."  This message is reinforced by additional elements of the transaction and by marketing that features messages like, "Why throw your money away renting when you can own your own?"  Defendants count on buyers' lack of understanding that they are not becoming ordinary homeowners, are not earning equity, and can be evicted just like a renter.

9.    Given the condition of their houses and their reliance on deception to ensnare victims, Defendants need vulnerable customers to perpetrate this scheme.  Defendants target minority neighborhoods because they believe that, due to the historic denial of equal opportunities for good credit and homeownership, many people in minority neighborhoods are especially susceptible to this predatory scheme.  Defendants further focus on the most vulnerable people within these neighborhoods by pursuing low-income customers, emphasizing in their marketing that monthly payments are low and that no or low down payments are required.

10.    This is not, accordingly, an equal opportunity predatory scheme.  It is one that Defendants purposefully target at and that disparately impacts Marion County's high-minority neighborhoods.  The neighborhoods where the Rainbow houses are located are 63.4% minority, but the neighborhoods in Marion County where Defendants do not offer rent-to-own houses are

only 38.8% minority.  Because of where Defendants have purchased their properties, a minority

resident of the County is 2.55 times as likely as a white resident to live close to at least one of

Defendants' rent-to-own properties.  These dramatic differences are the result of Defendants'

deliberate decision to focus their scheme on minority neighborhoods.  This targeted approach is

exemplified by a particular census block that is over 80% minority, where Defendants have

purchased 35 of the 36 low-value houses.[2]

11.     These disparities are not explained by Defendants' focus on inexpensive,

rundown houses.  45.1% of low-value properties in Marion County are in majority-minority

neighborhoods, but 64.2% of Defendants' properties are in majority-minority neighborhoods.

Operating disproportionately in high-minority neighborhoods is Defendants' intention; it is not

just the result of buying up cheap houses.

12.     Moreover, Defendants are primarily advertising to minorities because their

primary means of advertising is placing signs at their properties.  Defendants also advertise by

operating two storefront offices in neighborhoods that are over 68% minority.

13.     As indicated above, targeting minority neighborhoods to find customers for

predatory rent-to-own contracts constitutes reverse redlining.  Reverse redlining has repeatedly

been held to violate federal anti-discrimination laws, including the FHA and ECOA.  The

disparate impact of Defendants' rent-to-own program on residents of minority neighborhoods

likewise violates the FHA and ECOA.

14.     As used by Congress and the courts, reverse redlining refers to the practice of

targeting residents in certain geographic areas for credit on unfair terms due to the racial or

ethnic composition of the area.  In contrast to "redlining," which is the practice of denying

---

[2] Census blocks are determined by the U.S. Census Bureau.  They are smaller than census tracts.

quality credit products to specific geographic areas because of the racial or ethnic composition of the area, reverse redlining involves the targeting of an area for the marketing of deceptive, predatory, or otherwise deleterious lending practices because of the race or ethnicity of the area's residents.  This practice has repeatedly been held to violate the FHA and ECOA.  *See, e.g.*, *Saint-Jean v. Emigrant Mortg. Co.*, 50 F. Supp. 3d 300, 305 (E.D.N.Y. 2014); *Matthews v. New Century Mortg. Corp.*, 185 F. Supp. 2d 874, 886-88 (S.D. Ohio 2002); *Hargraves v. Capital City Mortg. Corp.*, 140 F. Supp. 2d 7 (D.D.C. 2000).

15.     In addition to constituting reverse redlining, Defendants' predatory scheme independently violates the federal Truth in Lending Act, Indiana's Home Loan Practices Act, and other requirements of Indiana law.

16.     TILA is designed to protect consumers who are buying houses.  Defendants acknowledge that TILA applies to their rent-to-own program, but they fail to satisfy four critical TILA requirements.  TILA requires Defendants to make a reasonable, good faith determination that the consumer will be able to repay the debt.  Because upon information and belief the interest rates charged always or almost always exceed a statutory threshold, TILA also requires Defendants to give the consumer a copy of an independent appraisal of the property; to refrain from entering contracts with consumers who have not had pre-loan counseling from an independent counselor; and to provide a mandated disclosure statement.  *See* 12 C.F.R. §§ 1026.32(c), 1026.34(a)(5), 1026.35(c)(6), 1026.43(c).  Defendants do none of this.  If they did, consumers would be much better informed about the value and condition of the houses, would understand the predatory nature of Defendants' scheme, and would not get caught so frequently in unsustainable transactions.

17.    Defendants' scheme also violates HLPA (Indiana Code § 24-9-3-7(c)) and Indiana Code § 32-31-8-5.  HLPA prohibits deceptive practices in connection with real estate transactions, including mortgage and rental transactions.  The additional Indiana statutory provision requires landlords to deliver rental properties in a "safe, clean, and habitable condition," and to maintain electrical, plumbing, heating, and other such systems in "good and safe working condition."  Defendants insist that these transactions are rentals when it comes to utilizing eviction procedures – they filed over 300 evictions in Marion County in just the first eight months of 2017 – and must therefore comply with the obligations imposed on them by state law with respect to rental properties.

18.    The Individual Plaintiffs bought Rainbow houses between 2012 and 2016.  They are all minorities.  Mr. Kamano and Mr. Spencer are black.  Ms. Gaspar, Mr. Paz, and Ms. Tejeda are Hispanic.  The Rainbow houses that the Individual Plaintiffs bought are all located in high-minority census blocks.  The Individual Plaintiffs all have low incomes.

19.    The Individual Plaintiffs were all deceived by Rainbow about the nature of the transaction and the condition of the house.  They did not understand that Rainbow would treat them as mere renters.  To the contrary, they reasonably believed they were achieving the American dream of becoming homeowners.  None of the houses they signed contracts for were habitable, but because they thought they had an opportunity for homeownership, the Individual Plaintiffs were willing to and did invest significant amounts of their own money and labor to make repairs.

20.    But while the Individual Plaintiffs knew the houses needed work, the amount of work required was far greater than they understood when they signed contracts with Defendants. For example, Plaintiff Franklin Paz found out that the walls of the home had no drywall or wood

8

under the siding, so rats and other animals freely entered his home. He also discovered that there was significant leaking and, as a result, the home was full of mold.  Plaintiff Norma Tejeda found out that the plumbing in the bathroom did not work and that, when it rains, every room in the house leaks.  Plaintiff Mory Kamano found out that he cannot live in his house in colder months because it lacks insulation.  Plaintiff Cordell Spencer discovered that there was no electrical wiring at all in the house and that, when the water was turned on, the sinks and tub flooded.  These are just examples.

21.     Ms. Gaspar has invested tens of thousands of dollars in labor and supplies to try and make her house livable, but it still has significant problems, including flooding and mold. She feels she cannot leave because of the amount of money and work she has put into the home. Mr. Paz has invested more than $8,000 to try to make his house livable and is afraid to leave all of the time and money he has invested in the home to try to make it livable. Ms. Tejeda has lost her Rainbow house and the approximately $1,500 she invested in it to make repairs.  Mr. Spencer lost his Rainbow house and the thousands of dollars and dozens of hours he spent trying to make it livable over several years.  Mr. Kamano has primarily slept in his mechanic's shop or at a friend's home because he cannot afford to pay for utilities at his Rainbow house after investing thousands of dollars to try and make it livable.

22.     The experiences of the Individual Plaintiffs are typical of the many people who have been victimized by Defendants' rent-to-own program.  The Individual Plaintiffs satisfy the class action requirements set forth in Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3).

23.     Plaintiff FHCCI, a nonprofit organization dedicated to fair housing, identified and spoke with the Individual Plaintiffs and dozens of other individuals who purchased Rainbow houses as part of its investigation into Defendants' discriminatory and predatory practices.

FHCCI first learned from community advocates that Defendants appeared to be engaged in predatory lending practices targeting vulnerable minorities and minority neighborhoods. Upon learning of this potential discrimination, FHCCI was forced to divert hundreds of staff hours and significant additional resources to investigate the nature and extent of the possible discrimination, as well as to divert resources to education and outreach efforts to counteract Defendants' discrimination. This is because Defendants' targeting of vulnerable Indianapolis residents and minority neighborhoods directly contradicts FHCCI's mission of eliminating housing discrimination and creating equal, safe housing opportunities for all central Indiana residents.

24.     Plaintiffs bring this action to seek redress for the injuries caused by Defendants' predatory rent-to-own scheme and to prevent the continuation of the scheme. Absent relief, Plaintiffs' injuries and the number of similarly situated victims will continue to grow.

## PARTIES

25.     Plaintiff Fair Housing Center of Central Indiana, Inc. is a private, nonprofit corporation incorporated under the laws of Indiana with its principal place of business at 445 N. Pennsylvania Street, Suite 811, Indianapolis, Indiana, 46204. The FHCCI's mission includes ensuring equal housing opportunities by eliminating housing discrimination, including in Marion County, Indiana. The FHCCI works to eliminate housing discrimination and to ensure equal opportunity for all people through advocacy, education and outreach, investigation of fair housing violations, and enforcement.

26.     Plaintiff Maria Gaspar is a resident of Indianapolis, Indiana. She is Hispanic.

27.     Plaintiff Mory Kamano is a resident of Indianapolis, Indiana. He is black.

28.     Plaintiff Franklin Paz is a resident of Indianapolis, Indiana. He is Hispanic.

10

29.     Plaintiff Cordell Spencer is a resident of Indianapolis, Indiana.  He is black.

30.     Plaintiff Norma Tejeda is a resident of Indianapolis, Indiana.  She is Hispanic.

31.     Defendant Rainbow Realty Group, Inc. is a for-profit corporation incorporated under the laws of Indiana.  Its principal office address is 6104 East 21st Street, Indianapolis, Indiana, 46219.  It is the public face and manager of the rent-to-own program described herein. It is listed as the "landlord" on the Purchase Agreements described herein.  It has registered 65 assumed names with the Indiana Secretary of State and operates the rent-to-own program under many of them.

32.     Defendant James R. Hotka is, and at all relevant times has been, President, Owner, and General Manager of Defendant Rainbow Realty Group, Inc. and a resident of Indiana.  Defendant Hotka is also President and Owner of Defendant Empire Holding Corp. Defendant Hotka created and manages Defendant Shore Waters Development, LLC on behalf of its four members.  Defendant Hotka also created and manages Defendant Sunshine Trust, Defendant Sunflower Trust, Defendant Sporting Trust, Defendant Redskins Trust, and Defendant Alley Cat Trust.  Defendant Hotka personally directs the rent-to-own program described herein and the operations of all of the other Defendants.

33.     Defendant Empire Holding Corp. is a for-profit corporation incorporated under the laws of Indiana.  Its principal office address is 6104 East 21st Street, Indianapolis, Indiana, 46219.  Defendant Hotka uses hundreds of land trusts to operate the rent-to-own program described herein, and Defendant Empire Holding Corp. is the trustee of each of them.  Each land trust owns one house utilized in the program and no more.  When Defendant Hotka submits a bid on a house to purchase for the rent-to-own program, he does so in the name of a land trust that he creates for this purpose and that has no assets.  If the bid is successful, Defendant Hotka provides

11

funds to the land trust for the purchase.  If the bid is not successful, he maintains the legal existence of the land trust to use for a subsequent bid.  The beneficiary of each land trust is either Defendant Hotka, Defendant Shore Waters Development, LLC, Defendant Sunshine Trust, Defendant Sunflower Trust, Defendant Sporting Trust, Defendant Redskins Trust, or Defendant Alley Cat Trust.  Defendant Empire Holding Corp. was created to serve as trustee of the land trusts. The individual land trusts have no checking account or other assets. Defendant Empire Holding Corp. maintains a written management agreement with Defendant Rainbow Realty to effectuate the operation of the rent-to-own program described herein.

34.     The rent-to-own program is set up so that Defendant Shore Waters Development, LLC, Defendant Sunshine Trust, Defendant Sunflower Trust, Defendant Sporting Trust, Defendant Redskins Trust, and Defendant Alley Cat Trust (collectively, "Owner Entities") will ultimately receive the profits from, and be responsible for the expenses of, the rent-to-own program. Each individual land trust (which each own a single Rainbow house) has one of the Owner Entities as its beneficiary. The Owner Entities pay 10% of the monthly income that comes in from each of those Rainbow houses to Defendant Rainbow Realty to pay Rainbow's employees and the expenses for running the program. This includes paying for Rainbow's advertising, insurance, legal expenses, and office space.  The Owner Entities do not have their own addresses, offices, or employees; their finances are run by Defendant Rainbow Realty and/or Defendant Hotka.

