**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| FAIR HOUSING CENTER OF CENTRAL INDIANA, INC., *et al.*, | |
| Plaintiffs, | |
| v. | Case No. 1:17-cv-1782-RLM-TAB |
| RAINBOW REALTY GROUP, INC., *et al.*, | |
| Defendants. | |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT**
**OF MOTION FOR CLASS CERTIFICATION**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... iii

EXHIBIT INDEX ................................................................................................................... vi

INTRODUCTION ..................................................................................................................... 1

STANDARD OF REVIEW ....................................................................................................... 3

PROPOSED CLASS AND SUBCLASSES ................................................................................ 3

FACTUAL BACKGROUND .................................................................................................... 5

    I.      RAINBOW TREATS RTB CUSTOMERS IN A UNIFORM AND
           PREDATORY MANNER ......................................................................................... 5

    II.     THE RTB PROGRAM IS CONCENTRATED IN HIGH-MINORITY
           NEIGHBORHOODS .............................................................................................. 16

ARGUMENT ......................................................................................................................... 18

    I.      THE PROPOSED CLASS SATISFIES THE REQUIREMENTS OF RULE 23(a) ................. 18

          A.     Rule 23(a)(1) – Numerosity Is Satisfied Because the Class
                Has Thousands of Members and the Smallest Subclass
                Has Hundreds .......................................................................................... 18

          B.     Rule 23(a)(2) – Commonality Is Satisfied Because the
                Claims Raise Common Questions of Law and Fact
                Capable of Classwide Resolution on the Basis
                of Common Evidence About the Uniform RTB Program ........................ 18

               1.      Reverse Redlining Claims Under the FHA and ECOA ................ 19

               2.      Condition of Premises Under Indiana Law .................................... 23

                3.      Indiana Home Loan Practices Act .................................................. 24

                4.      Truth in Lending Act Claims ......................................................... 26

          C.     Rule 23(a)(3) – Typicality Is Satisfied Because the Class
                Representatives Experienced the Same Unlawful Conduct and
                Share the Same Interests as the Class and Subclasses ............................. 27

i

D.     Rule 23(a)(4) – Adequacy Is Satisfied Because the Named
       Plaintiffs and Their Counsel Will Adequately Represent the
       Proposed Class and Subclasses ................................................................ 28

II.    THE PROPOSED CLASS SATISFIES THE REQUIREMENTS OF RULE 23(b) .................. 30

       A.     Rule 23(b)(2) – Injunctive and Declaratory Relief .................................... 30

       B.     Rule 23(b)(3) – Predominance and Superiority ......................................... 31

              1.     Common Questions of Law and Fact Predominate ...................... 32

              2.     Adjudication Through a Class Action Is Superior ........................ 34

CONCLUSION ................................................................................................................ 35

# TABLE OF AUTHORITIES

**Cases**                                                                                   **Page(s)**

*Abbott v. Lockheed Martin Corp.*, 725 F.3d 803 (7th Cir. 2013) ...................................................30

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997).......................................................30, 32, 35

*Arnold Chapman & Paldo Sign & Display Co. v. Wagener Equities Inc.*,
747 F.3d 489 (7th Cir. 2014) ...........................................................................................24

*Arreola v. Godinez*, 546 F.3d 788 (7th Cir. 2008)...................................................................27, 28

*Bell v. PNC Bank, Nat'l Ass'n*, 800 F.3d 360 (7th Cir. 2015) ..............................................3, 24, 33

*Butler v. Sears, Roebuck & Co.*, 727 F.3d 796 (7th Cir. 2013) ........................................27, 33, 34

*CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721 (7th Cir. 2011)........................28

*Chi. Teachers Union, Local No. 1 v. Bd. of Ed. of the City of Chi.*,
797 F.3d 426 (7th Cir. 2015) ....................................................................................... *passim*

*City of Memphis v. Wells Fargo Bank, N.A.*, No. 09-2857-STA,
2011 WL 1706756 (W.D. Tenn. May 4, 2011) ...............................................................29

*Columbus Bd. of Educ. v. Penick*, 443 U.S. 449 (1979) ...............................................................22

*Connecticut v. Teal*, 457 U.S. 440 (1982)...................................................................................21

*Flack v. Wis. Dep't of Health Servs.*, No. 18-cv-309-wmc (W.D. Wis. 2019)............................29

*Fonder v. Sheriff of Kankakee Cty.*, No. 12-cv-2115,
2013 WL 5644754 (C.D. Ill. Oct. 15, 2013)....................................................................33

*Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147 (1982)..........................................................27, 28

*Gladstone, Realtors v. Vill. of Bellwood*, 441 U.S. 91 (1979).......................................................4

*Grimes v. Evergreen Recreational Vehicles, LLC*, No. 3:16-CV-472-JD,
2018 WL 1257237 (N.D. Ind. Mar. 12, 2018)................................................................34

*Hargraves v. Capital City Mortg. Corp.*, 140 F. Supp. 2d 7 (D.D.C. 2000) ................................19

*In re Checking Account Overdraft Litig.*, 307 F.R.D. 630 (S.D. Fla. 2015)................................20

*In re Stericycle, Inc.*, No. 13 C 5795,
2017 WL 635142 (N.D. Ill. Feb. 16, 2017) ............................................................25, 31

*Kelen v. World Fin. Network Nat'l Bank*, 295 F.R.D. 87 (S.D.N.Y. 2013)..................................26

*Koss v. Norwood*, 305 F. Supp. 3d 897 (N.D. Ill. 2018).......................................................3, 28

*Mayor & City Council of Baltimore v. Wells Fargo Bank, N.A.*,
NO. JFM-08-62, 2011 WL 1557759 (D. Md. Apr. 22, 2011) ......................................29

*McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
672 F.3d 482 (7th Cir. 2012) ....................................................................20, 22, 31

*Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802 (7th Cir. 2012) ...............3, 18, 19, 33

*Moore v. Duke*, Civ. No. 00-953 (D.D.C. 2013)...................................................................29

*Morgan v. Richmond Sch. of Health and Tech., Inc.*,
No. 3:12-cv-373 (E.D. Va. 2013) ...........................................................................29

*Mullins v. Direct Dig., LLC*, 795 F.3d 654 (7th Cir. 2015) ................................................25, 33, 35

*Muro v. Target Corp.*, 580 F.3d 485 (7th Cir. 2009)...........................................................28

*Old W. End Ass'n v. Buckeye Fed. Sav. & Loan*,
675 F. Supp. 1100 (N.D. Ohio 1987)..........................................................................4

*Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256 (1979) .....................................................22

*Physicians Healthsource Inc. v. A-S Medication Sols.*,
318 F.R.D. 712 (N.D. Ill. 2016)........................................................................18, 29

*Pierre v. Midland Credit Mgmt., Inc.*, No. 16 C 2895,
2017 WL 1427070 (N.D. Ill. Apr. 21, 2017) ...........................................................26

*Pryor v. NCAA*, 288 F.3d 548 (3d Cir. 2002) ......................................................................22

*Rainbow Realty Grp. v. Carter*, Case No. 19S-CC-00038 (Ind. 2019) ......................................24

*Red Barn Motors, Inc. v. NextGear Capital, Inc.*, 915 F.3d 1098 (7th Cir. 2019) ................23, 33

*Retired Chi. Police Ass'n v. City of Chicago*, 7 F.3d 584 (7th Cir. 1993)..................................29

*Saint-Jean v. Emigrant Mortg. Co.*, 50 F. Supp. 3d 300 (E.D.N.Y. 2014).................................19

*Saint-Jean v. Emigrant Mortg. Co.*, 337 F. Supp. 3d 186 (E.D.N.Y. 2018)...............................29

*Schneider v. Union Hosp., Inc.*, No. 2:15-CV-00204-JMS-DKL,
2016 WL 6037085 (S.D. Ind. Oct. 14, 2016) ...............................................................32

*Spano v. Boeing Co.*, 633 F.3d 574 (7th Cir. 2001)...................................................28

*Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750 (7th Cir. 2014)................................20, 26

*Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205 (1972)...............................................4

*Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036 (2016) ......................................5, 33

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) ....................................3, 18, 21, 22

**Statutes**                                                                  **Page(s)**

Ind. Code § 24-9-2-7...............................................................................................24, 25

Ind. Code § 24-9-3-7.................................................................................................4, 24

Ind. Code § 32-31-8-5...............................................................................................4, 23

**Regulations**                                                               **Page(s)**

12 C.F.R. § 1002.2 .........................................................................................................23

24 C.F.R. § 100.500 .......................................................................................................21

**Rules**                                                                     **Page(s)**

Fed. R. Civ. P. 23 .................................................................................................. *passim*

**INDEX OF EXHIBITS**

| Exhibit | Full Citation | Citation Abbreviation | Excerpt |
|---|---|---|---|
| 1 | Declaration of Augusta Allen (Aug. 29, 2018) | | |
| 2 | Declaration of Christopher Allen (Jan. 24, 2018) | | |
| 3 | Declaration of Jose Alvarez (Feb. 26, 2018) | | |
| 4 | Declaration of Gail Brewer (Apr. 16, 2019) | | |
| 5 | Declaration of Jay Burnett (Feb. 8, 2018) | | |
| 6 | Declaration of Edna Cardenas (Aug. 28, 2018) | | |
| 7 | Declaration of Crystal Coffey (Feb. 15, 2018) | | |
| 8 | Declaration of Teriana Davis (Jan. 24, 2018) | | |
| 9 | Declaration of Amanda Gilman (Aug. 29, 2018) | | |
| 10 | Declaration of Robert Graves (Feb. 23, 2018) | | |
| 11 | Declaration of Tanya Mitchell (Apr. 17, 2019) | | |
| 12 | Declaration of Tod Northington (Apr. 17, 2019) | | |
| 13 | Declaration of Jennifer Osborne (Oct. 19, 2018) | | |
| 14 | Declaration of Carmen Santiago Pagan (Mar. 5, 2018) | | |
| 15 | Declaration of Odell Palmore (Aug. 28, 2018) | | |
| 16 | Declaration of Marva Perkins (Feb. 6, 2018) | | |
| 17 | Declaration of Jairo Pineda (Aug. 28, 2018) | | |
| 18 | Declaration of Keith Sharp (Apr. 16, 2019) | | |
| 19 | Declaration of Elizabeth Stephens (Mar. 8, 2018) | | |
| 20 | Declaration of Jose Taveras (Aug. 28, 2018) | | |