35.     Defendant Shore Waters Development, LLC, is a limited liability company incorporated under the laws of Indiana. Its principal office address is 6104 East 21st Street, Indianapolis, Indiana, 46219. Defendant Hotka is the registered agent and keeper of records for Shore Waters. Defendant Shore Waters Development, LLC is the beneficiary for the land trusts

created by Defendant Hotka to operate the rent-to-own program since approximately 2006.

Defendant Shore Waters Development, LLC, along with the other Owner Entities, receives

income from the rent-to-own program and pays a proportional share of all of the program's

expenses, including the offices, employees, and legal fees.  Specifically, Defendant Shore Waters

Development, LLC receives all of the income for the Rainbow houses for which it is the

beneficiary, and claims deductions for any expenses spent by Rainbow on those houses.  The

money that Defendant Rainbow Realty and/or Defendant Hotka use to purchase those Rainbow

houses is then recorded as a loan to Defendant Shore Waters Development, LLC.  Defendant

Shore Waters Development LLC claims as assets any depreciable improvements located at those

houses (*e.g.*, roofs, furnaces, hot water heaters).  Defendant Shore Waters Development, LLC

also claims as deductions a percentage of Rainbow's operating expenses proportional to the

number of Rainbow houses for which it is the beneficiary instead of paying Defendant Rainbow

Realty for its management services. Defendant Shore Waters Development, LLC distributes

$32,000 a month in profits from the rent-to-own program to Defendant Hotka's children through

Defendant Rainbow Realty. Defendant Shore Waters Development, LLC does not have its own

bank account; its funds are commingled with Defendant Rainbow Realty's accounts. Defendant

Shore Waters Development, LLC has no assets other than those associated with the Rainbow

rent-to-own program.

    36.    Defendant Sunshine Trust is a trust created by Defendant Hotka. It is the

beneficiary of several individual land trusts which own one Rainbow house each.  Defendant

Hotka is the beneficiary of the Sunshine Trust. Defendant Sunshine Trust, along with the other

Owner Entities, receives income from the rent-to-own program and pays a proportional share of

all of the program's expenses, including the offices, employees, and legal fees.  Upon

information and belief, Defendant Sunshine Trust claims as assets any depreciable improvements located at those houses (*e.g*., roofs, furnaces, hot water heaters).  Upon information and belief, Defendant Sunshine Trust also claims as deductions a percentage of Rainbow's operating expenses proportional to the number of Rainbow houses for which it is the beneficiary instead of paying Defendant Rainbow Realty for its management services. Unlike the other Owner Trusts, Sunshine Trust does not have its own financial account; its income and expenses flow to and from Mr. Hotka's personal accounts.

37.     Defendant Alley Cat Trust is a trust created by Defendant Hotka. It is the beneficiary of several individual land trusts which own one Rainbow house each.  Defendant Hotka's daughter Allison Hotka is the beneficiary of the Alley Cat Trust. Defendant Alley Cat Trust, along with the other Owner Entities, receives income from the rent-to-own program and pays a proportional share of all of the program's expenses, including the offices, employees, and legal fees.  Upon information and belief, Defendant Alley Cat Trust, claims as assets any depreciable improvements located at those houses (*e.g*., roofs, furnaces, hot water heaters). Upon information and belief, Defendant Alley Cat Trust also claims as deductions a percentage of Rainbow's operating expenses proportional to the number of Rainbow houses for which it is the beneficiary instead of paying Defendant Rainbow Realty for its management services.

38.     Defendant Redskins Trust is a trust created by Defendant Hotka. It is the beneficiary of several individual land trusts which own one Rainbow house each.  Defendant Hotka's son, Christopher Hotka, is the beneficiary of the Redskins Trust. Defendant Redskins Trust, along with the other Owner Entities, receives income from the rent-to-own program and pays a proportional share of all of the program's expenses, including the offices, employees, and legal fees.  Upon information and belief, Defendant Redskins Trust claims as assets any

depreciable improvements located at those houses (*e.g.*, roofs, furnaces, hot water heaters). Upon information and belief, Defendant Redskins Trust also claims as deductions a percentage of Rainbow's operating expenses proportional to the number of Rainbow houses for which it is the beneficiary instead of paying Defendant Rainbow Realty for its management services.

39.     Defendant Sporting Trust is a trust created by Defendant Hotka. It is the beneficiary of several individual land trusts which own one Rainbow house each.  Defendant Hotka's son, Jessie Hotka, is the beneficiary of the Sporting Trust. Defendant Sporting Trust, along with the other Owner Entities, receives income from the rent-to-own program and pays a proportional share of all of the program's expenses, including the offices, employees, and legal fees.  Upon information and belief, Defendant Sporting Trust claims as assets any depreciable improvements located at those houses (*e.g.*, roofs, furnaces, hot water heaters).  Upon information and belief, Defendant Sporting Trust also claims as deductions a percentage of Rainbow's operating expenses proportional to the number of Rainbow houses for which it is the beneficiary instead of paying Defendant Rainbow Realty for its management services.

40.     Defendant Sunflower Trust is a trust created by Defendant Hotka. It is the beneficiary of several individual land trusts which own one Rainbow house each.  Defendant Hotka's daughter, Leighanna Hotka, is the beneficiary of the Sporting Trust. Defendant Sunflower Trust, along with the other Owner Entities, receives income from the rent-to-own program and pays a proportional share of all of the program's expenses, including the offices, employees, and legal fees.  Upon information and belief, Defendant Sporting Trust claims as assets any depreciable improvements located at those houses (*e.g.*, roofs, furnaces, hot water heaters).  Upon information and belief, Defendant Sporting Trust also claims as deductions a percentage of Rainbow's operating expenses proportional to the number of Rainbow houses for

which it is the beneficiary instead of paying Defendant Rainbow Realty for its management services.

41.     Defendant James Hotka manages the accounting for the program in its entirety and for all of the Defendants. Program expenses are paid alternately from accounts set up for Defendant Rainbow Realty and Defendant Hotka's personal account.

42.     For purposes of operating the abusive rent-to-own program described herein, Defendants Rainbow Realty Group, Inc., Empire Holding Corp., Shore Waters Development, LLC, Alley Cat Trust, Redskins Trust, Sporting Trust, Sunshine Trust, Sunflower Trust, and James R. Hotka are mutual agents of each other; are engaged in a civil conspiracy; and/or are engaged in a joint venture.

## JURISDICTION AND VENUE

43.     This Court has jurisdiction over this matter pursuant to 15 U.S.C. §§ 1640(e) and 1691e(f); 28 U.S.C. §§ 1331, 1343, and 1367; and 42 U.S.C. § 3613.

44.     Venue is proper in this district under 28 U.S.C. § 1391(b) because Defendants conduct business in and are residents of the district and a substantial part of the events and omissions giving rise to the claims occurred in the district.

## FACTUAL BACKGROUND

**I.      DEFENDANTS ARE EFFECTIVELY REVIVING THE REPUGNANT PRACTICE OF DISCRIMINATORY LAND CONTRACTS THAT FLOURISHED DURING MUCH OF THE TWENTIETH CENTURY**

45.     Through much of the twentieth century, predatory and discriminatory land contracts stripped wealth from residents of minority communities and denied them the same opportunities to accumulate wealth through housing that were available in white communities. Defendants' scheme is of a piece with this history.  It is effectively a modern version of the same practice, with a few adjustments.

46.     What made land contracts profitable in the past was redlining.  With redlining, the federal government and private lenders denied minority communities access to good mortgage products that dramatically expanded opportunities for homeownership.

47.     Redlining took hold in the 1930s when the federal government, responding to the Great Depression, created the Home Owners' Loan Corporation and the Federal Housing Administration.  These new agencies provided direct assistance to individuals who sought financing for housing and federal insurance to back private mortgage lending.  The programs expanded access to mortgages and made them much more affordable.  Over the next decades they assisted millions of families in obtaining the financing necessary for homeownership.  The amount of wealth that families who benefited have been able to amass, and hand down to their children and grandchildren, is staggering.

48.     Minorities were systematically excluded from these programs.  This meant minority borrowers were also largely excluded from private credit markets, as private lenders depended heavily on government programs.  The government implemented this discriminatory policy by drawing red lines around entire neighborhoods, giving rise to the term redlining.

17

Redlining by private lenders continued even after government-sponsored redlining came to an
end.

49.     Redlining left minorities who aspired to be homeowners with scarce options, and
predatory actors frequently stepped in to fill the void with land contracts.  They bought up
houses at low prices in minority neighborhoods and in neighborhoods where they could scare
white homeowners into fleeing at the prospect of integration.  They then turned around and sold
the house to minorities through exploitive, one-sided land contracts.  Sales prices were
unjustifiably inflated and interest rates were exorbitant, much higher than white buyers paid with
their government-insured mortgages.  Land contract buyers gained no equity, no matter how
much they spent on their monthly payments and improving their homes, unless they made it all
the way to the end of these predatory contracts.  The deck was stacked against them and most
never did.  The sellers would then take the house back and sell it again.

50.     A 1962 study of Chicago illustrates the prevalence of predatory land contracts and
their concentration in minority communities.  The study found that, in one neighborhood, over
85 percent of home purchases by black residents were made through land contracts.  By contrast,
white consumers entered into land contracts infrequently, reflecting their ability to secure
traditional, quality mortgage credit on fair terms.

51.     The lack of access to quality mortgage credit and the pervasiveness of predatory
land contracts went hand in glove, and they contributed significantly to socioeconomic
difficulties in many minority neighborhoods.  In Indianapolis, the Coalition to End
Neighborhood Deterioration formed in 1973 to address redlining, which it described as "the
basic cause of the spreading deterioration of central city neighborhoods."

52.     At least as far back as 1969, minority communities have tried to use the federal

courts to fight back against sellers who "acted to take advantage of the pattern of racial

segregation and the scarcity of housing for negroes by . . . resell[ing] . . . properties to negroes

under installment land contracts at prices far in excess of appraised value." *Contract Buyers*

*League v. F & F Inv.*, 48 F.R.D. 7, 9 (N.D. Ill. 1969).

53.     Predatory land contracts eventually subsided, but predatory subprime lending

grew and was also targeted disproportionately at minority communities.[3]  With the crash of

subprime lending a decade ago and the ensuing financial crisis, history is now coming full circle

with a return to exploitive land contract-like schemes targeting minority neighborhoods.  Several

recent reports have described companies implementing these schemes using foreclosed houses

purchased at fire sale prices and located disproportionately in minority neighborhoods across the

country.[4]  As the New York Times recently explained in discussing the revival of these practices,

"[m]ost tenants walk away with nothing, having sunk money for rent and repairs into homes they

had once hoped to own."[5]

---

[3] *See, e.g.*, U.S. Dep't of Housing & Urban Dev. & U.S. Dep't of the Treasury, *Curbing Predatory Home Mortgage Lending* (June 2000) at 72; National Community Reinvestment Coalition, *Income is No Shield Against Racial Differences in Lending II:  A Comparison of High-Cost Lending in America's Metropolitan and Rural Areas* (July 2008).

[4] *See, e.g.*, National Consumer Law Center, *Toxic Transactions:  How Land Installment Contracts Once Again Threaten Communities of Color* (July 2016); Alexandra Stevenson & Matthew Goldstein, *Rent-to-Own Homes: A Win-Win for Landlords, A Risk for Struggling Tenants*, N.Y. Times, Aug. 21, 2016 ("*Win-Win*"); Rebecca Burns, *The Infamous Practice of Contract Selling is Back in Chicago*, Chicago Reader, Mar. 1, 2017.

[5] *See Win-Win*, *supra* n.4.  There has been a similar return to redlining.  Recently the federal government has brought several redlining actions against mortgage lenders, including Indianapolis lenders, and declared redlining a top fair lending priority.  *See, e.g.*, Office of Public Affairs, U.S. Dep't of Justice, *Justice Department Reaches Settlement with Ohio-Based Banks to Resolve Allegations of Lending Discrimination* (Dec. 28, 2016); *United States v. Union Savings Bank*, Case No. 1:16-cv-01172-TSB (S.D. Ohio filed Dec. 28, 2016); U.S. Consumer Financial

54. Defendants' rent-to-own scheme fits all too well into this ignoble history. Defendants are targeting the same communities targeted with land contracts last century to take advantage of people who, because of this very history, have less experience buying homes with the help of reputable lenders and are particularly vulnerable to deceptive tactics. Their victims gain no equity from their down payment, their monthly payments, or the improvements they make to their houses, and they stand to lose everything if they cannot stay current. Staying current is even harder because the houses are in such poor condition and require buyers to incur substantial expense just to make them livable, a challenge inherent with Rainbow properties that was not necessarily inherent to contract buying in the past.