| 21 | Declaration of Gaylon Townsell (Mar. 27, 2019) | | |
| 22 | Declaration of Eva Watts (Mar. 29, 2019) | | |
| 23 | Defendants' Responses to Plaintiffs' Fourth Set of Interrogatories (April 18, 2019) | D. Rog. IV | |
| 24 | Deposition of James Hotka (Apr. 24, 2019) | James Hotka Dep. | Yes |
| 25 | Purchase Agreement of Plaintiff Mory Kamano | Kamano Purchase Agreement | |
| 26 | Purchase Agreement of Plaintiff Norma Tejeda | Tejeda Purchase Agreement | |
| 27 | Purchase Agreement of Plaintiff Cordell Spencer | Spencer Purchase Agreement | |
| 28 | Purchase Agreement of Plaintiff Maria Gaspar | Gaspar Purchase Agreement | |
| 29 | Purchase Agreement of Plaintiff Franklin Paz | Paz Purchase Agreement | |
| 30 | Fed. R. Civ. P. 30(b)(6) Deposition of Rainbow Realty (Oct. 19, 2018) | Rainbow Dep. | Yes |
| 31 | Rainbow Realty Featured Rent-to-Buy Property List | Featured RTB Properties | |
| 32 | Deposition of Albert Argueta (Sept. 18, 2018) | Argueta Dep. | Yes |
| 33 | Deposition of Franco Bruno (Mar. 26, 2019) | Bruno Dep. | Yes |
| 34 | Trial Testimony of James Hotka Vol. II, *Rainbow Realty Group, Inc. v. Katrina Carter*, Case No. 49D14-1505-CC-16629 (Aug. 9, 2016) | Hotka Trial Testimony Vol. II | Yes |
| 35 | Deposition of James Hotka, *State of Indiana v. James R. Hotka, Rainbow Realty Group* (Indiana Real Estate Commission) (Sept. 27, 2013) | Hotka AG Dep. | Yes |
| 36 | Deposition of Benjamin Garcia (Mar. 22, 2019) | Garcia Dep. | Yes |
| 37 | Defendants' Answer, *State of Indiana v. Rainbow Realty,* Case No. 49D03-1301-PL-002987 (Marion Cty. Super. Ct. Apr. 2, 2013) | AG Answer | |
| 38 | Deposition of Norma Tejeda (Apr. 18, 2019) | Tejeda Dep. | Yes |
| 39 | Deposition of Franklin Paz (Apr. 5, 2019) | Paz Dep. | Yes |

| 40 | Deposition of Mory Kamano (Apr. 5, 2019) | Kamano Dep. | Yes |
| 41 | Deposition of Cordell Spencer (Apr. 15, 2019) | Spencer Dep. | Yes |
| 42 | Deposition of Maria Gaspar (Apr. 16, 2019) | Gaspar Dep. | Yes |
| 43 | Deposition of Christopher Hotka (Dec. 11, 2018) | C. Hotka Dep. | Yes |
| 44 | Amended Expert Report of Dr. Allan Parnell (corrected) | Parnell Report I | |
| 45 | Expert Report of Steven Meyer | Meyer Report I | |
| 46 | Deposition of Tonya Blankenship (Mar. 21, 2019) | Blankenship Dep. | Yes |
| 47 | Deposition of Jessie Hotka (Mar. 20, 2019) | Jessie Hotka Dep. | Yes |
| 48 | Purchase Agreement Declaration of Norma Tejeda | Tejeda Purchase Agreement Decl. | |
| 49 | Defendants' Responses to Plaintiffs' Second Set of Requests for Admission (April 18, 2019) | D. RFA II | |
| 50 | Defendants' Responses to Plaintiffs' First Set of Interrogatories (December 18, 2017) | D. Rog I | |
| 51 | Reply Expert Report of Kathleen E. Keest | Keest Report II | |
| 52 | Expert Report of Kathleen E. Keest | Keest Report I | |
| 53 | Defendants' Expert Rebuttal Report of Marsha J. Courchane | Courchane Report | |
| 54 | Rainbow Rent-to-Buy Advertisement | Rainbow RTB Advertisement | |
| 55 | Deposition of Nallely Molina (Oct. 16, 2018) | Molina Dep. | Yes |
| 56 | Deposition of Viviana Torres (May 22, 2019) | Torres Dep. | Yes |
| 57 | Sellers Residential Real Estate Disclosure of Plaintiff Norma Tejeda | Tejeda Sellers RRED | |
| 58 | Defendants' Responses to Plaintiffs' First Set of Requests for Admission (Oct. 20, 2017) | D. RFA I | |
| 59 | TIL Disclosure of Plaintiff Norma Tejeda | Tejeda TIL Disclosure | |
| 60 | Supplemental Expert Report of Stephen Meyer | Meyer Report II | |

| 61 | Plaintiffs' Interest Rate and Average Prime Offer Rate Analysis | Interest Rate and APOR Analysis | |
| 62 | Table 2: Plaintiffs' Analysis of Purchase Agreements Over Time | Table 2: Analysis of Purchase Agreements | |
| 63 | Analysis of Rainbow Realty Purchase Agreements Lasting 24 Months or Less | Analysis of Purchase Agreements Lasting 24 Months or Less | |
| 64 | Rainbow Late Fee and Eviction Policy | Eviction Filing Policy | |
| 65 | Deposition of Arelys Carbajal (May 22, 2019) | Carbajal Dep. | Yes |
| 66 | Pet Policy for Rent-to-Buy Contracts | Pet Policy RTB | |
| 67 | Rent-To-Buy Lock and Secure Sheet | RTB Lock & Secure | |
| 68 | Application of Mory Kamano | Kamano Application | |
| 69 | Application of Norma Tejeda | Tejeda Application | |
| 70 | Application of Franklin Paz | Paz Application | |
| 71 | Application of Maria Gaspar | Gaspar Application | |
| 72 | Application of Cordell Spencer | Spencer Application | |
| 73 | Declaration of Advanced Debt Collection | Advanced Debt Collection Decl. | |
| 74 | Rainbow Payment Ledger for Mory Kamano | Kamano Ledger | |

**INTRODUCTION**

This is a challenge to a predatory "rent to buy" ("RTB") real estate scheme designed to entrap unsophisticated and vulnerable consumers into confusing, grossly unfavorable transactions using the false promise of homeownership. Defendants acquire the cheapest, most dilapidated housing stock in the Indianapolis area—primarily in Marion County—and lure their victims into paying outrageously inflated prices and exorbitant interest rates for them, and into investing their own time and money to try and make them livable. But the promise is false.

Most who enter RTB contracts quickly fall behind on their monthly payments. That is virtually inevitable because Defendants target people with such poor financial profiles as to have few if any other options for homeownership, and approve nearly anyone without regard to their ability to repay the loan while making necessary repairs on the house. Thirty percent of these supposedly 30-year contracts fail within six months, the majority before the two-year mark. Relying on a deceptive contract created just for the RTB program, Defendants evict their customers as soon as they fall behind and resell the house to the next customer, leaving most with nothing. This predatory business model allows Defendants to make plenty of money even as thousands have been victimized in the last ten years.

The RTB scheme is orchestrated by Defendant James R. Hotka ("Hotka") using companies and trusts he created and controls, which are also Defendants here. The Defendants are referred to collectively herein as "Rainbow" because the public face of the program is Defendant Rainbow Realty Group, Inc.

The RTB program is also discriminatory. Expert analysis confirms that the RTB houses are located disproportionately in neighborhoods that have much higher percentages of African Americans, Hispanics, and non-whites than the area overall. The demographics of neighborhoods

with such cheap houses do not fully explain this; Rainbow's properties are more concentrated in minority neighborhoods than those demographics would suggest. That is because Rainbow is targeting these neighborhoods based on race and ethnicity. Targeting predatory practices on these bases is referred to as "reverse redlining" and violates fair housing and fair lending laws.

The RTB program is standardized from beginning to end. All customers are subject to the same predatory conduct and have their rights violated in the same ways. This case is therefore suitable for adjudication as a class action and the individual Named Plaintiffs—Maria Gaspar, Mory Kamano, Franklin Paz, Cordell Spencer, and Norma Tejeda—now move for certification under Fed. R. Civ. P. ("Rule") 23(b)(2) and (b)(3). They are all African-American or Hispanic. All entered RTB transactions, only to find that their rundown houses were even worse than they realized (or could have before signing) and that they could not afford their monthly payments to Rainbow, the costs of repair, and their other living expenses. Testimony from twenty-two similarly-injured declarants further confirms the standardized policies and practices that are central to all aspects of the RTB program.[1]

The requirements for certification are easily met here. Of central importance, the key questions in this lawsuit are common across the class, will be resolved by common evidence, and predominate over any individual issues which (if necessary) may be addressed in subsequent proceedings pursuant to well-established Seventh Circuit precedent. These common questions include: Is the RTB program predatory? Is it deceptive? Is it discriminatory in effect or by design? Do the form contracts allow Rainbow to simultaneously shirk a landlord's duty to provide habitable properties while evicting its customers like ordinary renters? Does federal law require Rainbow to provide certain protections, like an independent appraisal, that it admittedly

---

[1] *See* Exs. 1-22.

does not? This litigation "rises or falls" on the answers to these questions, *Chicago Teachers Union, Local No. 1 v. Board of Education of the City of Chicago*, 797 F.3d 426, 444 (7th Cir. 2015), and the additional Rule 23 factors are likewise satisfied, as discussed below. This establishes that certification is warranted.

Plaintiffs bring claims under the federal Fair Housing Act ("FHA"), Equal Credit Opportunity Act ("ECOA"), and Truth in Lending Act ("TILA"), and two Indiana statutes. An appropriate structure for an overall class and subclasses is set forth below, reflecting different statutes of limitations. Plaintiffs respectfully request that they be appointed to represent the interests of the class and subclasses, and that undersigned counsel be appointed class counsel.

## STANDARD OF REVIEW

Plaintiffs must prove by a preponderance of the evidence that the requirements of Rule 23 have been met. *Bell v. PNC Bank, Nat'l Ass'n*, 800 F.3d 360, 373 (7th Cir. 2015).

As the Seventh Circuit has instructed, the class certification decision is not "a dress rehearsal for the trial on the merits." *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012). The question at class certification is "whether a class action is the proper way to *resolve* the merits," not an analysis *of the merits*. *Koss v. Norwood*, 305 F. Supp. 3d 897, 915 (N.D. Ill. 2018) (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351-52 (2011)) (emphasis added). In other words, "[g]oing beyond the limited inquiry required and addressing the merits before class certification puts the cart before the horse." *Id.* Thus, "the court should delve no further into the merits than is necessary to decide whether to certify a class." *Id.*

## PROPOSED CLASS AND SUBCLASSES

For their reverse redlining claims under the FHA and ECOA, and for their claim that Rainbow violated Indiana's requirement that it deliver rental premises in a safe, clean, and

3

habitable condition, comply with health and housing codes, and maintain major systems such as electrical (Ind. Code § 32-31-8-5), Plaintiffs seek certification of a class of all people who entered a RTB agreement with Rainbow for a residential property **since the beginning of 2009**, excluding those who successfully paid off their agreement.[2] There have been over two thousand agreements during the proposed class period, many with two signatories (*e.g.*, a married couple). Rainbow states that 82 agreements have been paid off since the RTB program began in 1992, *e.g.*, by a customer who comes into sufficient cash to get out from under this bad deal.[3]

For their claim that Rainbow engaged in deceptive acts in violation of the Indiana Home Loan Practices Act (Ind. Code § 24-9-3-7(c)), Plaintiffs seek certification of a subclass of all people who entered a RTB agreement with Rainbow for a residential property **since May 30, 2012**, excluding those who successfully paid off their agreement.