55. Under the knowingly false pretense of providing the opportunity to own a home and build wealth, Defendants are using land contract-like transactions to extract wealth and leave their victims worse off than they started. As before, minority neighborhoods are Defendants' prime target.

## II. DEFENDANTS STRUCTURE THEIR RENT-TO-OWN CONTRACT TO EVADE GIVING CONSUMERS THE LEGAL PROTECTIONS AND ECONOMIC BENEFITS THEY ARE DUE

56. With fair, non-predatory transactions, there are upsides and downsides to buying a home, just as there are upsides and downsides to renting. What Defendants do, however, is saddle their victims with all of the disadvantages of both. They make sure that all the advantages of both accrue to themselves. Defendants' attempt to have it both ways injures every customer and is not legitimate. It is fundamentally unfair and predatory.

---

Protection Bureau, *Fair Lending Report of the Consumer Financial Protection Bureau* (April 2017) at 4 ("In 2017 we will increase our focus in the area[] of redlining . . . to ensure that creditworthy consumers have access to mortgage loans . . . ."); *see also id.* at 14.

57.     When taking out a mortgage to buy a home, buyers gain equity with each monthly payment and also when the value of the home increases because of improvements they make and/or because of market conditions.  Often that equity can be extracted and used as the owner sees fit.  A homeowner with equity who falls on hard times can sell the house and, often, walk away from the sale with cash.  If foreclosure cannot be avoided, it typically is a lengthier process than eviction with numerous safeguards built in to protect the owner.  On the negative side, owners are responsible for upkeep.  If the heating system breaks, an owner must pay to fix or replace it.  Owners also have to pay the property taxes and obtain homeowners' insurance.

58.     For renters, the advantages and disadvantages are generally reversed.  State law requires landlords to provide rentals "in a safe, clean, and habitable condition," maintain them in "good and safe working condition," and comply with health and housing codes.  Indiana Code § 32-31-8-5.  That means renters do not have to bear the costs of making and keeping a home habitable; landlords do.  This allocation of responsibilities may not be waived, *id.* § 32-31-8-4, and it applies equally to renters who have an "option to purchase," *id.* § 32-31-8-1(b).  Landlords must also pay the taxes and insurance.  On the other hand, renters do not derive any economic benefit from the value of a house and, if they fall behind on payments, can be evicted relatively quickly and easily by the landlord.

59.     Recognizing the functional similarity of land contracts and traditional mortgages, the Indiana Supreme Court has long held that purchasers under land contracts are entitled to many of the same protections as buyers in traditional mortgages.  This includes the right to go through foreclosure proceedings – rather than eviction proceedings reserved for normal landlord-tenant relationships – in the event of default.  *See Skendzel v. Marshall*, 261 Ind. 226 (1973).

60.     Defendants have structured their rent-to-own scheme to saddle consumers with all of the disadvantages of renting and all of the disadvantages of buying, but none of the advantages.  Defendants reserve all the benefits of both for themselves.  Defendant Hotka recognizes this, declaring "I am getting it both ways."

61.     Having the best of both worlds is critical for Defendants' business model.  Since the buyers generally are financially distressed consumers who must pay for improvements to rundown homes on top of their monthly payments to Defendants, the default rate is extraordinarily high.  Reclaiming a property via foreclosure would take Defendants at least six months to a year – during which time the property generates no revenue – and would require significant legal fees and court costs.  The business would be untenable with so many defaults.  To make money off their scheme, Defendants need to be able to get people out fast and cheap.  Defendants cannot do that if they have to go through foreclosures proceedings.

62.     Defendants' solution was to concoct a transaction that has let them get away with using eviction proceedings when a consumer defaults.  These are usually completed in two months or less and take place in small claims court at minimal cost.  At the same time, Defendants designed the transaction to avoid a traditional landlord-tenant relationship because that would place them on the hook for making and keeping the properties habitable, a cost that would cut into their profits and which they are determined to shirk.

63.     The key document Defendants came up with is what they call, in large bold capitalized letters at the top, a "Purchase Agreement."  Defendants use the same Purchase Agreement with all consumers, adjusted to reflect the property address, "buyer," price, and interest rate.

64.     Much of the nomenclature used in the Purchase Agreement is that of a purchase money mortgage financed by the seller.  The consumer is listed as the "Buyer."  There is a "PURCHASE PRICE," a "Principal & Interest Payment," a 30-year "Term of Contract," an "Interest Rate," and a "Total Monthly PITI Payment."[6]  The document is set up so that all of these jump off the page.  The contract is accompanied by a "Truth-In-Lending Disclosure," a document required under the federal Truth in Lending Act for standard mortgage transactions.  Among other things, the disclosure document identifies the "Borrower," the "Lender," the "ANNUAL PERCENTAGE RATE," the "FINANCE CHARGE," the "AMOUNT FINANCED," and the "TOTAL OF PAYMENTS."  Defendants check a box on the disclosure that says "the goods or property being purchased" constitute security for the loan.

65.     The lingo in these documents is consistent with Defendants' advertising, which emphasizes ownership with phrases such as "Why throw your money away renting when you can own your own," "Tired Of Renting Start Owning," "home ownership opportunities," "Home For Sale!!!!!," "home looking for a new owner," and "Ready to Own!!!!"

66.     But Defendants depart from a standard purchase mortgage with clauses that are deliberately obscured in the fine print and written in legalese.  They say that the "Buyer" shall make monthly "rental payments" to Defendant Rainbow Realty Group, Inc. equal in amount to what is identified prominently as the "PITI Payment."  After "twenty-four or more" payments, the Purchase Agreement continues, "the parties hereto shall execute a 'Conditional Sales Contract' (Land Contract) form embodying the terms contained herein."  The Purchase Agreement provides for the essential terms that will apply under the Conditional Sale Contract:

---

[6] "PITI" is a standard mortgage term used to identify the total monthly cost for principal, interest, taxes, and insurance.  The amount for insurance is zero because Defendants leave that to the customer.

the total purchase price; the monthly payment amount (always the same as under the Purchase

Agreement); the interest rate; and a thirty-year amortization schedule.  It further provides that the

initial twenty-four or more "rental payments" are to be applied as real principal-reducing/equity-

increasing payments as if the Conditional Sales Contract had been in effect from the start of the

Purchase Agreement.

67.    The consumer thus becomes contractually bound to fulfill the already articulated

terms of the Conditional Sale Contract from the start of the Purchase Agreement.  The two are

set up to operate in practice like a single agreement that has two phases.  Indeed, Defendant

Hotka is adamant that because buyers are obligated by the Purchase Agreement to later enter into

the Conditional Sales Contract, they are not merely renters (or renters with an option to later

enter a second contract).  This is how Defendants try to justify their disregard for Indiana's

habitability requirement.  Where it helps them avoid this habitability requirement, Defendants

want their rent-to-own program to be construed as an ordinary seller-financed sale and not a

rental.  This is a key part of having it both ways.

68.    Explicitly attempting to avoid the obligations of a landlord, the Purchase

Agreement provides that the "OWNER WILL MAKE NO REPAIRS," the Buyer is responsible

for "maintaining the property and related equipment," and the Buyer "shall pay the cost of all

repairs, improvements, pest control and/or maintenance to the property.  (This shall include any

repairs required by governmental or private agencies[.])"  A "move-in form" given to the

consumer before execution of the contract likewise requires the consumer to "acknowledge . . .

that all properties are offered for sale in 'AS-IS' condition without any warranty of habitability."

24

The Buyer must also pay for homeowners' insurance and "all real estate property taxes, assessments and/or liens."[7]

69.     Defendants follow through on this contract language and refuse to make any repairs unless the consumer agrees to pay a steep price.  Defendants are fully aware that their customers are living in these rundown houses and have admitted as much, yet they repeatedly disclaim responsibility for repairs.  They likewise know that the customers they target cannot afford to make all the necessary repairs themselves.

70.     While Defendants want to avoid the obligations of a landlord, they do not want to surrender the benefits.  Thus, the Purchase Agreement is set up to act just like an ordinary rental arrangement if the buyer defaults.  In that case, the consumer forfeits all payments just like in land contracts of old.  This is critical to Defendants' scheme because it has let them get away with evicting people instead of using much longer foreclosure proceedings.  The Purchase Agreement also makes clear that any investments consumers make so the houses can be livable redound to Defendants' benefit upon default; it states that "[a]ll improvements made to the property shall become a permanent part of the property and remain with the property if returned to the Seller."  That is, Defendants are enriched by any repairs and improvements made by their victims, while their victims walk away empty-handed.  In short, the consumer has the disadvantages of renting and the disadvantages of buying.

71.     The language providing for a transition to a Conditional Sales Contract is in the fine print and Defendants follow a standard operating procedure of not explaining it.  In the unusual case when a consumer successfully reaches the twenty-four payment mark, it is

---

[7] Buyers are unable to claim a tax deduction for property taxes, however, because Defendants do not record a change of title.

Defendants' policy and practice not to present the second part of the arrangement for execution. That is because even Defendants acknowledge that the second part lets consumers start to gain equity and affords them greater rights under state law regarding land contracts. Since by design the buyers rarely know that their contract entitles them to make the transition, it does not happen often. The Purchase Agreement's rules, which Hotka admits let Defendants "get[] it both ways," remain in effect. Even when a Conditional Sales Contract is executed, the customer has spent all the time leading up to it bearing the burden of making the house as livable as possible, a responsibility that Indiana law says rests with Defendants.

72.     Another document consumers must sign at the outset, called a "Purchase Agreement Declaration," becomes part of the Purchase Agreement and confirms that Defendants have adopted this convoluted structure in an effort to have it both ways. Consumers are supposed to initial a box on this form that says "BUYING" instead of the box that says "RENTING." The "BUYING" box elaborates, "I am not renting the property. . . . I do not expect the property owner to make any repairs to the property and fully understand that I am buying the property 'as-is' with out [sic] any warranty of habitability." The document even specifies the statutory rental habitability requirement that Defendants are attempting to evade (Indiana Code § 32-31-8, discussed above).

73.     Defendant Hotka executes each Purchase Agreement acting in two capacities: as President of Defendant Empire Holding Corp. (the trustee of the trust identified as the "Seller"), and as President of Defendant Rainbow Realty Group, Inc. (identified as the "landlord"). Defendant Hotka executes additional documents in connection with each transaction as President of Defendant Empire Holding Corp.

74.     What this all comes down to is that Defendants want access to quick and low-cost eviction proceedings, and they want to avoid any repair responsibilities.  That is why they use these peculiar and deceptive documents.  But as an Indiana Superior Court held in 2016 in rejecting an eviction action brought by Defendants:

> The Agreement is contradictory and unlawful. . . .  In its dealings with the Defendants, Plaintiff treated Defendants as homeowners when it came to maintaining the property and as tenants when it came time to evict them. . . .  Agreements such as that entered into between the parties are prohibited by statute . . . .[8]

## III.   THE HOUSES IN DEFENDANTS' SCHEME ARE RUN-DOWN AND SOLD AT VASTLY INFLATED PRICES

75.     The structure of the deal is not the only thing that is bad for consumers.  Rainbow houses are also in terrible condition.  Just how bad the houses are is kept hidden by Defendants.

76.     Years ago Defendants primarily operated a standard rental business.  Their rental houses may well have been in reasonable condition, as required by state law.  Only around 15% of the business was rent-to-own because it was hard to find customers; the growth of subprime lending beginning in the 1990s meant that would-be buyers, even with poor credit and slim chances of repaying a loan, could usually get a traditional mortgage and choose from a greater selection of higher quality houses.  As Defendant Hotka has said, "when the economy was good, if you could sign your signature you could get a home, so what were we left with?"

77.     Then the foreclosure crisis and financial crash created a golden opportunity for Defendants to switch gears.  Defendants' rent-to-own business model depends on being able to buy very cheap homes.  Thousands of new foreclosures and vacancies created an abundance of

---

[8] This decision came in the rare circumstance where the buyer facing eviction was able to obtain legal representation and remove the eviction from Small Claims Court (where Defendants routinely file their eviction actions) to Superior Court.  The case is on appeal.  The vast majority of Defendants' evictions remain and are adjudicated in Small Claims Court.

such houses in Marion County.  Simultaneously, the crash caused subprime lending to disappear as mortgage credit standards tightened dramatically.  Defendants suddenly had a plentiful and cheap supply of houses, and the competition from subprime lenders for customers with poor credit profiles was gone.