For their claims that Rainbow violated TILA by failing to satisfy four consumer protection requirements, Plaintiffs seek certification of a subclass of all people who entered a RTB agreement with Rainbow for a residential property, excluding those who successfully paid off their agreement, **since May 30, 2014** (Counts III to V: ability to repay, disclosure, pre-loan counseling), and a subclass of all people who did so **since May 30, 2016** (Count VI: appraisal).

The different timeframes are due to different statutes of limitations. There is otherwise no difference between the proposed class and subclasses. All Named Plaintiffs are members of the proposed class. Named Plaintiffs Gaspar, Paz, and Tejeda are members of each subclass.[4]

---

[2] All people harmed by Rainbow's discrimination may challenge it, regardless of protected class membership. *See, e.g.*, *Gladstone, Realtors v. Vill. of Bellwood*, 441 U.S. 91, 103 n.9 (1979); *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 208 (1972); *Old W. End Ass'n v. Buckeye Fed. Sav. & Loan*, 675 F. Supp. 1100, 1102 (N.D. Ohio 1987).

[3] Ex. 23 (D. Rog. IV) at No. 21; Ex. 24 (James Hotka Dep.) at 116-19, 150-51.

[4] Mory Kamano entered his Purchase Agreement on February 3, 2012 (Ex. 25), Norma Tejeda on September 7, 2016 (Ex. 26), Cordell Spencer on May 23, 2012 (Ex. 27), Franklin Paz on May 31, 2017 (Ex. 29), and Maria Gaspar on June 1, 2016 (Ex. 28). Ms. Gaspar's partner signed the family's original Purchase Agreement; after his death, Ms. Gaspar was compelled to sign a new one to avoid losing all the family had invested. Ex. 42 (Gaspar Dep.) at 27-28, 32-33.

## FACTUAL BACKGROUND

I.   **RAINBOW TREATS RTB CUSTOMERS IN A UNIFORM AND PREDATORY MANNER**

Defendant Rainbow Realty Group is an Indianapolis company. It is run by its owner,

Defendant James Hotka.[5] The relationship between Defendants, whereby they collectively own,

operate, and benefit from the RTB program, is described in Plaintiffs' Motion for Leave to File

Third Amended Class Action Complaint (ECF No. 87) (Dec. 17, 2018).

Rainbow's RTB program is as uniform and standardized as it could possibly be, and

predatory at every turn. The program has been this way throughout the proposed class period.

It starts with Rainbow's product: rundown houses. Rainbow's standard property listing

describes them as "FIX-UP HOMES."[6] Hotka and Rainbow employees have testified that none

of the houses are livable.[7] This is confirmed by testimony from all twenty-seven Named

Plaintiffs and declarants.[8] They describe, among many other serious problems: rampant mold

throughout the homes; basements that flood any time it rains; partial or completely missing

electrical wiring; insufficient insulation; broken plumbing, furnaces, and water heaters;

infestations of mosquitos, rats, and other animals; deteriorated flooring; non-functional heating

systems; and leaking roofs, ceilings, and sinks.[9]

Rainbow's method for acquiring inventory is designed to find nothing but dilapidated

properties: it makes very low bids on the cheapest houses for sale. Throughout the class period,

---

[5] Ex. 30 (Rainbow Dep.) at 19-20, 27, 41.

[6] Ex. 31 (Featured RTB Properties); Ex. 32 (Argueta Dep.) at 116-17.

[7] Ex. 34 (Hotka Trial Testimony Vol. II) at 29-30; Ex. 35 (Hotka AG Dep.) at 17; Ex. 32 (Argueta Dep.) at 56; Ex. 33 (Bruno Dep.) at 115; Ex. 36 (Garcia Dep.) at 216; *see also* Ex. 37 (AG Answer) ¶ 9.8 ("[t]he customers are advised that the properties are not habitable").

[8] The related "experiences of a subset" of Rainbow's customers are, in connection with class certification, "probative as to the experiences of all of them." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1048 (2016).

[9] Ex. 38 (Tejeda Dep.) at 46-47; Ex. 39 (Paz Dep.) at 50-51; Ex. 40 (Kamano Dep.) at 65-68; Ex. 41 (Spencer Dep.) at 101-09; Ex. 42 (Gaspar Dep.) at 19-22; *see also, e.g.,* Ex. 2 ¶¶ 24-25; Ex. 9 ¶¶ 25-26; Ex. 10 ¶¶ 21-22; Ex. 11 ¶¶ 24-25; Ex. 12 ¶¶ 27-28; Ex. 14 ¶¶ 22-23; Ex. 13 ¶¶ 26-27; Ex. 18 ¶¶ 26-27; Ex. 19 ¶¶ 24-25.

Rainbow has used a computer program to pull from the local multiple listing service ("MLS") every property offered for less than approximately $35,000.[10] Chris Hotka looks at the results weekly and decides whether to bid, spending "a couple of minutes, if that" on each.[11] Rainbow has made over 17,000 bids during the class period.[12] The bids are approximately one-third of the asking price.[13] Because Rainbow's bids are so low, its average purchase price is $8,661.[14] By definition, houses purchased so cheaply in the area will not be habitable, as confirmed by expert witness Steven Meyer, Executive Director of the King Park Development Corporation and former Administrator of Indianapolis's Brownfield Redevelopment Corporation.[15]

Rainbow then "sells" these houses to RTB customers for multiples of its own purchase price.[16] The average initial RTB contract price is $45,423.[17] By policy and practice, Rainbow does not repair the homes first; it only secures them, collects trash, and resolves open health and safety code violations issued by local authorities.[18] The "Purchase Agreement Declaration" that Defendant Empire Holding Corp. signs in every transaction nonetheless states, deceptively and dishonestly, that "Buyer acknowledges that he/she is receiving a substantial discount in purchase price."[19] To the contrary, the sales prices are outrageously inflated in disregard of fair market value.[20]

---

[10] Ex. 30 (Rainbow Dep.) at 52-53, 118-19 (maximum MLS threshold has at times been $30,000 and $35,000, and as high as $50,000); Ex. 43 (C. Hotka Dep.) at 75-76.
[11] Ex. 43 (C. Hotka Dep.) at 87-88, 248.
[12] Ex. 30 (Rainbow Dep.) at 177.
[13] Ex. 43 (C. Hotka Dep.) at 102-04; Ex. 30 (Rainbow Dep.) at 148-49.
[14] Ex. 44 (Parnell Report I) at 3.
[15] Ex. 45 (Meyer Report I) at 2-3.
[16] Ex. 24 (James Hotka Dep.) at 74.
[17] Ex. 44 (Parnell Report I) at 3.
[18] Ex. 43 (C. Hotka Dep.) at 169, 175; Ex. 46 (Blankenship Dep.) at 37-38. Such violations on vacant properties are limited to orders to repair the exterior of a home, abandoned vehicle violations, zoning violations, and trash violations. Ex. 47 (Jessie Hotka Dep.) at 25-26.
[19] Ex. 48 (Tejeda Purchase Agreement Decl.); Ex. 49 (D. RFA II) at No. 17; Ex. 33 (Bruno Dep.) at 115-16.
[20] Ex. 45 (Meyer Report I) at 4.

Rainbow can only sell its rundown houses at such inflated prices by finding people without viable alternatives. Finding people without choice is Rainbow's stated goal: "to enable participation in home ownership by those generally not able to participate in home ownership due to an inability to qualify and borrow money through traditional mortgage financing."[21] But as Plaintiffs' expert Kathleen Keest explains, "the absence of meaningful choice is an element of unfair, overreaching practices, not an excuse for them."[22]

Defendants' own expert confirms it is reaching people without alternatives. For Rainbow customers, she states, "there would likely have been no other option for a path to homeownership than one similar to [Rainbow's] RTB model."[23] The credit scores of Rainbow's RTB customers confirm it, too. A third do not even have a credit score and the average is only 551. Defendants' expert describes scores below 640 as "poorer credit risks,"[24] yet only 15% even top 600.

In fact, Rainbow's underwriting policy is to have virtually no underwriting standards at all. Rainbow has no minimum credit score requirement[25] and advertises "bad credit no problem."[26] Only people with an open bankruptcy or who have been evicted in the last six months are barred.[27] A customer does not need any income at all to get approved, only enough money to make a deposit of three times the monthly payment.[28] That is only $1,797 for a house with a monthly payment of $599/month, a common price across the class period.[29] The deposit is less for anyone who shows or merely states that they earn three times the monthly payment.[30]

---

[21] Ex. 50 (D. Rog I) at No. 8.
[22] Ex. 51 (Keest Report II) at 21. Keest has 40 years of consumer finance experience. Ex. 52 (Keest Report I) at 1-3.
[23] Ex. 53 (Courchane Report) at 29-31.
[24] *Id.* at 28-29.
[25] Ex. 32 (Argueta Dep.) at 173.
[26] *See, e.g.*, Ex. 31 (Featured RTB Properties); Ex. 54 (Rainbow RTB Advertisement).
[27] Ex. 55 (Molina Dep.) at 60-61, 151-53; Ex. 24 (James Hotka Dep.) at 68-69, 103.
[28] Ex. 33 (Bruno Dep.) at 253-54.
[29] *See, e.g.*, Ex. 29 (Paz Purchase Agreement); Ex. 26 (Tejeda Purchase Agreement).
[30] Ex. 33 (Bruno Dep.) at 253-54.

Rainbow does not consider whether a customer will be able to make these monthly payments given how much money it will cost the customer to repair the house and the customer's other debts.[31] Information about those debts is not even required.[32] Rainbow obtains credit reports on applicants but ignores all the information about their payment history for other debts.[33] Rainbow has such lax standards knowingly and intentionally. As Hotka explains, "we take people that are incredibly high risk" and whose "credit says you are not going to pay me."[34] Rainbow does not care because it wants people without an alternative. They are the easiest targets.

Once Rainbow has its high-risk audience in the door, it follows the same process for everyone. Customers are provided lists of available houses that uniformly have very little information,[35] are told to pick from them, and receive keys to go look on their own.[36] They cannot properly assess the condition of a house because the utilities are turned off.[37]

In a "Sellers Residential Real Estate Disclosure," an Indiana document that calls for item-by-item information, Rainbow represents that it does not know of its properties' many deficiencies, but that is not true. Rainbow systematically gathers information about its houses from the MLS system; by inspecting newly acquired properties and ones that return to inventory when a RTB agreement fails, using a specific form; by addressing code violations; through complaints from customers about property conditions; by performing repairs for customers (for which it charges); by making general inspections of properties; and by taking pictures to use in eviction hearings.[38] But on the Disclosure form, signed by Empire in every RTB transaction,

---

[31] Ex. 30 (Rainbow Dep.) at 326; Ex. 55 (Molina Dep.) at 186-187; Ex. 32 (Argueta Dep.) at 191-92.
[32] Ex. 30 (Rainbow Dep.) at 326; Ex. 55 (Molina Dep.) at 186-187.
[33] Ex. 55 (Molina Dep.) at 61-64.
[34] Ex. 34 (Hotka Trial Testimony Vol. II) at 34; Ex. 35 (Hotka AG Dep.) at 59.
[35] Ex. 31 (Featured RTB Properties).
[36] Ex. 56 (Torres Dep.) at 48.
[37] Ex. 30 (Rainbow Dep.) at 326-27; Ex. 33 (Bruno Dep.) at 146; Ex. 46 (Blankenship Dep.) at 81.
[38] Ex. 46 (Blankenship Dep.) at 77-79; Ex. 32 (Argueta Dep.) at 136.