78.     There was also limited competition from investors because it is challenging to earn an adequate profit by buying low-priced houses in the neighborhoods Defendants target. The costs of making these houses decent and habitable are often too great given what they can be rented or sold for, and so few choose to make the investment.  But by avoiding the costs of repair and upkeep through their deceptive rent-to-own scheme, Defendants knew they could make a great deal of money.

79.     Defendants seized the opportunity and began snatching up hundreds of houses at rock bottom prices – $10,000 or even less.  Rent-to-own became around 85-90% of their business.  Upon information and belief, Defendants now have close to 1,000 houses in their rent-to-own program in Marion County.

80.     The houses are in terrible condition and Defendants make no repairs before selling them.  The following problems, among others, are common:

a.     Fundamental components such as water heaters, furnaces, electrical wiring, plumbing fixtures, and gas lines often are missing or badly damaged.

b.     Basements flood and roofs leak.

c.     Windows and doors are missing or broken.

d.     Exterior and interior walls have holes.

e.     There are rodent, cockroach, and/or termite infestations.

   f.  Floors have holes and are damaged by animal feces and urine.

   g.  There is extensive mold because of the leaks.

  81.  Many of these problems cannot be discerned by prospective customers.  The utilities are turned off and so cannot be assessed adequately when customers visit a house they are considering.  Water problems are hidden unless it is a rainy day, when few people are looking at houses.  Defendants make no mention of obtaining an independent home inspection, and their customers lack the experience to know they should or the resources to do so.

  82.  Defendants, on the other hand, are fully aware of the poor condition of their houses.  Defendant Hotka has stated that, "I don't think any of them are livable."  Defendants know how little they are paying for the properties, of course, which reflects their poor condition.  After acquisition by Defendants, many are vacant for an extended period of time; by Defendant Hotka's own account, they deteriorate even further when vacant because of vandalism and theft.  Defendants also receive many complaints about the condition of the houses from consumers.  They are, of course, aware of these complaints when they go to resell a house to a new victim after a past one is evicted.  Defendants also assign numerical ratings to every house that, they claim, are based on the condition of the house.

  83.  Yet Defendants claim to know nothing about the houses' condition when it suits them.  The fine print in Defendants' standard Purchase Agreement states, "Buyer . . . understands that the Seller . . . has little or no knowledge of the properties [sic] condition."  Likewise, on the "Sellers Residential Real Estate Disclosure" form that Defendants provide pursuant to Indiana law, Defendants state that "Owner has . . . little or no knowledge of [the property's] condition."  That is what Defendants tell their victims, but it is not true.  Defendants know what kind of houses they are peddling.

84.     Defendants nonetheless jack up the sales price by 300%, 400%, even 500% when they sell a house through their rent-to-own program.  The sales prices are vastly and unjustifiably inflated.  Defendants will purchase a rundown house for $10,000, for example, and sell it without any repairs to an unsuspecting victim for $40,000.

85.     Defendants do not disclose what they paid for the house and do not provide or indicate that their customers should obtain an independent appraisal.  As with inspections, Defendants know that their customers are unlikely to obtain an appraisal on their own because they lack the necessary experience and resources.  Defendants count on customers not knowing the true condition or value of their houses before they sign a contract.

86.     Defendants turn the poor condition of the houses to their further benefit by offering to make repairs and adding the cost to their customers' monthly payment obligations.  Defendants routinely overcharge for these repairs and do low quality work, requiring customers to then hire someone else and pay a second time, try and do the work themselves, or live with the shoddy work.  This practice commonly causes customer's monthly debt to increase by 10%, 20%, or more, and contributes significantly to the high rate at which buyers fall behind on their rent-to-own payments.  The type of repairs involved are generally the very kind that Defendants should be making and paying for themselves in accordance with Indiana's habitability requirement.

87.     In addition to inflated sales prices and overcharging for low-quality repairs, Defendants strip what little wealth their customers have by basing customers' monthly payments on exorbitant interest rates and charging high late fees, both provided for in the Purchase Agreement.  Upon information and belief, interest rates charged by Defendants prior to the filing of this lawsuit always or nearly always exceeded 10% and go at least as high as the 18% rate

charged to Plaintiff Mory Kamano.  These rates are especially egregious given the low interest rate environment that has prevailed since the financial crash.

## IV.   THE BUYING PROCESS CREATED BY DEFENDANTS IS INTENDED TO DECEIVE AND EXPLOIT

88.   The buying process created by Defendants is fast.  It is designed to swiftly steer unsuspecting consumers into a rotten deal, as well as draw in people with a dire need for housing and no other alternative.  Signs on Rainbow houses feature the tag line, "GET APPROVED IN 3 DAYS."  Many are approved in even less time.

89.   On the same day that consumers first contact them or very soon thereafter, Defendants give consumers the keys to a few houses to look at on their own.  As noted above, many of the defects cannot be discerned because the utilities are turned off, Defendants withhold their knowledge about the state of disrepair that the houses are in, and there is no independent inspection or appraisal.

90.   With nothing more this scheme would be predatory and constitute reverse redlining in violation of the FHA and ECOA.  It is actually even worse, though, because Defendants systematically violate other laws designed to protect consumers.  This makes their scheme all the more predatory.

91.   When a consumer picks a house, Defendants collect some income-related documents but do not do a meaningful assessment of the consumer's ability to afford the property.  For example, they do not consider consumers' credit scores and histories, and even advertise "Bad Credit, No Credit, No Problem."  They do not consider whether consumers can afford the many repairs that Defendants know are needed, repairs that will often cost more than $10,000.  They do not consider other debts that customers must pay.  This violates TILA's requirement that a "creditor shall not make a loan that is a covered transaction unless the creditor

makes a reasonable and good faith determination at or before consummation that the consumer will have a reasonable ability to repay the loan according to its terms." 12 C.F.R. § 1026.43(c)(1).

92.     Despite Defendant Hotka's acknowledgement that TILA applies to the rent-to-own transactions, Defendants have built into their business model the expectation that most of their customers will not be able to maintain their monthly payments, and so screen out few if any customers.

93.     Buyers falling behind is what usually happens.  According to Defendant Hotka, in 70% of the contracts the buyer falls behind within the first six months alone and is summarily evicted.[9]  This happened an astonishing 95% of the time from 2009 to 2014.  Upon information and belief, the pace continues unabated.  A review of Indiana's online court information system indicates that, from January through August of this year, Defendants filed over 300 eviction proceedings in Small Claims Court in Marion County.

94.     As indicated above, this does not undermine Defendants' profitability.  To the contrary, it is part of the plan.  That is because Defendants have set up the scheme so that they invest little and get to keep everything when they evict a buyer.  They keep the down payment, the monthly payments (which are much higher than they would receive for selling at a fair price and with a fair interest rate), and the value of any repairs and improvements the buyer made.  All the equity stays with Defendants.  They can and do turn around and resell the same house to another buyer using the same scheme, and often increase the price if the just-evicted buyer made the house a little better.

---

[9] For context, in June of 2011 Florida had the highest state-level foreclosure rate at a single point in time during the foreclosure crisis.  It was less than 13%.  *See* CoreLogic, *United States Residential Foreclosure Crisis:  Ten Years Later* (Mar. 2017) at 4.

95.     Since Defendants' profit does not depend on whether a customer can afford the house, they do not take the time to genuinely consider consumers' ability to fulfill the terms of a Purchase Agreement.  Defendants instead get their customers to sign the deal quickly.  The paperwork is first presented to the consumer at Defendant Rainbow's office just before the consumer is expected to sign it.  A copy is not provided in advance and Defendants do not suggest that consumers read it.  To the contrary, Defendants rush consumers through the process in as little as ten minutes.  Defendants offer very little explanation of the terms of the transaction, primarily just emphasizing that the property is "as-is."

96.     As a result, consumers sign not just with a false impression of the quality of the house, but also thinking that they are entering into a typical house purchase with a typical mortgage.  Defendants encourage this misapprehension through the terminology in their advertising and the prominent placement of mortgage-sounding words in the Purchase Agreement, as described above.  Defendant Hotka says that he tells consumers "they are buying it," even though he knows this is nothing like an ordinary house purchase.  In fact, he knows that in the vast majority of cases Defendants will be evicting each occupant like an ordinary renter.

97.     Defendants' failure to abide by three additional TILA requirements contributes substantially to consumers' high eviction rate and misapprehension about the condition and value of the house and about the transaction.  First, upon information and belief, all or nearly all of these transactions qualify as "higher-priced."  This means that at least three days before consummation, Defendants must give the consumer (at no cost) an appraisal performed by a certified or licensed appraiser.  12 C.F.R. § 1026.35(c)(6).  Defendants do not do this.

98.     Second, upon information and belief, all or nearly all these transactions qualify as "high-cost."  This requires Defendants to give the consumer the following written disclosure at

least three days before consummation:  "You are not required to complete this agreement merely because you have received these disclosures or have signed a loan application.  If you obtain this loan, the lender will have a mortgage on your home.  You could lose your home, and any money you have put into it, if you do not meet your obligations under the loan."  12 C.F.R. § 1026.32(c).  Defendants do not this.

99.     Third, because upon information and belief all or nearly all of these transactions qualify as "high-cost," Defendants may not originate them without first "receiv[ing] written certification that the consumer has obtained counseling on the advisability of the mortgage from a counselor that is approved to provide such counseling by the Secretary of the U.S. Department of Housing and Urban Development or, if permitted by the Secretary, by a State housing finance authority."  12 C.F.R. § 1026.34(a)(5).  Defendants do not require this certification and, upon information and belief, receive it from few if any of their customers.

100.    Defendants make matters even worse for consumers during the buying process by strongly encouraging them to make extra payments each month beyond what the Purchase Agreement requires, including by encouraging them to use tax refunds to make extra payments. They tell consumers that these payments will reduce the principal on their loans and allow them to pay off their houses in less than thirty years.  In truth, very few consumers gain any benefit whatsoever from these payments, and Defendants know it.  That is because consumers forfeit everything when they fall behind and are evicted by Defendants.  The extra principal payments only serve to enrich Defendants when they evict someone.

## V.      DEFENDANTS TARGET THEIR SCHEME AT MINORITY NEIGHBORHOODS

101.    As indicated above, Defendants intentionally target their predatory rent-to-own scheme at Marion County's high-minority neighborhoods and minority residents.  Defendants

target customers on the basis of race and ethnicity primarily by concentrating their house purchases (*i.e.*, their inventory) in high-minority neighborhoods.  This is clear from data regarding the demographics of the neighborhoods in Marion County where Defendants' houses are located, compared to those of the neighborhoods where Defendants houses are not located.

102.    In the census blocks where Defendants have one or more rent-to-own properties, the population is 63.4% minority.  But in the census blocks where Defendants do not have any rent-to-own properties, the population is only 38.8% minority.  This 25-percentage point difference is due to Defendants' decision to target their predatory scheme at minority neighborhoods.  Their goal is to attract minority customers and they have set up their business to do exactly that.

103.    Because Defendants target areas of high minority concentration, a minority resident of Marion County is 2.55 times as likely to live in a census block with at least one Rainbow house as a white resident.  Defendants' targeting of minority neighborhoods thus facilitates their targeting of minority residents as potential customers.

104.    Defendants' focus on rundown houses contributes to but does not fully explain the disproportionately high minority population in the neighborhoods where they have houses.  This is apparent from the fact that low-value houses are dispersed more evenly across Marion County's neighborhoods than Defendants' houses.  45.1% of the County's low-value houses are in majority-minority census blocks, but 64.2% of Rainbow houses are in majority-minority census blocks.

105.    Since Defendants' main method of advertising their houses is to place signs on and in front of them, and the houses are disproportionately in high-minority neighborhoods,

Defendants are knowingly, deliberately, and primarily advertising to Marion County's minority residents.  The people likely to see the signs are the people who walk or drive in the vicinity.

106.    Defendants also reach consumers from two storefront offices maintained by Defendant Rainbow in Indianapolis.  Though on opposite sides of the city, both are in high-minority neighborhoods.  For the office at 6104 East 21st Street, the census block is 91% minority and the census tract is 76.3% minority.  For the one at 3214 West 16th Street, the census block is 68.8% minority and the census tract is 75.0% minority.  Defendants' decision to locate these sales offices in high-minority neighborhoods reflects and evidences their primary interest in targeting minority consumers.

107.    Upon information and belief, Defendants target minority neighborhoods because they believe that minorities are especially susceptible to their predatory scheme.  Due to the historic denial of equal opportunities for reputable mortgages and homeownership opportunities, Defendants expect to find many vulnerable people in minority neighborhoods who they can take advantage of and deceive.  Defendants believe they can make people in minority neighborhoods think they are being offered a great opportunity to achieve the American dream of homeownership, when they are just getting a bad deal.  That is why Defendants target minority neighborhoods.