Rainbow gives the same information for every property.[39] The Disclosure claims, falsely, that "[t]he owner . . . has little or no knowledge of [the property's] condition."[40] Rainbow likewise tells customers that it has not viewed the houses and does not know anything about them.[41]

Rainbow similarly fails to provide prospective customers the information that TILA requires for covered transactions, *i.e.*, an appraisal and a disclosure that they do not have to complete the transaction.[42] Rainbow does not obtain certifications that applicants have obtained counseling, also required by TILA.[43]

Rainbow not only withholds a great deal of important truthful information from prospective customers, but affirmatively misleads them about the nature of RTB transactions. Specifically, it leads them to believe they will become homeowners. The Named Plaintiffs and declarants repeatedly testify to this.[44] It is not true, as discussed below.

Once somebody chooses to apply, the application process is, as Hotka states, "as standardized as we can make it."[45] It almost invariably results in approval.

The four documents executed to consummate a RTB transaction are the same for everyone.[46] They are the Purchase Agreement, Purchase Agreement Declaration, Truth-In-Lending Disclosure ("TIL"), and Sellers Residential Real Estate Disclosure.[47] All these

---

[39] Ex. 33 (Bruno Dep.) at 107-08; *see also, e.g.,* Ex. 57 (Tejeda Sellers RRED).
[40] Hotka's sworn testimony, in the face of all this evidence, that "we give them everything we know that's wrong with the property," demonstrates that there are serious concerns about his credibility. Ex. 35 (Hotka AG Dep.) at 10.
[41] Ex. 46 (Blankenship Dep.) at 78-79; Ex. 43 (C. Hotka Dep.) at 230; Ex. 32 (Argueta Dep.) at 136.
[42] Ex. 58 (D. RFA I) at Nos. 1-2, 5; Ex. 33 (Bruno Dep.) at 106; Ex. 43 (C. Hotka Dep.) at 72, 181.
[43] Ex. 58 (D. RFA I) at Nos. 3, 4; Ex. 32 (Argueta Dep.) at 193; Ex. 33 (Bruno Dep.) at 106.
[44] Ex. 39 (Paz Dep.) at 42; Ex. 41 (Spencer Dep.) at 88, 90; Ex. 42 (Gaspar Dep.) at 36; Ex. 40 (Kamano Dep.) at 29, 60; Ex. 38 (Tejeda Dep.) at 29-30; *see also, e.g.,* Ex. 1 ¶ 15; Ex. 5 ¶ 14; Ex. 7 ¶ 13; Ex. 15 ¶ 15; Ex. 16 ¶ 14; Ex. 17 ¶ 16; Ex. 21 ¶ 15; Ex. 22 ¶ 16.
[45] Ex. 24 (James Hotka Dep.) at 67.
[46] Ex. 24 (James Hotka Dep.) at 77-79; Ex. 32 (Argueta Dep.) at 208; Ex. 33 (Bruno Dep.) at 63, 69-70, 95-96, 118-19.
[47] Ex. 33 (Bruno Dep.) at 63; Ex. 26 (Tejeda Purchase Agreement); Ex. 59 (Tejeda TIL Disclosure); Ex. 57 (Tejeda Sellers RRED); Ex. 48 (Tejeda Purchase Agreement Decl.).

documents have been in use throughout the class period, without any meaningful change.[48] One of two employees rushes through these documents in a standard fashion with the customer in the lobby of Rainbow's main office.[49]

The Purchase Agreement was created by Hotka for the RTB program;[50] it is not a standard industry document. It uses the lingo of a purchase-money mortgage financed by the seller, with a "Buyer," "Seller," "PURCHASE PRICE," "Principal & Interest Payment," 30-year "Term of Contract," "Interest Rate," and a "Total Monthly PITI Payment."[51] The document is set up so all of these jump off the page, leading the customer to think they are becoming a homeowner.[52] The same is communicated by requiring customers to check a box on the Purchase Agreement Declaration saying "[m]y intent is to purchase the property" and reject one that says "[m]y intent is to rent the property."[53]

But Hotka included fine print in the Purchase Agreement so he can treat it like an ordinary rental contract when a customer defaults. This allows Rainbow to quickly evict so-called Buyers instead of using much longer foreclosure proceedings that afford greater protections.[54] Evicted customers forfeit the value of repairs and improvements they made and their monthly payments, including equity that would have accrued under a typical mortgage.[55] To facilitate the use of evictions, Hotka's "innovation" was to characterize the Purchase

[48] Ex. 23 (D. Rog. IV) at Nos. 23, 24; Ex. 49 (D. RFA II) at Nos. 14, 16, 17; Ex. 48 (Tejeda Purchase Agreement Decl.) ("This agreement has not changed substantially since the mid 1990's"); Ex. 30 (Rainbow Dep.) at 277-78.
[49] Ex. 32 (Argueta Dep.) at 209; Ex. 33 (Bruno Dep.) at 119-20; *see also, e.g.,* Exs. 4 ¶ 14, 5 ¶ 12, 20 ¶ 13.
[50] Ex. 35 (Hotka AG Dep.) at 36; Ex. 30 (Rainbow Dep.) at 249-50.
[51] "PITI" is a standard mortgage term used to identify the total monthly cost for principal, interest, taxes, and insurance. The amount for insurance is zero because Rainbow leaves that to the customer. *See* Ex. 26 (Tejeda Purchase Agreement).
[52] Ex. 26 (Tejeda Purchase Agreement).
[53] Ex. 32 (Argueta Dep.) at 248; Ex. 33 (Bruno Dep.) at 114.
[54] Ex. 35 (Hotka AG Dep.) at 14-15.
[55] Ex. 26 (Tejeda Purchase Agreement) at K, M.

Agreement payments as "rent" (equal to the PITI payment), and state that after "twenty-four or more rental payments, the parties hereto shall execute a 'Conditional Sales Contract' (Land Contract) form embodying the terms contained herein."[56] That is, although a customer signs a document called a "Purchase Agreement" containing the terms of a home purchase, that document's fine print provides that the customer is a mere renter until signing a *different* document. Most customers default before ever making the 24 rental payments required to become eligible for the second contract, and even for those who do, Rainbow's policy is not to present them with the second contract to sign.[57]

Hotka admits that he designed this two-step transaction so he can evict customers just like renters.[58] It also lets Rainbow justify charging pet fees to its so-called Buyers, and otherwise maintain the rights of a landlord.[59] There is no transfer of title under the Purchase Agreement; that only happens in the rare event that the entire purchase price and all interest is paid.[60]

Having thus stripped customers of the legal rights of homebuyers, Rainbow relies on the same innovation to also strip them of the legal rights of tenants. It evades a landlord's central obligation of maintaining a habitable property—placing that burden entirely on the customer—on the theory that RTB customers commit to a 30-year purchase from the start and thus are not tenants.[61] The Purchase Agreement Declaration makes this rationale plain by citing the state habitability law explicitly. That is why the customer must check the box that says "purchase," not "rent." The same document states that the customer is "buying the property 'as-is' without any warranty of habitability," and the Purchase Agreement itself provides that the Buyer is

---

[56] Ex. 26 (Tejeda Purchase Agreement) at B.
[57] Ex. 35 (Hotka AG Dep.) at 12 (70% of agreements fail in first 6 months); Ex. 30 (Rainbow Dep.) at 304-06; Ex. 33 (Bruno Dep.) at 188-89.
[58] Ex. 37 (AG Answer) ¶ 11; Ex. 34 (Hotka Trial Testimony Vol. II) at 35-36; Ex. 35 (Hotka AG Dep.) at 15, 68-69.
[59] Ex. 35 (Hotka AG Dep.) at 61-62.
[60] Ex. 30 (Rainbow Dep.) at 255; Ex. 26 (Tejeda Purchase Agreement).
[61] Ex. 33 (Bruno Dep.) at 113-14; Ex. 46 (Blankenship Dep.) at 125.

responsible for "maintaining the property and related equipment," and "shall pay the cost of all repairs, improvements, pest control and/or maintenance to the property. (This shall include any repairs required by governmental or private agencies[.])" To make matters worse, RTB "Buyers" cannot take advantage of funding available to help people rehabilitate their homes because they are not actually homeowners.[62]

In short, the transaction is structured so that Rainbow has the advantages of being a landlord (eviction) *and* of being a seller (no responsibility to repair or pay taxes), but avoids the disadvantages of both.[63] Hotka has admitted as much.[64]

All of this is standardized. The only difference in terms among customers is the purchase price and interest rate, and the variations in these are not material to Plaintiffs' claims. Whatever purchase price is stated is consistently marked up enormously from the price Rainbow paid or any fair market value. The interest rates (which are tied to the property, not based on the customer's application[65]) similarly are consistently exorbitant. Federal law defines a "high-cost" loan as having a rate at least 6.5% higher than the "average prime offer rate," or "APOR,"[66] and a "higher-priced mortgage loan" as 1.5% or 2.5% above APOR (depending on size).[67] For every month from January 2009 through November 2016, the RTB rates exceeded APOR by between 7% and 11%.[68] Months after this case was filed, Hotka began lowering rates to approximately

---

[62] Ex. 60 (Meyer Report II) at 4-5.
[63] Ex. 52 (Keest Report I) at 14-16, 22-23.
[64] Ex. 35 (Hotka AG Dep.) at 61-62 (Q: "So you get it both ways?" A: "Yes, I do.").
[65] Ex. 30 (Rainbow Dep.) at 218.
[66] The Consumer Financial Protection Bureau describes APOR as "based on the average interest rates, fees, and other terms on mortgages offered to highly qualified borrowers." *See* https://www.consumerfinance.gov/ask-cfpb/what-is-a-higher-priced-mortgage-loan-en-1797/.
[67] *E.g.*, Ex. 52 (Keest Report I) at 28-31.
[68] Ex. 61 (Interest Rate and APOR Analysis); Ex. 52 (Keest Report I) at 29.