108.    The statistics cited above also show that Defendants' rent-to-own program, though neutral on its face with respect to race, color, and national origin, has a disparate impact on minority neighborhoods, including through Defendants' decision to limit their program to low-priced housing.  There is no legitimate business justification for the program's disparate impact because the program itself is not legitimate – it is predatory.

VI.   **THE EXPERIENCES OF THE NAMED INDIVIDUAL PLAINTIFFS**

A.   **Plaintiff Mory Kamano**

109.   Plaintiff Mory Kamano is originally from Guinea and is now a legal permanent resident of the United States.  He is black.  He purchased a Rainbow house at 1138 N. Mount Street in Indianapolis in February 2012.

110.   Before the Rainbow house, Mr. Kamano lived with his girlfriend at her parent's house.  They wanted a place of their own and a friend suggested Rainbow after seeing Rainbow signs that said "you buy you fix."

111.   Mr. Kamano went to Rainbow's office on 21st Street in Indianapolis and was given the keys for three homes to visit.  Rainbow denied having any knowledge of the condition of the houses.  The utilities were not connected when he went to the houses so he could not inspect them thoroughly.

112.   The first two houses Mr. Kamano visited were not remotely livable, with problems such as, for example, a leaking roof, no floors, extensive mold, and the remnants of severe vandalism.  In Mr. Kamano's view, those houses could not be made livable and had to be torn down.  The third house was somewhat better.  It lacked basic elements – such as sinks in the bathroom and kitchen, a shower, a furnace, electrical wiring, and plumbing – but it at least appeared structurally sound and was conveniently located.  The monthly payment was also less than other places Mr. Kamano had seen.  After seeing the houses, Mr. Kamano returned to Rainbow's office with the intent of buying the third house he viewed.

113.   Defendants' Purchase Agreement presented the transaction as a seller-financed sale at a price of $19,508 with an interest rate of 18.00%, a down payment of $598, and a duration of 30 years.  Based on these terms, Defendants calculated a monthly payment of $294

(plus an additional $5 per month for taxes), meaning that the total cost of the house would be approximately $106,000.

114.    Mr. Kamano was never given an independent appraisal before signing the contract.  He had not been to a housing counselor and was not referred to one.  He was not given the disclosure about not having to go forward with the transaction required by 15 U.S.C. § 1639(a).  All were required because of the high interest rate.

115.    Mr. Kamano did not have a reliable income at the time because he was just starting out as a self-employed auto mechanic.  Rainbow did not ask many questions about his financial resources and history.  Rainbow approved Mr. Kamano's application.  If Defendants had properly assessed Mr. Kamano's ability to afford the house, Defendants would have determined that he could not afford it.

116.    Mr. Kamano returned shortly thereafter with a down payment to sign the contract. He was never given time to read the document.  Instead, a Rainbow employee quickly summarized the contract.  He had never bought a home before and did not have a good understanding of the arrangement he was getting into.  The whole process took less than thirty minutes.  Mr. Kamano understood that he was becoming a homeowner.

117.    Because Rainbow failed to deliver the premises in a safe, clean, and habitable condition, Mr. Kamano had to invest substantial time and expense into repairing his home.  Just to fix the problems of which he had been aware at the time he signed his contract, Mr. Kamano hired an electrician to place electrical wiring and a contractor to make the bathroom more usable; he fixed the plumbing himself.  He also installed sinks in the kitchens and bathrooms, doors throughout the house, a window, kitchen cabinets, light fixtures, and a furnace.  These repairs

cost him over $7,000 out of pocket as well as many hours of time devoted to doing a large portion of the work himself.

118.    The true condition of the house, however, turned out to be even worse than Mr. Kamano expected.  Mr. Kamano found out the house lacks insulation and cannot be heated in the winter without running up an electricity bill in the thousands of dollars, something that Mr. Kamano cannot afford.  Mr. Kamano cannot install the insulation himself and cannot afford to pay someone to do it.  As a result, Mr. Kamano has stayed at his mechanic's shop or a friend's home during cold months instead of sleeping in his house.  This means that his ten-year-old daughter, who he has partial custody of, cannot stay with him during those months.

119.    Mr. Kamano's porch has also started to sink into the ground.

120.    Mr. Kamano asked for Rainbow's assistance in making repairs, but Rainbow refused to make repairs except at unjustifiably high prices that Mr. Kamano cannot afford.

121.    Defendants have known throughout, due to Mr. Kamano's complaints about the condition of the house and otherwise, that he was living in the house and that it was in such poor condition.

122.    Mr. Kamano has fallen behind on his payments several times and Defendants have instituted eviction proceedings against him.  Defendants have dropped those proceedings when Mr. Kamano has come up with extra money.  He is afraid to lose the house because he will lose everything he has invested in it.

123.    Mr. Kamano regrets ever having signed a contract with Rainbow.  He would not have signed his contract had he understood at the time how the transaction really operates, that he was not truly buying the house, and the condition and value of the house.

124.    Defendants have never asked Mr. Kamano to enter a conditional sales contract as a second phase of his transaction with them.

125.    Mr. Kamano's house is located in a high-minority neighborhood.  The census block is 4.4% white; 26.1% Hispanic; and 69.6% black; the census block group[10] is 3.1% white; 6.0% Hispanic; and 87.7% black.

**B.    Plaintiff Cordell Spencer**

126.    Plaintiff Cordell Spencer is black.  He lived in a Rainbow house at 2322 Dearborn Avenue in Indianapolis from 2012 to 2017.

127.    Mr. Spencer is a former Marine.  In 2012, he and his longtime partner were living with family in the Indianapolis area when the home caught on fire.  Many of their belongings were destroyed and the house became uninhabitable.

128.    Mr. Spencer needed to find housing quickly.  He saw advertisements for Rainbow Realty on lawn signs and on flyers placed on cars in his mostly African-American neighborhood.

129.    In May 2012, Mr. Spencer and his partner went into the Rainbow office on 21st Street in Indianapolis, where they received keys to a number of houses to visit on their own. They saw approximately 10 houses, and all of them had significant problems.  For example, some of the houses were infested with rodents and wild animals, one house had a living room full of dead leaves, and multiple houses did not have windows or framing.  The utilities were turned off when they went to the houses so they could not inspect them thoroughly.

130.    Mr. Spencer and his partner decided that their best option was the house at 2322 Dearborn Avenue and returned to Rainbow's office with the intent of buying it.  They

---

[10] Census block groups are determined by the U.S. Census Bureau.  They are smaller than census tracts, but larger than census blocks.

understood that there were significant problems at the house, but believed it to be in better condition than their other options.  The couple also found the home conveniently located because it was near Mr. Spencer's son's school and his mother's home.

131.     Mr. Spencer and his partner had looked into other housing options, but this appeared to be cheaper and quicker than other options. In addition, Mr. Spencer was willing to put in the work that he thought the home needed because he understood that he would own the property.  He had never owned a home before, and he believed that buying was a better long-term investment than renting.

132.     Defendants' Purchase Agreement presented the transaction as a seller-financed sale at a price of $34,600 with an interest rate of 14.8%, a down payment of $0, and a duration of 30 years.  Based on these terms, Defendants calculated a monthly payment of $432 (plus an additional $17 per month for taxes), meaning that the total cost of the house would be approximately $160,000.

133.     Mr. Spencer and his partner were never given an independent appraisal before signing the contract.  They had not been to a housing counselor and were not referred to one. They were not given the disclosure about not having to go forward with the transaction required by 15 U.S.C. § 1639(a).  All were required because of the high interest rate.

134.     Rainbow staff requested pay stubs and identification but did not perform a credit check or ask whether Mr. Spencer or his partner had any existing debts.  At the time, Mr. Spencer was earning approximately $14/hour in a part-time job at a Reebok distribution center, and his partner was earning less than $20,000/year working as a childcare assistant.  They were paying approximately $325 per month for a car payment and had other debts.  Their application

was approved.  If Defendants had properly assessed Mr. Spencer and his partner's ability to afford the house, Defendants would have determined that they could not afford it.

135.    Mr. Spencer and his partner then went in to sign the contract.  They were not provided the paperwork before the meeting, and they felt rushed to sign quickly.  Neither of them had ever bought a home before and they did not have a good understanding of the details of the contract.  Mr. Spencer believed that he was becoming a homeowner.

136.    Mr. Spencer and his partner moved into the house in June or July of 2012.  The house was not in safe, clean, and habitable condition, and the condition was even worse than they anticipated.  The basement was filled with dirt, debris, and black mold, and the stairs into the basement were dangerously warped.  There was significant flooding and leaking throughout the house, including in the basement.  There was no water heater, and no plumbing.  The floors and walls were in disrepair, and there was lead paint throughout the home.  There was no electrical wiring in the house.

137.    Mr. Spencer contacted Rainbow about making repairs.  He and his partner agreed to pay an electrician through Rainbow to install wiring in the home.  Rainbow charged them $1,500 for the wiring, and added that charge to the monthly payment due.  That increased the monthly payment Rainbow requested from $449 to approximately $550. Given the cost of the repair, which Mr. Spencer believed to be unjustifiably high, Mr. Spencer and his partner decided not to request any other repairs through Rainbow.

138.    Mr. Spencer spoke to Rainbow employees about the condition of the house many times. Defendants knew that he and his partner were living in the house and that it was in poor condition.

139.     Mr. Spencer and his partner put dozens of hours of labor and thousands of dollars into trying to make the house more habitable.  In addition to paying to put wiring in the home, they installed plumbing, light fixtures, and fans.  They installed a water heater and sinks and repaired the tub.  They sanded, refinished, buffed, and lacquered the floors.  They plastered, sanded, and painted the walls.  They fixed the stairs leading into the basement.  They installed insulation in the roof.  They cemented multiple cracks in the walls throughout the house and particularly in the basement.

140.     Mr. Spencer and his partner fell behind on their payments several times and Defendants instituted eviction proceedings against them.  Defendants dropped those proceedings when they came up with extra money.

141.     In April 2016, Mr. Spencer's partner became ill and needed surgery. In November 2016, she had surgery and Mr. Spencer was concerned that he would be unable to take care of her in his Rainbow home.  He was concerned about the condition of the home, which, despite their efforts, remained unsafe.  In addition, because Mr. Spencer's partner was not working, it was difficult for him to continue to pay the monthly payment.

142.     Defendants filed an eviction against Mr. Spencer and his partner in February 2017.  Defendants did not proceed with a foreclosure action, or provide Mr. Spencer or his partner with any credit for any equity obtained in the home or the repairs they had made.

143.     Mr. Spencer now rents a home in the same neighborhood, but it is not large enough or sufficiently safe for his partner or Mr. Spencer's son to live with him.

144.     Mr. Spencer regrets ever having signed a contract with Rainbow.  He would not have signed the contract had he understood at the time how the transaction really operates, that they were not truly buying the house, and the condition and value of the house.

145.    Defendants never asked Mr. Spencer to enter a conditional sales contract as a second phase of his transaction with them.

146.    Mr. Spencer's former house is located in a high-minority neighborhood.  The census block is 15.9% white; 0% Hispanic; and 77.3% black; the census block group is 7.3% white; 7.7% Hispanic; and 82.8% black.

**C.    Plaintiff Maria Gaspar**

147.    Plaintiff Maria Gaspar is Hispanic. She has lived in a Rainbow house at 1251 W. 32nd Street with her five children since December 2010.

148.    In early 2010, Armando Mercado, Maria Gaspar's partner and father of her two youngest children, brought home keys and took her to visit several Rainbow houses. All of them were in bad condition and, in Ms. Gaspar's opinion, were not livable. None of the properties had utilities connected, and all of them had significant problems with their floors, walls and/or windows.

149.    On March 15, 2010, without Ms. Gaspar's knowledge, Mr. Mercado entered into a Purchase Agreement with Defendants for the home at 1251 W. 32nd Street. The Purchase Agreement presented the transaction as a seller-financed sale at a price of $17,350 with an interest rate of 13.3%, a down payment of $0, and a duration of 30 years.  Based on these terms, Defendants calculated a monthly payment of $196 (plus an additional $53 a month for taxes), meaning that the total cost of the house would be over $70,000.

150.    In approximately July or August of 2010, Mr. Mercado asked Ms. Gaspar for money to make repairs on a house he was working on. When she asked him additional questions about what he needed the money for, he told her that he had purchased the house at 1251 W. 32nd Street and now owned it. Mr. Mercado explained that he would use his construction

44

experience to fix the house up and make it livable if she would purchase all of the supplies. Ms. Gaspar, feeling that she had no choice, agreed to this arrangement and provided significant money to Mr. Mercado so that he could make repairs.