10%, thus "only" exceeding APOR by approximately 5% every month,[69] but compensated by further increasing the already inflated sales price of each house so the monthly payment would not change.[70] As Plaintiffs' expert Keest explains, not only does this interest rate manipulation make the contracts even more deceptive, it does not lower the rate that is properly used for purposes of Truth in Lending application.[71]

The entirely foreseeable result of Rainbow's policies and practices is that RTB customers fail and lose their homes at an astonishing rate. Out of 2,335 Purchase Agreements entered between January 1, 2009, and June 2, 2018 (the date of the last one produced to Plaintiffs), 1,697 ended by June 2, 2018.[72] This *understates* the failure rate, because it includes transactions entered near the end of the period analyzed (including 68 in the first half of 2018) that did not yet have time to fail.[73] Of all the concluded transactions, the average duration was only 15.24 months.[74] Nearly 30% last 6 months or fewer.[75] And these Purchase Agreements did not end because consumers paid off the purchase price. Over the 27-year history of the program, only 82 transactions *ever* concluded because the customer somehow paid Rainbow in full.[76]

Even granting Rainbow the unlikely assumption that all 82 Purchase Agreements paid off were originated during the 2009 to 2018 period, and even counting as "successes" newer RTB transactions that did not have time to fail, that is a failure rate of 69%. These figures parallel Hotka's testimony that "I can already tell you that 70 percent of the people don't make it to begin

---

[69] Ex. 61 (Interest Rate and APOR Analysis); Ex. 52 (Keest Report I) at 29-30; Ex. 30 (Rainbow Dep.) at 196-97, 200-01.
[70] Ex. 52 (Keest Report I) at 29-30; Ex. 30 (Rainbow Dep.) at 196-97, 200-01.
[71] Ex. 52 (Keest Report I) at 23-24, 29-30; Ex. 51 (Keest Report II) at 16-20.
[72] Ex. 62 (Table 2: Analysis of Purchase Agreements).
[73] *Id.*
[74] *Id.*
[75] Ex. 63 (Analysis of Purchase Agreements Lasting 24 Months or Less); Ex. 52 (Keest Report I) at 25 n.51.
[76] Ex. 24 (James Hotka Dep.) at 116-19; Ex. 23 (D. Rog. IV) at No. 21.

with. They just don't. They don't make the payments."[77] Rainbow knows the failure rates because it tracks them regularly.[78] None of this is by chance: "[t]he program is constructed so that consumers are more likely to fail than succeed in completing the contract."[79]

Once a RTB customer is late on a single monthly payment, Rainbow utilizes uniform rules and procedures to determine what late fees to assess, what calls to make and letters to send seeking payment, whether to accept a repayment plan, whether to institute eviction proceedings, and what damages to seek in eviction proceedings.[80] Two Rainbow employees responsible for evictions estimate that Rainbow files 30 evictions a month on average.[81]

When a transaction fails, the house returns to Rainbow's RTB inventory. As a result, 74% of the 855 houses "sold" during the class period have been "sold" at least twice during that time. Nearly half (49%) have been "sold" at least three times.[82]

Despite the alarming failure rate, Rainbow made only one small underwriting change during the class period (adding the rule against evictions in the last six months).[83] That is because, from Rainbow's perspective, rampant failures are not a problem. As Hotka explains, "[y]ou get a few to go right and that's how it makes your money."[84] In fact, Rainbow may not even need "a few to go right"; an average failed RTB "sale" (15.24 months at $599/month) covers Rainbow's average acquisition cost.

---

[77] Ex. 35 (Hotka AG Dep.) at 37.
[78] Ex. 55 (Molina Dep.) at 149-50.
[79] Ex. 52 (Keest Report I) at 5.
[80] Ex. 64 (Eviction Filing Policy); Ex. 24 (James Hotka Dep.) at 47-49; Ex. 47 (Jessie Hotka Dep.) at 110-12, 151-54, 156; Ex. 36 (Garcia Dep.) at 112-14, 133-34; Ex. 46 (Blankenship Dep.) at 110-12, 114; Ex. 33 (Bruno Dep.) at 196, 206.
[81] Ex. 47 (Jessie Hotka Dep.) at 118; Ex. 46 (Blankenship Dep.) at 112.
[82] Ex. 52 (Keest Report I) at 21 & n.42.
[83] Ex. 24 (James Hotka Dep.) at 102-03.
[84] Ex. 35 (Hotka AG Dep.) at 26; *see also* Ex. 24 (James Hotka Dep.) at 101-02 ("[t]he ones that do pay, pay for the ones that don't").

The uniformity in the RTB program described above is achieved through careful attention to training, written policies, automation, and forms.[85] Rainbow is a small company, and somebody new to a job is trained by somebody with experience to perform it the same way. There are also written training materials and numerous written policies.[86] Hotka testified that Rainbow's computer systems were designed "to standardize as many things as we could possibly standardize."[87] He added that standardization is similarly accomplished with forms: "[t]he forms are the company policy."[88] This assures that all customers are treated the same way.

The Named Plaintiffs and declarants confirm that this is how Rainbow works and that it takes advantage of vulnerable people in the same ways. Each entered a Purchase Agreement after January 1, 2009.[89] Their testimony about their own experience repeatedly shows that customers see multiple Rainbow houses (with the utilities off)[90] that are all in poor condition;[91] pick one that they later find is in much worse condition than they realized;[92] are approved despite poor qualifications;[93] are rushed through the document signing;[94] do not receive an appraisal or the disclosure about not needing to complete the transaction;[95] have not received counseling on

---

[85] Ex. 24 (James Hotka Dep.) at 133-35, 137-39; Ex. 32 (Argueta Dep.) at 311-12; Ex. 55 (Molina Dep.) at 144-48; Ex. 43 (C. Hotka Dep.) at 204-05; Ex. 33 (Bruno Dep.) at 118-19; Ex. 65 (Carbajal Dep.) at 31.

[86] *See, e.g.*, Ex. 66 (Pet Policy RTB); Ex. 64 (Eviction Filing Policy); Ex. 67 (RTB Lock and Secure).

[87] Ex. 24 (James Hotka Dep.) at 138.

[88] *Id.*

[89] *See* Exs. 25-29.

[90] Ex. 41 (Spencer Dep.) at 64; Ex. 38 (Tejeda Dep.) at 28-29; Ex. 42 (Gaspar Dep.) at 16; Ex. 40 (Kamano Dep.) at 65-66; Ex. 39 (Paz Dep.) at 29.

[91] Ex. 39 (Paz Dep.) at 20; Ex. 38 (Tejeda Dep.) at 25-26; Ex. 42 (Gaspar Dep.) at 16; Ex. 40 (Kamano Dep.) at 31-32, 48-49; Ex. 41 (Spencer Dep.) at 69.

[92] Ex. 41 (Spencer Dep.) at 69; Ex. 39 (Paz Dep.) at 21, 24, 47; Ex. 38 (Tejeda Dep.) at 45-46; Ex. 40 (Kamano Dep.) at 48.

[93] Ex. 68 (Kamano Application) (showing three evictions, multiple judgments, multiple accounts in collections, and a credit score of 550); Ex. 69 (Tejeda Application) (showing three accounts in collections and a no-hit credit report); Ex. 70 (Paz Application) (showing accounts past-due and in collections and a credit score of 551); Ex. 71 (Gaspar Application) (showing a no-hit credit report); Ex. 72 (Spencer Application) (no credit report run, and income of "0" shown on application).

[94] Ex. 39 (Paz Dep.) at 58; Ex. 41 (Spencer Dep.) at 79-80; Ex. 38 (Tejeda Dep.) at 39, 63; Ex. 42 (Gaspar Dep.) at 33-34; Ex. 40 (Kamano Dep.) at 102-103.

[95] Defendants' Answer to Third Am. Compl. (ECF No. 108) (Mar. 24, 2019) ¶¶ 114, 133, 168, 181, 200.

buying a home;[96] do not understand the nature of the transaction;[97] think they are becoming homeowners;[98] and do not think they can be evicted;[99] invest significant money and/or their own labor to try to make the house livable;[100] find they cannot afford the monthly debt to Rainbow and the cost of fixing the house;[101] and feel deceived and taken advantage of by Rainbow.[102]

Keest reviewed the RTB program and found that it includes many hallmarks of predatory subprime lending.[103] She describes it as "a business seeking to take unfair advantage of consumers who are inexperienced and put them into a financial situation that offers little real chance of them accomplishing their goal of buying a livable home."[104]

## II.   THE RTB PROGRAM IS CONCENTRATED IN HIGH-MINORITY NEIGHBORHOODS

Plaintiffs' expert demographer, Dr. Allan Parnell, analyzed the location of the RTB properties. He determined that they are located in neighborhoods with significantly higher percentages of African Americans and Hispanics than the area as a whole. For example, in Marion County (where more than 90% of the RTB properties are located), Dr. Parnell found that the typical neighborhood of a RTB property is 45.1% African-American, but overall the County is just 26.4% African-American. He likewise identified disparities for Hispanics, for all non-whites, and when considering all nine counties in which RTB properties are located.[105]

---

[96] *Id.*
[97] Ex. 41 (Spencer Dep.) at 85-87; Ex. 39 (Paz Dep.) at 25-26; Ex. 38 (Tejeda Dep.) at 38; 63; Ex. 42 (Gaspar Dep.) at 34-35, 37-38; Ex. 40 (Kamano Dep.) at 60.
[98] Ex. 39 (Paz Dep.) at 42; Ex. 41 (Spencer Dep.) at 88, 90; Ex. 42 (Gaspar Dep.) at 36; Ex. 40 (Kamano Dep.) at 29, 60; Ex. 38 (Tejeda Dep.) at 29-30.
[99] Ex. 39 (Paz Dep.) at 42; Ex. 40 (Kamano Dep.) at 97-98.
[100] Ex. 39 (Paz Dep.) at 47-49; Ex. 38 (Tejeda Dep.) at 46-47; Ex. 42 (Gaspar Dep.) at 20, 43; Ex. 40 (Kamano Dep.) at 63-73, 100; Ex. 41 (Spencer Dep.) at 100-10.
[101] Ex. 39 (Paz Dep.) at 45; Ex. 41 (Spencer Dep.) at 97-98; Ex. 40 (Kamano Dep.) at 97-98.
[102] Ex. 41 (Spencer Dep.) at 117; Ex. 39 (Paz Dep.) at 46-47; Ex. 38 (Tejeda Dep.) at 59; Ex. 42 (Gaspar Dep.) at 49; Ex. 40 (Kamano Dep.) at 97-99, 102-03; *see also* Exs. 1-22.
[103] Ex. 52 (Keest Report I) at 4-5, 12-24, 32.
[104] *Id.* at 32.
[105] Ex. 44 (Parnell Report) at 7-12, 33-34.

Dr. Parnell further found that the neighborhoods where houses are listed at or below the price point that Rainbow considers bidding on are disproportionately minority. That is, Rainbow's bidding criterion directly leads it to buy houses for its RTB inventory in disproportionately minority neighborhoods. For example, the African-American population is 15.5% across the nine counties, but 34.1% in the neighborhoods in the counties where houses are listed for $35,000 or less. He found comparable disparities for each demographic group, for Marion County alone, and when setting the limit at $50,000.[106]

Finally, Dr. Parnell found that the neighborhoods of the RTB properties are disproportionately minority when compared to the neighborhoods with properties below Rainbow's bidding threshold. Again, this was the case for every comparison. For example, in the nine counties the non-white population in the neighborhoods of the RTB properties is 59.3%; the non-white population where Rainbow considers bidding is 47.7%.[107] That is, the properties are in higher minority neighborhoods than Rainbow's bidding criterion would lead to on its own.

All of Dr. Parnell's findings of disproportionality are statistically significant.

Rainbow's advertising builds on this disproportionate concentration to target people of color. The primary method of advertising the RTB program is placing signs on RTB houses and at nearby street corners pointing to the houses.[108] Rainbow places thousands of these signs.[109] The inevitable effect is to attract primarily customers from these same neighborhoods, meaning customers who are disproportionately African-American and Hispanic.