151.    When Ms. Gaspar first saw the home, the house was not in safe, clean, and habitable condition.  It looked as though it had been burned, and the rooms were full of smoke and ash.  The roof was severely damaged and had visible holes in it.  There was no furnace and no air conditioner.  There was no sink, stove, or refrigerator in the kitchen.  There were no functional sinks, tubs, or toilets in the bathroom and the house lacked plumbing.  There was no functional staircase to the second floor or the basement.  There was no electrical wiring in the walls and the insulation was so old that it did not function. The walls and floors were in dangerous disrepair and were full of holes.  The house was missing windows and doors.  The basement flooded severely and one of the walls of the basement was severely damaged and had a large hole in it. Whenever it rained, it would fill with dirt and sand. There was significant mold in the basement and throughout the home. The home was extremely wet and moist throughout and infested with mosquitoes and rats.

152.    Mr. Mercado and Ms. Gaspar put in a significant amount of work before they moved into it. They fixed the walls with sheetrock, plywood, and drywall and put in doors and windows. They patched the worst areas of the floor where there were significant holes. They put insulation in the walls, as well as some wiring. They also installed a furnace and installed plumbing. However, the home was still not safe or habitable.

153.    After they moved in, a red letter arrived at the house from Rainbow Realty that said that the monthly payment was late and asked for the outstanding balance as well as a late fee. It stated that there would be eviction proceedings if the outstanding charges were not paid.

Ms. Gaspar was confused about why the company was asking Mr. Mercado for monthly payments on the house when he had told her he owned it. Mr. Mercado told Ms. Gaspar that it was a mistake and he would take care of it.

154.   A few months later, in the middle of 2011, another red letter arrived at the house. Ms. Gaspar went to the Rainbow Realty office listed on the letter and asked why the company was sending letters to her partner. A Rainbow employee explained to Ms. Gaspar that Mr. Mercado did not own the home but had entered a rent-to-own contract for the home. The employee said that he had agreed to pay $249 a month over 30 years, and that, at that time, they would own the home. Ms. Gaspar was shocked to discover the terms of the agreement because she believed that the house was clearly not worth the over $70,000 they would pay over 30 years.

155.   The Rainbow employee also told Ms. Gaspar that the condition of the house was their responsibility and Rainbow would not make any repairs.

156.   Ms. Gaspar continued to ask questions about the terms of the agreement. The Rainbow employee told her that she needed to stop asking questions because she was not on the contract. The employee told Ms. Gaspar that if she continued to ask questions, they would call the police.

157.   Because Ms. Gaspar was living in the house with her five children and had also put in a significant amount of money into supplies and repairs, she began to take responsibility for making the monthly payments so that she and her children would not face eviction.

158.   Ms. Gaspar regularly paid the payments each month. She went into the Rainbow office regularly and the employees were aware that she was paying the monthly payments. Defendants knew that she, Mr. Mercado, and their children were living in the house and that it was in poor condition.

46

159.    After several months, Ms. Gaspar asked a Rainbow employee if she could be put on the contract given that she was making the payments. The employee said that Ms. Gaspar could not be added to the contract unless Mr. Mercado agreed to sign something allowing her on the contract. When Ms. Gaspar asked Mr. Mercado to sign the form, he refused.

160.    Ms. Gaspar remained confused about the nature of the agreement her partner had entered into with Rainbow. After Rainbow employees cut the grass at their Rainbow home, Ms. Gaspar went into the office and asked why the company would do that, given that her partner had ownership of the property. Rainbow said they had notified her that the City charged them if the grass was not cut, so they reserved the right to cut the grass and then request reimbursement.

161.    In December 2013, Ms. Gaspar separated from Mr. Mercado and left the Rainbow house with the children. In the spring of 2014, Mr. Mercado was deported to Mexico.  Because Ms. Gaspar had ceased making payments (and Mr. Mercado was not paying them), Rainbow initiated eviction proceedings against them and the utilities were turned off. Ms. Gaspar received correspondence from Rainbow demanding money for the outstanding payments and court fees. Although it contributed to her having to declare bankruptcy, she paid the outstanding balance on Mr. Mercado's account as well as the overdue utility bills and moved back into the Rainbow home.

162.    In December of 2015, Mr. Mercado was killed in Mexico. Ms. Gaspar was informed that if she returned to Mexico, she and her children were at risk of being killed as well because of their association with Mr. Mercado.

163.    Ms. Gaspar went into the Rainbow office to speak with someone to ask about what would happen to the agreement in light of Mr. Mercado's passing. A Rainbow employee informed Ms. Gaspar that his children would be responsible for the contract because Ms. Gaspar

47

and Mr. Mercado had not been married. In order to try to make sure her young children were not saddled with Mr. Mercado's debts, she asked again if she could be added to the contract.

164.    In addition, Ms. Gaspar felt as if she had no choice but to try to continue to live in the Rainbow home. Although it was still not in good condition, Ms. Gaspar had already put thousands of dollars into the home in monthly payments and in supplies and labor to make it more livable. Ms. Gaspar felt that remaining at their Rainbow home was the best option to avoid losing all of the money they had invested in the property. She also wanted to avoid moving her children while they were dealing with the loss of their father.

165.    The Rainbow employee said that Rainbow would allow her to enter into a Purchase Agreement in her own name for the remainder of the contract, provided she would provide documentation of income and a death certificate. She explained that it would be difficult to obtain a death certificate from Mexico, particularly because she could not travel there. They insisted that she find a way to obtain one. Rainbow staff did not offer to let Ms. Gaspar sign a Conditional Sales Contract, despite the fact that she had regularly paid the monthly payments on the home for over four years.

166.    After several months, Ms. Gaspar obtained a death certificate from Mexico for Mr. Mercado.  She went to the Rainbow office and provided the death certificate.  Rainbow staff did not perform a credit check or ask whether Ms. Gaspar had any existing debts.  She had been denied a credit card and believes she had bad credit at the time. She had also filed for bankruptcy twice, including once as a result of having to pay the overdue bills on the Rainbow house. Rainbow did not ask her any questions about her credit or bankruptcy. Her application was approved.

167.   Defendants' Purchase Agreement presented the transaction as a seller-financed sale at a price of $16,902.00 with an interest rate of 13.31%, a down payment of $0, and a duration of 24 years.  Based on these terms, Defendants calculated a monthly payment of $196 (plus an additional $16 per month for taxes), meaning that the total cost of the house would be approximately $55,700.

168.   Ms. Gaspar was never given an independent appraisal before signing the contract. She had not been to a housing counselor and was not referred to one.  She was not given the disclosure about not having to go forward with the transaction required by 15 U.S.C. § 1639(a). All were required because of the high interest rate.

169.   Ms. Gaspar then went in to sign the contract.  She was not provided the paperwork before the meeting, and she felt rushed to sign quickly.  She had never seen a copy of the agreement Mr. Mercado had signed and she did not have a good understanding of the details of the contract that was presented to her.

170.   During this process, Ms. Gaspar understood that if she paid more than the required monthly payment each month, it would help her pay off the debt and own the home faster.

171.   Over the years, Ms. Gaspar has put thousands of dollars into trying to make the house more habitable. She has finished putting electrical wiring throughout the house. She installed air conditioners. She replaced the flooring throughout the home. Toilets, sinks, and bathtubs were installed in the bathroom, and the kitchen now has a sink, a stove, a refrigerator and cabinets. She reopened the walls to add insulation in her bedroom, and painted the walls throughout the house.  She has repaired the stairs to make them workable.

172.   The house still needs a significant amount of work to be habitable, however. The electric bills in the winter are extremely high because the insulation in the walls is still

insufficient. The basement still floods and is full of mold. Ms. Gaspar has been unable to abate

the rat infestation. Many of the walls are still unfinished or in bad condition, and the stairs are

still unfinished. Ms. Gaspar has considered leaving the house, but she is afraid to lose all of the

time and money she has invested in it.

173.    Ms. Gaspar did not agree to enter the original contract, but would not have

agreed to it if she had known how the transaction would operate, that it would not make her or

her partner a homeowner, and the condition and value of the house. She signed a contract with

Rainbow in 2016 only because she had no other options to try to keep the value of the tens of

thousands of dollars she has spent on this home.

174.    Ms. Gaspar's house is located in a high-minority neighborhood.  The census block

The census block is 100% black; the census block group is 7.5% white and 85% black.

### D.    Plaintiff Norma Tejeda

175.    Plaintiff Norma Tejeda is Hispanic.  She lived in a Rainbow house at 6137 E.

Windsor Drive in Indianapolis for a short period in 2016.

176.    Along with her husband and her four children (ages 5, 8, 11, and 16), she was

renting a house in Indianapolis in 2016 that had significant flooding in the basement.  The

flooding attracted mosquitoes and caused mold problems, aggravating her son's asthma.  Ms.

Tejeda felt like she needed to move immediately, and a friend told her about Rainbow and how

easy they make it to buy a house.  Ms. Tejeda's husband was very excited about the idea of

owning a house.

177.    Ms. Tejeda and her husband went into the Rainbow office on 21st Street in

Indianapolis, where they received keys to a number of houses to visit on their own.  Rainbow

denied having any knowledge of the condition of the houses.  The utilities were turned off when

they went to the houses so they could not inspect them thoroughly.  She and her husband saw

over 20 houses, and many of them were completely unlivable.  For example, one house had a

large hole in the roof and a giant hole in the floor.

178.    Ms. Tejeda and her husband decided that they could live in the Rainbow house on

Windsor Drive and returned to Rainbow's office with the intent of buying it.  They understood

that there were significant problems at the house, but it was the best option they saw.  Ms. Tejeda

asked if the water heater was functional, but was told by a Rainbow representative that he did not

know.

179.    Ms. Tejeda had looked into rental options, but this option appeared to be cheaper

based on the information then available to her, and it would let her family move out of their

current rental quickly.  Ms. Tejeda felt like she had no other option.

180.    Defendants' Purchase Agreement presented the transaction as a seller-financed

sale at a price of $64,900 with an interest rate of 11.87%, a down payment of $300, and a

duration of 30 years.  Based on these terms, Defendants calculated a monthly payment of $658

(plus an additional $41 per month for taxes), meaning that the total cost of the house would be

approximately $237,000.

181.    Ms. Tejeda and her husband were never given an independent appraisal before

signing the contract.  They had not been to a housing counselor and were not referred to one.

They were not given the disclosure about not having to go forward with the transaction required

by 15 U.S.C. § 1639(a).  All were required because of the high interest rate.

182.    Rainbow staff requested pay stubs and identification but did not perform a credit

check or ask whether Ms. Tejeda and her husband had any debts.  The six-person Tejeda

family's total income was less than $30,000.  This came from Ms. Tejeda's husband because, as

she told Rainbow, she was not employed at the time.  Rainbow nonetheless asked for paystubs from her last job to use in assessing her application.  Ms. Tejeda told Rainbow that they could not make the payment for the first month until her husband's next payday.  She also told Rainbow that she was applying for food stamps.  Their application was approved.  If Defendants had properly assessed Ms. Tejeda and her husband's ability to afford the house, Defendants would have determined that they could not afford it.

183.    Ms. Tejeda and her husband then went in to sign the contract.  Ms. Tejeda attempted to read the contract slowly, but was told by the Rainbow employee to sign and then he would explain everything to them.  Ms. Tejeda did not want to sign the paperwork so quickly, but the Rainbow staff insisted.  Ms. Tejeda and her husband were provided a Spanish version of the Purchase Agreement to read, but were told to sign an English version.  They had never bought a home before and did not have a good understanding of the arrangement they were getting into.  Ms. Tejeda understood that she was becoming a homeowner.

184.    During this process, Rainbow told Ms. Tejeda and her husband that if they paid more than the required monthly payment each month it would help them pay off their debt faster.  Rainbow also encouraged them to make a large payment after they received their tax refund.

185.    Ms. Tejeda informed Rainbow staff that they had a dog and Rainbow said they would have to pay an additional $20 monthly fee as well as a $120 pet deposit. This was confusing to Ms. Tejeda, who could not understand why they would have to pay additional money to have a pet in their own home.

186.    Ms. Tejeda and her husband moved into the house on September 15, 2016.  The house was not in safe, clean, and habitable condition, and the condition was even worse than they anticipated.  It was extremely dirty and filled with trash, there were rodents, and the floors

were in disrepair.  The windows had no borders, the bathroom was not functioning, and the

bathtub was shattered.  When it rained for the first time, they discovered that there were

significant leaks in every room of the house.  The plumbing also was not in good and safe

working condition.