The Named Plaintiffs' Rainbow houses are in majority-minority neighborhoods.[110]

---

[106] *Id.* at 12-19, 35-38.
[107] *Id.* at 20-26, 39-42, 48-49.
[108] Ex. 30 (Rainbow Dep.) at 318-19; Ex. 43 (C. Hotka Dep.) at 225-26; Ex. 46 (Blankenship Dep.) at 98-99; Ex. 36 (Garcia Dep.) at 207-08; Ex. 33 (Bruno Dep.) at 294.
[109] Ex. 30 (Rainbow Dep.) at 318.
[110] Ex. 44 (Parnell Report I) at 27.

## ARGUMENT

Class certification is proper where the class satisfies Rule 23(a)'s numerosity, commonality, typicality, and adequacy requirements, and at least one of the three requirements set forth in Rule 23(b). *See Messner*, 669 F.3d at 811. Rainbow has acted in the same manner toward the class, satisfying (b)(2), and the (b)(3) predominance and superiority standards are met. Rule 23 is satisfied.

### I.     THE PROPOSED CLASS SATISFIES THE REQUIREMENTS OF RULE 23(a)

#### A.     Rule 23(a)(1) – Numerosity Is Satisfied Because the Class Has Thousands of Members and the Smallest Subclass Has Hundreds

The proposed class includes over 2,000 members, identifiable from Defendants' records. *See supra* n. 72. The smallest subclass (for the TILA appraisal requirement) has hundreds of members. This easily satisfies the Rule 23(a)(1) requirement that "the class is so numerous that joinder of all members is impracticable." *See, e.g.*, *Physicians Healthsource Inc. v. A-S Medication Sols.*, 318 F.R.D. 712, 721 (N.D. Ill. 2016) (40 is generally sufficient).

#### B.     Rule 23(a)(2) – Commonality Is Satisfied Because the Claims Raise Common Questions of Law and Fact Capable of Class-wide Resolution on the Basis of Common Evidence About the Uniform RTB Program

Rule 23(a)(2)'s commonality requirement is met because Plaintiffs challenge the lawfulness of a standardized program. Although a single common question of law or fact would suffice to establish commonality, *Chicago Teachers Union*, 797 F.3d at 434 (citing *Wal-Mart*, 564 U.S. at 359), Plaintiffs present multiple common questions that will "generate common *answers* apt to drive the resolution of the litigation." *Id.* (quoting same). This is the paradigmatic case where the "same conduct or practice by the same defendant gives rise to the same kind of claims from all of the class members." *Chi. Teachers Union*, 797 F.3d at 440. Where, as here, "the same evidence will suffice for each [class] member to make a prima facie showing" of a

18

violation of law, the defendant's liability "becomes a common question." *Messner*, 669 F.3d at 815. Indeed, liability under *each* of Plaintiffs' claims revolves around common questions of fact and law that can be adjudicated class-wide.

### 1.     Reverse Redlining Claims Under the FHA and ECOA

Reverse redlining is about "targeting neighborhoods, overwhelmingly Black and Latino, with inflated credit, subprime loans, and other predatory lending practices . . . ." *Saint-Jean v. Emigrant Mortg. Co.*, 50 F. Supp. 3d 300, 305-06 (E.D.N.Y. 2014). Such practices have repeatedly been held to violate the FHA and ECOA. *See, e.g.*, *id.* at 306; *Hargraves v. Capital City Mortg. Corp.*, 140 F. Supp. 2d 7, 20 (D.D.C. 2000).

There are two key questions under Plaintiffs' reverse redlining claims: (1) whether the RTB program is unfair and predatory, and (2) whether it disparately impacts or is intentionally targeted at residents of minority communities. *See Hargraves*, 140 F. Supp. 2d at 20. Both will be answered class-wide through common evidence.

Whether the program is predatory can be answered on a class-wide basis because it is so standardized. The houses are purchased through a systematic process and none are livable; information about their condition is systematically obtained by Rainbow and uniformly withheld; sale prices are uniformly inflated by multiples; interest rates are uniformly exorbitant, whether explicitly or via admitted manipulation; no meaningful underwriting is used for any customers; all customers are sold an opportunity for home ownership that is illusory, as Rainbow well knows; all the transactions use the same confusing documents; all customers are saddled with the responsibility of repairing their homes like homeowners yet subject to eviction like renters; uniform collection procedures are applied upon default; and all customers are subjected to a business model that unabashedly aims to take advantage of people without viable alternatives.

Through this uniform program, Rainbow profits by intentionally leaving the area's most vulnerable residents to live in squalor and placing them at great risk of failure.

Because the evidence on these subjects shows that Rainbow's conduct is centrally controlled and standardized, narrow differences in class members' individual experiences under the RTB program do not defeat commonality. In *McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482 (7th Cir. 2012), the Court addressed two national policies on broker "teaming" and "account distribution." It found commonality even though individual brokers and their local managers were afforded substantial discretion in how to operate under the policies, *id.* at 488-90, because "the exercise of that discretion [wa]s influenced by the two company-wide policies," *id.* at 489. Any focus on "local, highly-individualized implementation of policies rather than the policies themselves" was misguided. *Id.* at 490.

Rainbow will dispute that its program is predatory, but that is immaterial. "Where the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members, there is a common question." *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014); *see also, e.g.*, *In re Checking Account Overdraft Litig.*, 307 F.R.D. 630, 634, 640-41 (S.D. Fla. 2015) (certifying class for claim that Wells Fargo unlawfully increased overdraft fees through "the same course of conduct" that included automation, misrepresentations, concealment, and materially uniform account agreements). Expert Kathleen Keest's analysis of the program's predatory nature applies equally to each class member.

Differences in the exact reasons why class members were vulnerable to harm from the predatory uniform RTB program are also immaterial. In *Chicago Teachers Union*, schools were selected for "reconstitution" (pursuant to which all school employees were replaced) for different reasons. For example, two were selected "to provide support for a nearby school that was

20

closing," one because "the local school council had asked for better options," one "because of its culture of complacency and poor quality instruction." 797 F.3d at 439. The Seventh Circuit nonetheless found commonality because the different reasons all came from a uniform set of criteria applied by a small group of decision-makers. *Id.* at 439-40. The common criteria, even though subjective, provided the "glue" required by *Wal-Mart* to hold together the reasons class members were harmed. *See id.* at 434. As in *Chicago Teachers Union*, application to all class members of a uniform program establishes commonality here, notwithstanding any variation in individual circumstances that leave class members harmed by the program.

Whether the RTB houses are located such that the program disparately impacts African Americans and Hispanics, or the program is intentionally targeted at African Americans and Hispanics, are likewise common questions. Disparate impact claims have up to three steps: whether a facially neutral practice disproportionately harms members of a protected class; if so, whether the practice is necessary to achieve a substantial and legitimate business purpose; and if so, whether the purpose can be served with a less discriminatory effect. *See, e.g.*, 24 C.F.R. § 100.500. Each can be addressed in common with common evidence.

At the first step, expert evidence from Dr. Parnell will show that the houses are disproportionately concentrated in high-minority neighborhoods and that this is the direct and inevitable result of Rainbow's policy of focusing exclusively on cheap houses. *See Chi. Teachers Union*, 797 F.3d at 435-36 (whether objective step in selection process causes disparate impact is a crucial common question) (discussing *Connecticut v. Teal*, 457 U.S. 440 (1982)).

At the second step, any claim by Rainbow that it is legitimate to target people without options by stocking its inventory with low-cost, rundown homes in high-minority neighborhoods, and then "selling" them at an outrageous mark-up and interest rate—knowing

that they likely will be evicted shortly with nothing to show for their investment—will be refuted by common evidence that it is predatory, not legitimate, to saddle people without options with such a toxic product. Absent a legitimate justification, the third step is not necessary. But even if it were, jurors could confirm, "in one stroke," *Wal-Mart*, 564 U.S. at 350, that eliminating the predatory elements of the RTB program would provide a less discriminatory alternative.

Expert evidence that the properties are even more concentrated in minority neighborhoods than would result from an even-handed application of Rainbow's bidding threshold will be used to demonstrate that the disproportionality is intentional, not just the result of a facially neutral practice. So will evidence that, having disproportionately concentrated its properties in minority neighborhoods, Rainbow's primary method of advertising the RTB program is to place signs at its existing RTB properties,[111] thus targeting predominantly minority customers. *See, e.g.*, *Columbus Bd. of Educ. v. Penick*, 443 U.S. 449, 464-65 (1979) (intent can be inferred from acting with knowledge of "the predictable effects"); *see also Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 n.25 (1979) (same); *Pryor v. NCAA*, 288 F.3d 548, 564-565 (3d Cir. 2002) (same).

Because both methods of showing discrimination, impact and intent, are susceptible to common proof and resolution, the question of discrimination is appropriate for class-wide resolution. *See Chi. Teachers Union*, 797 F.3d at 442-43 ("the question as to whether the reconstitution process discriminates against African Americans, either by disparate impact or treatment, can be adjudicated class-wide"); *McReynolds*, 672 F.3d at 489 (whether class-wide policy "causes racial discrimination and whether it nonetheless is justified by business necessity are issues common to the entire class and therefore appropriate for class-wide determination").

---

[111] Ex. 30 (Rainbow Dep.) at 318-19; Ex. 43 (C. Hotka Dep.) at 225-26; Ex. 46 (Blankenship Dep.) at 98-99; Ex. 36 (Garcia Dep.) at 207-08; Ex. 33 (Bruno Dep.) at 294.

22

For their ECOA claim, Plaintiffs must also demonstrate that Rainbow is a "creditor." *See* 12 C.F.R. § 1002.2(l) (defined in part as one who "regularly participates in a credit decision, including setting the terms of the credit"). Because Rainbow enters the same transaction with each customer, and acknowledges that the land trusts that hold title to the houses directly are creditors in these transactions, its status as a creditor can also be determined class-wide.[112]

### 2.      Condition of Premises Under Indiana Law

Plaintiffs' claim based on the state law requirements for the condition of rental premises, Ind. Code. § 32-31-8-5, likewise turns on a common question that can be resolved on a class-wide basis. Rainbow's policy, central to the RTB program, is not to fulfill the duties to deliver rental premises "in a safe, clean, and habitable condition," "[c]omply with all health and housing codes applicable to the rental premises," or provide and maintain adequate systems such as plumbing and heat. *See* Ind. Code § 32-31-8-5(1), (2), (4). It acknowledges that the houses are not livable, but explicitly puts the onus on its RTB customers in all of these areas by making the customers either handle repairs on their own or pay Rainbow to perform them.[113]

Rainbow's contention that the statute does not apply to the RTB program because of its uniform contractual language only confirms that the core facts are the same for each class member. Claims that turn on the interpretation of form contract provisions are ideally suited for class resolution. *See, e.g.*, *Red Barn Motors, Inc. v. NextGear Capital, Inc.*, 915 F.3d 1098, 1101-02 (7th Cir. 2019) (vacating decertification).