188.    Ms. Tejeda gave notice to Rainbow of the condition of the property when she

requested that Rainbow make repairs, including to the plumbing.  Rainbow would not make the

repairs unless Ms. Tejeda agreed to pay for them.  She refused.

188.    Defendants knew throughout, due to Ms. Tejeda's complaints about the condition

of the house and otherwise, that they were living in the house and that it was in such poor

condition.

189.    Ms. Tejeda and her husband spent over $1,500 and invested a significant amount

of their own time to paint the house, put in carpeting, and create a functioning bathroom.  They

did not complete many necessary repairs.

190.    The family lost Ms. Tejeda's husband's income because of his deportation.  After

his deportation, Ms. Tejeda quickly got a job as a maid in a hotel, but she was not paid in time to

make the next monthly payment.  Her new income would have been sufficient to continue

making the monthly payment if she did not also have to pay for the remaining expensive repairs

still needed on the house.

191.    Ms. Tejeda tried to explain the situation to Rainbow, but she was told that she

would be evicted if she did not continue to make her monthly payments, unless and until

someone else chose to purchase the home.  Defendants filed an eviction action on November 28,

2016.  Ms. Tejeda left the keys with Rainbow employees and moved herself and her four

children into a single room in a family member's home.

192.     Ms. Tejeda does not believe her family could have afforded to make the monthly house payments and the required repairs even with her husband's income.

193.     Ms. Tejeda regrets ever having signed a contract with Rainbow.  She would not have signed the contract had she understood at the time how the transaction really operates, that they were not truly buying the house, and the condition and value of the house.

194.     Ms. Tejeda's former house is located in a high-minority neighborhood.  The census block is 2.2% white; 10.9% Hispanic, and 87.0% black; the census block group is 19.2% white; 17.5% Hispanic; and 60.3% black.

**E.     Plaintiff Franklin Paz**

195.     Plaintiff Franklin Paz is Hispanic. He purchased a Rainbow house at 2208 N. Webster Ave. in Indianapolis in May 2017.

196.     Mr. Paz needed to find a new place to live because his lease on his old apartment had expired. He would have had to renew three months before it ended, but he did not want to renew the lease because he had been robbed twice and was worried about his and his family's safety. However, Mr. Paz could not find another standard rental apartment where he, his wife, and his two children could live within his price range.

197.     At the end of May 2017, Mr. Paz went to Rainbow's office on 21st Street in Indianapolis and was given the keys for a couple of homes to visit.  Rainbow denied having any knowledge of the condition of the houses.

198.     The first two homes that Mr. Paz saw were in terrible condition and he was not sure he could make them livable. The third house was also in bad condition, but looked like it needed the least amount of work.  He knew the floors were damaged, the kitchen had no cabinets, some windows were broken and missing, the back door was broken, and the walls

needed some repairs. After seeing the houses, Mr. Paz determined that, despite these problems, he and his family could live at the house on Webster Street and he returned to Rainbow's office with the intent of buying it. He understood that there were significant problems, but it was the best option he saw and their lease was running out in a few days.

199.    Defendants' Purchase Agreement presented the transaction as a seller-financed sale at a price of $64,900.00 with an interest rate of 9.87%, a down payment of $600, and a duration of 30 years.  Based on these terms, Defendants calculated a monthly payment of $558 (plus an additional $41 per month for taxes), meaning that the total cost of the house would be over $200,000.

200.    Mr. Paz was never given an independent appraisal before signing the contract.  He had not been to a housing counselor and was not referred to one.  He was not given the disclosure about not having to go forward with the transaction required by 15 U.S.C. § 1639(a). All were required because of the high interest rate.

201.    Rainbow staff requested pay stubs and identification but did not ask whether Mr. Paz had any existing debts.  A credit report run by Rainbow shows multiple credit warnings, including serious delinquencies and recent collection records.  His application was approved.  If Defendants had properly assessed Mr. Paz's ability to afford the house, Defendants would have determined that he could not afford it.

202.    Mr. Paz went in to sign the contract.  He was not provided the paperwork before the meeting, and he felt rushed to sign quickly.  He had never bought a home before and he did not have a good understanding of the details of the contract.  Mr. Paz believed that he was becoming a homeowner.

55

203.     After Mr. Paz saw the interest rate and the total amount he would pay for the property over 30 years, he did not want to proceed. He thought that the house was not worth the hundreds of thousands of dollars he would pay over the life of the contract. Mr. Paz expressed concern and asked Rainbow staff what would happen if he did not sign the contract. A Rainbow employee told him that they would keep the deposit and first month's rent that he had already paid, totaling $1,200. Mr. Paz did not have sufficient funds to put a security deposit down on another house without that money, and it was already the last day of the month. He signed because he felt he had no other choice.

204.    During this process, Rainbow staff told Mr. Paz that if he paid more than the required monthly payment each month it would help him pay off the debt faster.

205.     Mr. Paz and his family moved into the house in June.  The house was not in safe, clean, and habitable condition, and the condition was even worse than they anticipated.  Mr. Paz discovered that portions of the walls have nothing under the siding, so rats and other creatures can freely enter the property. He discovered that the hole in the back wall was created by a significant leak in the roof, and found a number of other leaks in the home and problems with the gutters. Mr. Paz also discovered that the electric wiring had been cut upstairs, and that many of the walls and floors in the home were full of mold.

206.     Mr. Paz contacted Rainbow about the problems he had not known about with the house.  He was informed that he was responsible for making all repairs.  Defendants thus knew and know, due to Mr. Paz's complaints about the condition of the house and otherwise, that he and his family are living in the house and that it is in such poor condition.

207.     Repairing these problems cost Mr. Paz over $8,000 as well as several hours of his own labor. He has painted the house, installed carpeting and cabinets, patched the walls, and

replaced plumbing and toilets. He is currently trying to fix the furnace. However, he has been unable to afford what it would cost to fix the roof and gutters, the problems with the electricity upstairs, the mold throughout the house, and the missing walls.

208.    Mr. Paz regrets having signed the contract with Rainbow. He felt pressured to sign because Rainbow refused to return his deposit and he did not have the funds to put down another deposit elsewhere without that money. He would not have signed his contract had he understood at the time how the transaction really operates, that he was not truly buying the house, and the condition and value of the house.

209.    Mr. Paz's house is located in a high-minority neighborhood.  The census block is 32% white; 24% Hispanic; and 44% black; the census block group is 24% white; 30% Hispanic; and 43% black.

## CLASS ALLEGATIONS

210.    The Individual Plaintiffs bring this Complaint as a class action pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3).

211.    The Individual Plaintiffs request that this Court certify one class and four subclasses, as follows.

212.    The Individual Plaintiffs request that this Court certify a class of all persons who have entered into a "rent-to-own" housing contract with Defendants since the beginning of 2009, excluding those (if any) who obtained title to the house, for purposes of the cause of action under Indiana Code § 32-31-8-5.  The Individual Plaintiffs are members of the class they seek to represent.

213.    The Individual Plaintiffs also request that this Court certify a subclass of all minorities who have entered into a "rent-to-own" housing contract with Defendants since the

beginning of 2009, excluding those (if any) who obtained title to the house, for purposes of the Fair Housing Act and Equal Credit Opportunity Act causes of action.  The Individual Plaintiffs are members of the subclass they seek to represent.

214.   The Individual Plaintiffs also request that this Court certify a subclass of all persons who have entered into a "rent-to-own" housing contract with Defendants since May 30, 2012, excluding those (if any) who obtained title to the house, for purposes of the cause of action under the Home Loan Practices Act, Indiana Code § 24-9-3-7(c).  Individual Plaintiffs Maria Gaspar, Franklin Paz, and Norma Tejeda are members of the subclass they seek to represent.

215.   The Individual Plaintiffs also request that this Court certify a subclass of all persons who have entered into a "rent-to-own" housing contract with Defendants since May 30, 2014, excluding those (if any) who obtained title to the house, for purposes of the Truth in Lending Act causes of actions under 12 C.F.R. §§ 1026.43(c) (ability to repay), 1026.32(c) (mandatory statement that consumer is not required to complete transaction), and 1026.34(a)(5) (pre-loan counseling).  Individual Plaintiffs Maria Gaspar, Franklin Paz, and Norma Tejeda are members of the subclass they seek to represent.

216.   The Individual Plaintiffs also request that this Court certify a subclass of all persons who have entered into a "rent-to-own" housing contract with Defendants since May 30, 2016, excluding those (if any) who obtained title to the house, for purposes of the Truth in Lending Act cause of action under 12 C.F.R. § 1026.35(c)(6) (mandatory disclosure of appraisal).  Individual Plaintiffs Maria Gaspar, Franklin Paz, and Norma Tejeda are members of the subclass they seek to represent.

217.   This action is properly maintained as a class action because:

58

a.   Joinder of all class members is impracticable because of the size of the class.  Plaintiffs understand that the class includes more than 1,000 people, and that the smallest subclass includes more than 100 people.

b.   Defendants have acted or refused to act on grounds generally applicable to the class.

c.   The claims alleged on behalf of the class and subclasses raise questions of law and fact that are common to the class and subclasses and predominate over questions affecting only individual members because all class members entered into the same or comparable written contracts with Defendants for the same program and received substandard housing under the program. Common questions of law and fact include, among others:  (i) whether Defendants intentionally targeted minorities or whether their policies and practices have a disparate impact on minorities in violation of ECOA and the FHA; (ii) whether any disparate impact is justified by business necessity; (iii) whether the rent-to-own program is unfair and predatory; (iv) whether Defendants are required to but do not make a reasonable and good faith determination that consumers have a reasonable ability to afford the transaction; (v) whether Defendants are required to but do not provide the required statement that a consumer is not required to complete the transaction, and whether they do so sufficiently in advance of when the contract is executed; (vi) whether Defendants are required to but do not exclude consumers who have not had pre-loan counseling; (vii) whether Defendants are required to but do not disclose an independent appraisal to consumers, and

59

whether they do so sufficiently in advance of when the contract is executed;
(viii) whether the homes that are part of Defendants' rent-to-own program are
premises to which Indiana state law requirements for the duties of landlords at
commencement of and during occupancy apply; and (ix) whether Defendants
engage in deceptive acts.

d.   The claims of the class representatives are typical of the class because the
class representatives entered into "rent-to-own" housing contracts with
Defendants that are the same as or comparable to the other class members'
contracts pursuant to the same housing program operated by Defendants, and
received substandard housing like the other class members.

e.   A class action is superior to the other available methods for fairly and
efficiently adjudicating this litigation.

218.   The class representatives and counsel will fairly and adequately represent the
interests of the class.  The class representatives have no interests that are antagonistic to the
interests of the other class members and class counsel have extensive experience in civil rights,
consumer, and class action litigation.

219.   Plaintiff FHCCI has no interests that are antagonistic to the interests of the
unnamed class members.

**INJURY TO NAMED INDIVIDUAL PLAINTIFFS AND PLAINTIFF FHCCI**

220.   The "own" part of "rent-to-own" rarely happens, and Defendants know it.  They
are deliberately using the veneer of ownership to avoid abiding by Indiana's habitability
requirement for rental properties.  Yet buyers are in fact deprived of the benefits of buying a

home, despite their reasonable expectation that are buying, which is intentionally fostered by Defendants.

221.     This scheme leaves Defendants' customers to live in uninhabitable properties with the burden of the cost of repairs, yet without equity and subject to eviction when they fall behind. This predatory combination of conditions is at the heart of Defendants' predatory scheme.  It harms every customer, regardless of whether they lose the house and what they understand about the transaction before they sign.

222.     As a direct, foreseeable, and proximate result of Defendants' actions, the Individual Plaintiffs have suffered significant financial injuries.  These injuries include the full value of the payments they made to Defendants as "rent" when Defendants failed to provide habitable properties.

223.     These injuries also include the costs the Individual Plaintiffs have incurred in their efforts to try and make their Rainbow properties habitable, investments they were willing to make because they believed they were becoming homeowners.  These costs include out-of-pocket expenses and the value of the time they invested in repairing the houses.  In the absence of Defendants' actions, the Individual Plaintiffs would not have incurred these costs.

224.     These injuries also include the extra payments made by the Individual Plaintiffs to reduce the principal balance on their loans as encouraged by Defendants.

225.     Federal law also provides for statutory damages in connection with the TILA violations of (a) up to the lesser of $1 million or 1% of Defendants' net worth, plus (b) all finance charges and fees paid.