It is immaterial that, as Rainbow may assert, class members received different houses in different states of disrepair. The key fact is that each class member was subjected to the same

---

[112] Ex. 30 (Rainbow Dep.) at 252, 254-55. Defendant Empire Holding, as trustee of every land trust, and Defendant Rainbow Realty Group execute every Purchase Agreement.
[113] Ex. 24 (James Hotka Dep.) at 76-77; Ex. 46 (Blankenship Dep.) at 75; *see also* Ex. 26 (Tejeda Purchase Agreement) at K.

policy of disavowing habitability requirements. The legality of that uniform policy is a common question. "Plaintiffs need not prove that every member of the proposed class has been harmed before the class can be certified" to challenge a policy to which all were exposed. *Bell*, 800 F.3d at 380. *Bell* upheld the certification of a class of all overtime-eligible workers to challenge a policy of failing to pay overtime. It did not matter that it was "likely that a certain number of class members were not harmed by the policy because they never worked beyond their forty-hour week." 800 F.3d at 380. Here, too, any differences as to the precise condition of the various properties in the RTB portfolio go to whether particular class members have a claim and what damages they may be due, both of which are properly determined after class certification rather than constituting a defense to it. *See Arnold Chapman & Paldo Sign & Display Co. v. Wagener Equities Inc.*, 747 F.3d 489, 492 (7th Cir. 2014) ("'How many (if any) of the class members have a valid claim is the issue to be determined *after* the class is certified.'") (citation omitted).

That the intersection of this statute and a RTB transaction is at issue in a matter pending before the Indiana Supreme Court does not undermine commonality. *See Rainbow Realty Grp. v. Carter*, Case No. 19S-CC-00038 (Ind. 2019). It remains to be seen if and how the resolution of that matter affects how the merits of the claims asserted here are ultimately resolved, but the merits likely will still be subject to resolution in a single stroke because they will still turn on common contract language.

### 3. Indiana Home Loan Practices Act

The central question under Plaintiffs' Home Loan Practices Act claim is also susceptible to class-wide resolution. Plaintiffs allege that pursuant to the very design of the RTB program, Rainbow violates the Act by engaging in "deceptive act[s]" with all its RTB customers. Ind. Code. § 24-9-3-7(c)(3). That is, it "makes a material misrepresentation" or "conceals material

information regarding the terms or conditions of the transaction." *Id.* § 24-9-2-7(a)(1).

Across the board, Rainbow holds out the RTB program as an opportunity for home ownership, but uniformly fails to tell customers that successful completion of the transaction is a rarity (82 instances in 27 years); it systematically collects but then withholds pertinent information about the condition of its houses, such that its customers inevitably find out—too late—that the house they picked is in worse condition than they realized; it emphasizes standard purchase terms in its confusing and contradictory contract documents and rushes its customers through them so they do not understand the nature of the transaction, including that they can be evicted like ordinary renters, and so they will be willing to put their own money and hard work into repairing a house they do not own and to a virtual certainty never will; and it tells all customers in writing that they are getting a discount on the house when in fact the houses are marked up to multiples of their actual market value. To its core, the program is a deception.

The objective deceptiveness of Rainbow's acts, perpetrated against all customers by design, establishes commonality because it can be adjudicated on a class-wide basis without respect to any individual plaintiff's circumstances. *See, e.g.*, *Mullins v. Direct Dig., LLC*, 795 F.3d 654, 674 (7th Cir. 2015) (whether company's statements to consumers were objectively false or misleading "is a common question suitable for class treatment," regardless of whether product was useful for some consumers); *In re Stericycle, Inc.*, No. 13 C 5795, 2017 WL 635142, at *6 (N.D. Ill. Feb. 16, 2017) (common question whether customers were deceived into overpaying for service). Commonality is satisfied even if the Home Loan Practices Act requires proof that class members were actually deceived.[114] Courts regularly certify classes challenging

---

[114] Plaintiffs are not aware of any caselaw regarding the elements of a claim under this law. Plaintiffs submit that the law is best construed to require only that a defendant's conduct is objectively deceptive, not that the plaintiff was subjectively misled as a result, because consumer protection statutes addressing misleading or deceptive practices

deceptive conduct notwithstanding the fact that the relevant claims require subjective reliance where (as here) the challenged conduct is standardized and likely to deceive each class member in the same way. *See Suchanek*, 764 F.3d at 757 ("question whether [product] packaging was likely to deceive a reasonable consumer is common;" error of law to deny certification due to any requirement of subjective reliance). This is appropriate here where Rainbow's deception goes to the very core of the bargain class members believe they are getting.

### 4.     Truth in Lending Act Claims

Finally, the resolution of Plaintiffs' claims that Rainbow fails to satisfy several TILA requirements will also be driven by common questions and common evidence. "TILA specifically contemplates and allows class actions to address creditors' failures to comply with the statute and applicable regulations." *Kelen v. World Fin. Network Nat'l Bank*, 295 F.R.D. 87, 91 (S.D.N.Y. 2013). Hotka acknowledges that the RTB program is subject to TILA generally; that is why the standard transaction documents include a Truth in Lending Disclosure.[115]

With three of the four TILA claims, Rainbow admits that it does not meet the consumer protection requirement, *e.g.*, providing customers an appraisal of the property performed by a certified or licensed appraiser.[116] That admission is common to all class members. Whether Rainbow satisfies the substantive requirement of the fourth—that it make a reasonable and good faith determination that the customer has a reasonable ability to repay the loan—is a common question because Rainbow's virtually nonexistent underwriting requirements are uniform.

Rainbow may argue that is not required to follow the TILA requirements, but what

---

are commonly construed in this manner. *See, e.g.*, *Pierre v. Midland Credit Mgmt., Inc.*, No. 16 C 2895, 2017 WL 1427070, at *10 (N.D. Ill. Apr. 21, 2017) (certifying class; common questions include whether statements would mislead reasonable consumer). But as explained above, commonality is satisfied either way.
[115] Ex. 35 (Hotka AG Dep.) at 65.
[116] Ex. 58 (D. RFA I) at Nos. 1-5; Ex. 33 (Bruno Dep.) at 106-07; Ex. 32 (Argueta Dep.) at 193.

matters for class certification is that the arguments (and the answer) are the same for each class member—and they are. Whether Rainbow is a "creditor," for example, is a common question answerable in one stroke based on common evidence, as discussed above with respect to ECOA.

The interest rates must also be sufficiently high to trigger the TILA protections. Common evidence from expert Keest shows that the rates exceed TILA's threshold, whether explicitly or through Hotka's admitted manipulation of stated rates to achieve precisely the same predatory ends. Even if Rainbow contends that its statutory compliance must be assessed taking at face value the stated interest rates in the more recent contracts without regard to his manipulation, that just presents a common question for the TILA subclasses.

*       *       *       *       *

Each of Plaintiffs' claims thus present questions of law and fact that can be adjudicated in whole or in large part on a class-wide basis. Rainbow took materially the same actions, pursuant to uniform policies, with respect to each class member, and so the "basic question" for each claim with respect to Rainbow's liability "is common to the entire [] class." *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 798 (7th Cir. 2013).

**C.     Rule 23(a)(3) – Typicality Is Satisfied Because the Class Representatives Experienced the Same Unlawful Conduct and Share the Same Interests as the Class and Subclasses**

Plaintiffs easily satisfy the typicality requirement of Rule 23(a)(3) that "the claims . . . of the representative parties are typical of the claims . . . of the class." Rule 23(a)(3). To establish typicality, the named plaintiffs must "possess the same interest" as the class and their injuries must "arise from the same course of conduct that gives rise to the other class members' claims." *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 156 (1982); *see Arreola v. Godinez*, 546 F.3d 788, 798 (7th Cir. 2008) ("A claim is typical if it arises from the same event or practice or course

27

of conduct that gives rise to the claims of other class members and her claims are based on the same legal theory") (citation omitted). That combination establishes "enough congruence between the named representative's claim and that of the unnamed members of the class to justify allowing the named party to litigate on behalf of the group." *Spano v. Boeing Co.*, 633 F.3d 574, 586 (7th Cir. 2001).

Each of the Named Plaintiffs' claims arises from the same course of conduct as do the class-wide claims, as explained more fully above in the Factual Background section and the closely related commonality analysis. *See Falcon*, 457 U.S. at 157 n.13 ("The commonality and typicality requirements of Rule 23(a) tend to merge."). Each class representative entered into a RTB contract that is materially the same as those of other class members, otherwise was subjected to comparable practices, and suffered comparable harm. Each seeks to recover based on legal theories that, if successful, also will lead to recovery for the remainder of the class. No more is required.

That the Named Plaintiffs and individual class members may have suffered somewhat different *damages* as a result of the Defendants' challenged practices is irrelevant. Nor is it relevant whether Defendants may have "particularized defenses . . . against certain class members." *CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 724 (7th Cir. 2011) (citation and quotation marks omitted). What matters is that Defendants subjected each to the same allegedly unlawful practices that define the RTB program, such that the liability determination will be the same for the Named Plaintiffs as for unnamed class members. *See Koss*, 305 F. Supp. 3d at 918 (quoting *Muro v. Target Corp.*, 580 F.3d 485, 492 (7th Cir. 2009)).

> **D.      Rule 23(a)(4) – Adequacy Is Satisfied Because the Named Plaintiffs and Their Counsel Will Adequately Represent the Proposed Class and Subclasses**

Rule 23(a)'s final requirement is satisfied because the Named Plaintiffs and undersigned

counsel will "fairly and adequately protect the interests of the class." Rule 23(a)(4). Adequacy of representation is comprised of two prongs: "the adequacy of the named plaintiffs' counsel, and the adequacy of representation provided in protecting the different, separate, and distinct interest" of the class members. *Retired Chi. Police Ass'n v. City of Chi.*, 7 F.3d 584, 598 (7th Cir. 1993), *cited in, e.g.*, *Physicians Healthsource Inc.*, 318 F.R.D. at 724 (internal citation omitted).

Counsel are adequate because they are experienced in the subject matter of the litigation, experienced in class action litigation, and have and will continue to devote substantial resources to representing the class. Rule 23(g)(1)(A). Counsel have deep experience and knowledge in prosecuting "reverse redlining" cases such as this one. *See, e.g.*, *Mayor & City Council of Baltimore v. Wells Fargo Bank, N.A.*, NO. JFM-08-62, 2011 WL 1557759 (D. Md. Apr. 22, 2011); *City of Memphis v. Wells Fargo Bank, N.A.*, No. 09-2857-STA, 2011 WL 1706756 (W.D. Tenn. May 4, 2011); *Saint-Jean v. Emigrant Mortgage Co.*, 337 F. Supp. 3d 186 (E.D.N.Y. 2018). In addition, counsel have served as class counsel for multiple certified civil rights cases, including *Flack v. Wisconsin Department of Health Services*, No. 18-cv-309-wmc (W.D. Wis. 2019), *Moore v. Duke*, Civ. No. 00-953 (D.D.C. 2013), and *Morgan v. Richmond School of Health and Technology, Inc.*, No. 3:12-cv-373 (E.D. Va. 2013). The docket in this case demonstrates counsel's investment, resources, and commitment to representing the class. Counsel has represented the class since 2016, including completing extensive fact discovery and submitting reports from four experts.