226.     State law also provides for statutory damages in connection with the violations of HLPA of two times the finance charges agreed to in the rent-to-own contracts.

227.    As a direct, foreseeable, and proximate result of Defendants' actions, the Individual Plaintiffs have suffered, and in the future will continue to suffer, humiliation, embarrassment, and mental and emotional distress.

228.    Without relief, the Individual Plaintiffs are also likely to be injured by damaged credit records.  Defendants report evictions to credit reporting agencies, and damaged credit will impair their ability to obtain housing, employment, and credit in the future because credit scores and histories are often used by lenders, landlords, employers, and creditors to make decisions about applications.

229.    The FHCCI first learned about Defendants' practices from numerous conversations with community advocates who had encountered individuals evicted summarily from Rainbow houses.  These advocates were concerned that predatory lending products were being targeted at minorities and minority neighborhoods in the Indianapolis area.  FHCCI staff confirmed that there were many signs advertising Rainbow houses in Marion County's majority-minority neighborhoods, but there were not similar concentrations of signs in majority-white neighborhoods.  Based in part on its awareness of the long history of predatory, discriminatory land contract-style practices throughout the United States, the FHCCI began to investigate whether Defendants were violating fair housing laws.

230.    As a direct result of Defendants' unlawful practices addressed herein, the FHCCI diverted hundreds of staff hours and significant additional resources to investigate Defendants' conduct and to conduct education and outreach designed to counteract the effects of that conduct. The FHCCI began a campaign to identify and speak with affected individuals to determine whether their rights to fair housing were being violated.  The FHCCI fielded phone calls from those individuals and others, researched Defendants' complex corporate structure, and reviewed

court records and other documents.  Upon discovering evidence that Defendants were engaged in discriminatory practices, the FHCCI conducted several trainings to educate the public on lending discrimination and to counteract the impact of unlawful rent-to-own transactions.  It also distributed materials on fair housing rights to current and former residents of Rainbow houses.

231.    Defendants' targeting of vulnerable Indianapolis residents and minority neighborhoods directly contradicts and frustrates FHCCI's mission.  Defendants' predatory scheme injures FHCCI and the community it serves by directly harming residents and communicating that businesses can use deceptive practices to evade their fair housing and other legal obligations to consumers.  FHCCI will have to continue diverting resources to counteract this illegal scheme unless and until Defendants are required to cease implementing it.

232.    In causing injury to the Individual Plaintiffs and Plaintiff FHCCI, Defendants have acted intentionally, maliciously, and with willful, callous, wanton, and reckless disregard for the Plaintiffs' rights.

## CAUSES OF ACTION

### Count I – Violation of the Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq.*

233.    Plaintiffs reallege and incorporate by reference all of the allegations set forth in paragraphs 1 through 232 above.

234.    Defendants are "creditors" within the meaning of 15 U.S.C. § 1691a(e) and 12 C.F.R. § 1002.2(l).

235.    The Individual Plaintiffs have been "applicants" within the meaning of 15 U.S.C. § 1691a(b) and 12 C.F.R. § 1002.2(e) when they have applied for an extension of credit for a rent-to-own property.

236.    Defendants' acts, policies, and practices are intentionally discriminatory on the basis of race, color, and/or national origin with respect to aspects of credit transactions, constitute reverse redlining, and violate 15 U.S.C. § 1691(a)(1).

237.    Defendants' acts, policies, and practices have a disparate impact on the basis of race, color, and/or national origin with respect to aspects of credit transactions in violation of 15 U.S.C. § 1691(a)(1).

238.    Defendants have maintained these acts, policies, and practices continuously and without material change since at least 2009, and they constitute a continuing violation of the Equal Credit Opportunity Act.

### Count II – Violation of the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*

239.    Plaintiffs reallege and incorporate by reference all of the allegations set forth in paragraphs 1 through 238 above.

240.    Defendants' acts, policies, and practices are intentionally discriminatory on the basis of race, color, and/or national origin and constitute reverse redlining.

241.    Defendants' acts, policies, and practices have an unjustified disparate impact on the basis of race, color, and/or national origin.

242.    Defendants' acts, policies, and practices have made and continue to make housing unavailable on the basis of race, color, and/or national origin in violation of 42 U.S.C. § 3604(a).

243.    Defendants' acts, policies, and practices have provided and continue to provide different terms, conditions, and privileges in the sale or rental of housing, and different services and facilities in connection therewith, on the basis of race, color, and/or national origin, in violation of 42 U.S.C. § 3604(b).

244.    Defendants' acts, policies, and practices have provided and continue to provide different terms, conditions, and privileges on the basis of race, color, and/or national origin in connection with the making of residential real estate-related transactions, in violation of 42 U.S.C. § 3605.

245.    Defendants have maintained these acts, policies, and practices continuously and without material change since at least 2009, and they constitute a continuing violation of the Fair Housing Act.

### Count III – Violation of the Truth in Lending Act (Ability to Repay), 15 U.S.C. § 1639c(a), 12 C.F.R. § 1026.43(c)

246.    Plaintiffs reallege and incorporate by reference all of the allegations set forth in paragraphs 1 through 245 above.

247.    The transactions at issue are "higher-priced covered transactions" within the meaning of 12 C.F.R. § 1026.43(b)(4).

248.    Defendants are "creditors" within the meaning of 12 C.F.R. § 1026.2(a)(17).

249.    Defendants have initiated the covered transactions at issue without making a reasonable and good faith determination at or before consummation that the consumer will have a reasonable ability to repay the loan according to its terms, in violation of 15 U.S.C. § 1639c(a) and 12 C.F.R. § 1026.43(c).

### Count IV – Violation of the Truth in Lending Act (Pre-Loan Counseling), 15 U.S.C. § 1639(u), 12 C.F.R. § 1026.34(a)(5)

250.    Plaintiffs reallege and incorporate by reference all of the allegations set forth in paragraphs 1 through 249 above.

251.    The transactions at issue are "high-priced mortgages" within the meaning of 12 C.F.R. § 1026.32(a)(1).

252.    Defendants are "creditors" within the meaning of 12 C.F.R. § 1026.2(a)(17).

253.    Defendants have extended the high-priced mortgages at issue without receiving

written certification that the consumer has obtained counseling on the advisability of the

transaction from an appropriate counselor, in violation of 15 U.S.C. § 1639(u) and 12 C.F.R.

§ 1026.34(a)(5).

### Count V – Violation of the Truth in Lending Act (Mandatory Disclosure), 15 U.S.C. § 1639(a), 12 C.F.R. § 1026.32(c)

254.    Plaintiffs reallege and incorporate by reference all of the allegations set forth in

paragraphs 1 through 253 above.

255.    The transactions at issue are "high-priced mortgages" within the meaning of 12

C.F.R. § 1026.32(a)(1).

256.    Defendants are "creditors" within the meaning of 12 C.F.R. § 1026.2(a)(17).

257.    Defendants have extended the high-priced mortgages at issue without providing a

disclosure stating:  "You are not required to complete this agreement merely because you have

received these disclosures or have signed a loan application.  If you obtain this loan, the lender

will have a mortgage on your home.  You could lose your home, and any money you have put

into it, if you do not meet your obligations under the loan."  This violates 15 U.S.C. § 1639(a)

and 12 C.F.R. § 1026.32(c).

### Count VI – Violation of the Truth in Lending Act (Appraisal), 15 U.S.C. § 1639h, 12 C.F.R. § 1026.35(c)(6)

258.    Plaintiffs reallege and incorporate by reference all of the allegations set forth in

paragraphs 1 through 257 above.

259.    The transactions at issue are "higher-priced mortgages" within the meaning of 12

C.F.R. § 1026.35(a)(1).

260.    Defendants are "creditors" within the meaning of 12 C.F.R. § 1026.2(a)(17).

261.    Defendants have extended the higher-priced mortgages at issue without providing the consumer with a written appraisal performed by a certified or licensed appraiser.  This violates 15 U.S.C. § 1639h and 12 C.F.R. § 1026.35(c)(6).

### Count VII – Violation of Indiana Code § 32-31-8-5
### (Condition of Premises)

262.    Plaintiffs reallege and incorporate by reference all of the allegations set forth in paragraphs 1 through 261 above.

263.    The properties at issue are "dwelling units" and "rental premises" within the meaning of Indiana Code §§ 32-31-8-1 and 32-31-8-3.

264.    Defendants have failed to deliver the properties at issue in a safe, clean, and habitable condition, as required by Indiana Code § 32-31-8-5.

265.    Defendants have failed to provide electrical, plumbing, and heating systems in good and safe working condition, as required by Indiana Code § 32-31-8-5.

266.    Defendants were given notice of and/or had actual knowledge of these violations and refused to remedy them.

### Count VIII – Violation of Indiana Home Loan Practices Act
### Ind. Code § 24-9-3-7(c)

267.    Plaintiffs reallege and incorporate by reference all of the allegations set forth in paragraphs 1 through 266 above.

268.    The transactions at issue are "mortgage transactions" and/or "real estate transactions" within the meaning of Indiana Code § 24-9-3-7(a) and (b).

269.    Defendants engaged in deceptive acts within the meaning of Indiana Code § 24-9-2-7 in connection with the transactions at issue, in violation of Indiana Code § 24-9-3-7(c)(3).

270.     In accordance with Indiana Code § 24-9-5-4(e), more than ninety days prior to the filing of this First Amended Complaint Plaintiffs notified the homeowner protection unit of the Office of the Indiana Attorney General of the violations of Indiana Code § 24-9-3-7(c) identified herein.  The homeowner protection unit has not subsequently instituted any action to redress the violations.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that the Court grant them the following relief:

271.     Enter a declaratory judgment that the foregoing acts, policies, and practices of Defendants violate 15 U.S.C. §§ 1639, 1639c, 1639h, and 1691; 42 U.S.C. §§ 3604 and 3605; and Indiana Code §§ 24-9-3-7(c) and 32-31-8-5;

272.     Enter a permanent injunction enjoining Defendants and their directors, officers, agents, and employees from continuing to publish, implement, and enforce the illegal conduct described herein and directing Defendants and their directors, officers, agents, and employees to take all affirmative steps necessary to remedy the effects of that conduct and to prevent additional instances of such conduct or similar conduct from occurring in the future;

273.     Award compensatory damages to Plaintiffs in an amount to be determined by the jury that would fully compensate Plaintiffs for their injuries caused by the conduct of Defendants alleged herein;

274.     Award statutory damages to Plaintiffs in an amount to be determined by the Court in accordance with 15 U.S.C. § 1640(a)(2)(B), 15 U.S.C. § 1640(a)(4), and Indiana Code § 24-9-5-4(a)(2);

275. Award punitive damages to Plaintiffs in an amount to be determined by the jury that would punish Defendants for the willful, wanton, and reckless conduct alleged herein and that would effectively deter similar conduct in the future;

276. Award Plaintiffs their reasonable attorneys' fees and costs pursuant to 15 U.S.C. §§ 1640(a)(3) and 1691e(d); 42 U.S.C. § 3613(c)(2); and Indiana Code §§ 24-9-5-4(a)(3) and 32-31-8-6(d)(1)(B); and

277. Order such other relief as this Court deems just and equitable.

## DEMAND FOR JURY TRIAL

278. Plaintiffs request trial by jury as to all issues so triable.

Date: December 17, 2018

/s/ Glenn Schlactus
Glenn Schlactus (admitted *pro hac vice*)
Jennifer Klar (admitted *pro hac vice*)
Joseph J. Wardenski (admitted *pro hac vice*)
Laura Gaztambide-Arandes (admitted *pro hac vice*)
Andrea Lowe (admitted *pro hac vice*)
RELMAN, DANE & COLFAX PLLC
1225 19th St., NW, Suite 600
Washington, D.C. 20036
Tel: 202-728-1888
Fax: 202-728-0848
gschlactus@relmanlaw.com
jklar@relmanlaw.com
jwardenski@relmanlaw.com
larandes@relmanlaw.com
alowe@relmanlaw.com

/s/ James P. Strenski
James P. Strenski (Bar #18186-53)
Ian P. Goodman (Bar #30645-49)
CANTRELL, STRENSKI & MEHRINGER, LLP
150 West Market Street, Suite 800
Indianapolis, IN 46204
Tel: 317.352.3500
Fax: 317.352.3501
jstrenski@csmlawfirm.com
igoodman@csmlawfirm.com

*Attorneys for Plaintiffs Fair Housing Center of Central Indiana, Inc., Maria Gaspar, Mory Kamano, Franklin Paz, Cordell Spencer, and Norma Tejeda*