The Named Plaintiffs are adequate class representatives because their interests are fully aligned with those of other class members and no "class members have antagonistic or conflicting claims." *Retired Chi. Police Ass'n*, 8 F.3d at 598 (internal citation omitted). Class representatives have all been subject to the same allegedly unlawful practices. They have the

same interest in recovering redress for their losses and ending the challenged practices. The

Seventh Circuit has affirmed named plaintiffs' adequacy even where there *is* risk of conflicts

within the class, and here there is none. *See Abbott v. Lockheed Martin Corp.*, 725 F.3d 803, 814

(7th Cir. 2013) (upholding certification of class challenging mismanagement of investment fund

notwithstanding theoretical possibility that some class members benefited from challenged

actions).

## II.   THE PROPOSED CLASS SATISFIES THE REQUIREMENTS OF RULE 23(b)

Plaintiffs need only satisfy one of Rule 23(b)'s three components. They satisfy two,

subsections (b)(2) and (b)(3). Simultaneous certification under both, sometimes termed "divided"

certification, is proper. *See, e.g.*, *Chi. Teachers Union*, 797 F.3d at 445.

### A.   Rule 23(b)(2) – Injunctive and Declaratory Relief

Certification under Rule 23(b)(2) is appropriate where, as here, "the party opposing the

class has acted or refused to act on grounds that apply generally to the class, so that final

injunctive relief or corresponding declaratory relief is appropriate respecting the class as a

whole." Civil rights cases are "'prime examples'" of (b)(2) classes. *Chi. Teachers Union*, 797

F.3d at 441 (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997)).

A (b)(2) class is appropriate here because of Rainbow's common conduct toward all RTB

customers. Plaintiffs seek a declaration that Rainbow's challenged practices are unlawful. They

also seek an injunction prohibiting Rainbow from collecting debts from past customers stemming

from failed RTB transactions;[117] from filing ordinary eviction proceedings against customers

currently in default (as opposed to using proceedings appropriate for homeowners); and from

---

[117] Since 2009 Rainbow has collected approximately $968,000 from over 1,200 former customers through the use of a debt collection agency. *See* Ex. 73 (Advanced Debt Collection Decl.).

continuing to implement its illegal practices.[118] These are important remedies essential to avoid further unlawful conduct and further harm from conduct that has already transpired, with respect both to customers who have and have not yet lost their Rainbow homes (both of which are groups represented in the class, giving the class standing to seek the relief requested). The Seventh Circuit held class-wide remedies including ones like these sufficient to maintain a (b)(2) class in *Chicago Teachers Union*. *See* 797 F.3d at 441-43 (declaratory order that practice violated civil rights statutes and injunction placing moratorium on continuing the practice).

Moreover, these remedies address practices inherent to the RTB program. This "common conduct means that it can be enjoined or declared unlawful only as to all class members or as to none of them." *In re Stericycle, Inc.*, 2017 WL 635142, at *8 (certifying class under (b)(2)). For example, the standardized RTB program is predatory, discriminatory, and deceptive or it is not, providing the predicate for (b)(2) certification.

That additional, individualized relief may be needed "does not preclude certification of a class for common equitable relief." *Chi. Teachers Union*, 797 F.3d at 442. The Seventh Circuit reversed the denial of (b)(2) certification in *McReynolds*, which challenged two policies as discriminatory, explaining: "[S]hould the claim of disparate impact prevail in the class-wide proceeding, hundreds of separate trials may be necessary to determine which class members were actually adversely affected by one or both of the practices and if so what loss each class member sustained . . . . But at least it wouldn't be necessary in each of those trials to determine whether the challenged practices were unlawful." 672 F.3d at 491.

## B.      Rule 23(b)(3) – Predominance and Superiority

Certification is proper under Rule 23(b)(3) when (1) common questions of law or fact

---

[118] Plaintiffs reserve the right to seek additional injunctive relief at the appropriate stage of the litigation.

31

"predominate over any questions affecting only individual members," and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

A (b)(3) class action is meant to cover cases "in which a class action would achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem Prods.*, 521 U.S. at 615 (internal citation omitted); *see also, e.g.*, *Chi. Teachers Union*, 797 F.3d at 444. This is a paradigmatic case in which (b)(3) certification is appropriate.

### 1.    Common Questions of Law and Fact Predominate

"Considerable overlap exists between Rule 23(a)(2)'s commonality prerequisite and Rule 23(b)(3). Rule 23(a)(2) requires that common issues exist; Rule 23(b)(3) requires that they predominate." *Schneider v. Union Hosp., Inc.*, No. 2:15-CV-00204-JMS-DKL, 2016 WL 6037085, at *15 (S.D. Ind. Oct. 14, 2016) (internal citation omitted). That is the case here.

The plaintiffs in *Chicago Teachers Union* alleged that the school board's selection of schools for reconstitution, pursuant to which all school employees were replaced, was discriminatory. 797 F.3d at 429-30, 432. The members of the putative class had different jobs (para-professionals, probationary appointed teachers, tenured teachers, and teachers without tenure) and different opportunities for reassignment, meaning there might be individual issues about remedies. *Id.* at 430, 432, 444. But the predominance requirement was met because "the key question upon which all of the litigation rises or falls can be answered for every plaintiff: was the selection process discriminatory?" *Id.* at 444.

The key questions here are also common. Is the RTB program predatory? Is it deceptive? Is it discriminatory, either in effect or intentionally? Is Rainbow relieved of the obligation to provide and maintain habitable houses because of how it structured the Purchase Agreement and

related documents? Does TILA require Rainbow to provide the consumer protections, *e.g.*, an appraisal, that it admittedly does not provide? Does TILA require Rainbow to assess the transaction's affordability reasonably and in good faith, and does its underwriting policy do that? The litigation will rise or fall for all class members on these common, central questions. And because this case concerns such standardized conduct and standardized contract language, finding predominance is particularly simple. *See Red Barn Motors, Inc.*, 915 F.3d at 1102 (interpretation of form contract is common question that predominates); *Fonder v. Sherriff of Kankakee Cty.*, No. 12-cv-2115, 2013 WL 5644754, at *7 (C.D. Ill. Oct. 15, 2013).

As *Chicago Teachers Union* and the plain language of Rule 23(b)(3) demonstrate, "[i]ndividual questions need not be absent" to satisfy predominance. *Messner*, 669 F.3d at 815. So long as "one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Tyson Foods,* 136 S. Ct. at 1045; *see also, e.g.*, *Bell*, 800 F.3d at 379-80 (not material that some class members may not have worked more than 40 hours per week and thus were not harmed by policy against paying overtime).

Individualized issues that may remain after resolution of the predominant ones can be addressed, the Seventh Circuit has made clear, in a subsequent phase: "It has long been recognized that the need for individual damages determinations at this later stage of the litigation does not itself justify the denial of certification." *Mullins*, 795 F.3d at 671. In *Bell*, the Court explained, "[i]f the class prevails . . . , scores of separate trials might be necessary to determine which class members were actually adversely affected by the policy and if they were, what loss each class member sustained." 800 F.3d at 379-80. And in *Butler*: "If the issues of liability are

33

genuinely common issues, and the damages of individual class members can be readily

determined in individual hearings, in settlement negotiations, or by creation of subclasses, the

fact that damages are not identical across all class members should not preclude class

certification." 727 F.3d at 801. All this is consistent with the Supreme Court's longstanding

recognition that it is an appropriate way under Rule 23 to handle individual circumstances when

they actually arise. *See Wal-Mart*, 564 U.S. at 366.

Common questions of law and fact predominate overwhelmingly here.

### 2.    <u>Adjudication Through a Class Action Is Superior</u>

Consideration of the four factors set forth in Rule 23(b)(3)(A)-(D) confirms that class

certification is the superior way to fairly and effectively adjudicate class members' claims here.

Class members have little to no "interest[s] in individually controlling the prosecution or

defense of separate actions." Rule 23(b)(3)(A). The recovery for most individual class members

is unlikely to exceed the low five figures—far too little to justify the complex litigation, with

expert witnesses and comprehensive discovery into Rainbow's discriminatory practices, required

to fully vindicate class members' rights. *See Grimes v. Evergreen Recreational Vehicles, LLC*,

No. 3:16-CV-472-JD, 2018 WL 1257237, at *9 (N.D. Ind. Mar. 12, 2018) (named plaintiff's

damages of about eight thousand dollars insufficient to justify complex litigation as individual).

This is the classic case where "[t]he class issues . . . will be the most complex and costly to

prove, while the individual issues and the information needed to prove them will be simpler and

more accessible to individual litigants." *Suchanek*, 764 F.3d at 760.

Moreover, most members of this class have limited economic resources and are legally

unsophisticated, making it unlikely that they would litigate individual cases at all. *See* Rule

23(b)(3)(B). Indeed, Plaintiffs are aware of no class member who has brought an individual

lawsuit against Rainbow. The only other challenges to Rainbow's conduct of which Plaintiffs are aware arose (1) when the state Attorney General brought suit; (2) when a consumer obtained legal aid representation in an eviction; and (3) in a *pro se* breach of contract claim. Neither the federal claims nor civil rights claims like those asserted here were raised in those actions. Class certification thus "vindicate[es] the rights of groups of people who individually would be without effective strength to bring their opponents into court at all," one of the primary purposes of Rule 23(b)(3). *Amchem Prods., Inc.*, 521 U.S. at 617. And concentrating litigation in this particular forum is more desirable than fracturing it in other state and federal litigation based on the happenstance of how cases challenging Rainbow's practices arise. *See* Rule 23(b)(3)(C).

Finally, this class action is not difficult to manage. *See* Rule 23(b)(3)(D). While "courts should not refuse to certify a class merely on the basis of manageability concerns," *Mullins*, 795 F.3d at 663, the ease with which this class action already is being managed confirms that certification is appropriate. Many of the relevant legal decisions even regarding categories of damages (*e.g.*, whether Rainbow is liable to class members for TILA statutory damages, rent and other fees paid, or repairs and improvements made at class members' own expense) can be resolved class-wide, leaving only ministerial calculations for individual damages determinations. Indeed, most of the information required to make those calculations (such as all amounts paid by and charged to class members) is in Rainbow's own records.[119]

## CONCLUSION

For the foregoing reasons, a class and three subclasses should be certified because Plaintiffs satisfy Rules 23(a), (b)(2) and (b)(3). The Named Plaintiffs should be designated as class representatives, and undersigned counsel as class counsel.

---

[119] *See* Ex. 74 (Kamano Ledger); Ex. 24 (James Hotka Dep.) at 89-93.

Dated: June 14, 2019     Respectfully submitted,

            /s/ Glenn Schlactus
            Glenn Schlactus (admitted pro hac vice)
            Jennifer I. Klar (admitted pro hac vice)
            Joseph J. Wardenski (admitted pro hac vice)
            Andrea Lowe (admitted pro hac vice)
            RELMAN, DANE & COLFAX PLLC
            1225 19th St., NW, Suite 600
            Washington, D.C. 20036
            Tel: 202-728-1888
            Fax: 202-728-0848
            gschlactus@relmanlaw.com
            jklar@relmanlaw.com
            jwardenski@relmanlaw.com
            alowe@relmanlaw.com

            James P. Strenski
            CANTRELL, STRENSKI & MEHRINGER,
            LLP
            150 West Market Street, Suite 800
            Indianapolis, IN 46204
            Tel: 317-352-3500
            Fax: 317-352-3501
            jstrenski@csmlawfirm.com

            *Attorneys for Plaintiffs*