UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

<table>
<tr><td>FAIR HOUSING CENTER OF CENTRAL INDIANA,<br>INC., MORY KAMANO, NORMA TEJEDA,<br>CORDELL SPENCER, MARIA GASPAR, and<br>FRANKLIN PAZ,</td><td>)<br>)<br>)<br>)<br>)</td><td></td></tr>
<tr><td><i>Plaintiffs</i>,</td><td>)<br>)<br>)</td><td>No. 1:17-cv-01782-JMS-TAB</td></tr>
<tr><td><i>vs.</i></td><td>)<br>)<br>)</td><td></td></tr>
<tr><td>RAINBOW REALTY GROUP, INC., EMPIRE<br>HOLDING CORP., JAMES R. HOTKA, SUNSHINE<br>TRUST, REDSKINS TRUST, SPORTING TRUST,<br>ALLEY CAT TRUST, SHORE WATERS<br>DEVELOPMENT, LLC, and SUNFLOWER TRUST,</td><td>)<br>)<br>)<br>)<br>)<br>)</td><td></td></tr>
<tr><td><i>Defendants</i>.</td><td>)<br>)</td><td></td></tr>
</table>

## <u>ORDER</u>

Plaintiffs Mory Kamano, Norma Tejeda, Cordell Spencer, Maria Gaspar, and Franklin Paz (collectively, "the Named Plaintiffs") all entered into agreements with Rainbow Realty Group, Inc. ("Rainbow") and various other entities (collectively, "the Defendant Entities") to rent to buy properties in Indianapolis, Indiana ("the RTB Agreements"). Plaintiff Fair Housing Center of Central Indiana, Inc. ("FHC") and the Named Plaintiffs allege that this program ("the RTB Program") was designed to entice vulnerable consumers living in predominantly Black and Latino neighborhoods to enter into the RTB Agreements, which represented overpriced transactions, by promising them homeownership. Plaintiffs allege that most of the rent-to-buy transactions failed within the first two years and the consumers were evicted. On behalf of themselves and a class consisting of all individuals who "entered a [rent-to-buy] agreement with Rainbow for a residential property since the beginning of 2009, excluding those who successfully paid off their agreement," [Filing No. 176 at 15], Plaintiffs assert various claims under the Equal Credit Opportunity Act, 15

1

U.S.C. § 1691, *et seq.* ("ECOA"), the Fair Housing Act, 42 U.S.C. § 3601, *et seq.* ("FHA"), the Truth in Lending Act, 15 U.S.C. § 1639 ("TILA"), and Indiana statutes. [Filing No. 100.] Plaintiffs Maria Gaspar, Franklin Paz, and Norma Tejeda have filed a Motion for Partial Summary Judgment, [Filing No. 308], and Defendants have filed a Cross-Motion for Summary Judgment, [Filing No. 314].[1]  Both motions are ripe for the Court's decision.

## I.
### STANDARD OF REVIEW

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a).  On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003).  "'Summary judgment is not a time to be coy.'" *King v. Ford Motor Co.*, 872 F.3d 833, 840 (7th Cir. 2017) (quoting *Sommerfield v. City of Chicago*, 863 F.3d 645, 649 (7th Cir. 2017)).  Rather, at the summary judgment stage, "[t]he parties are required to put their evidentiary cards on the table." *Sommerfield*, 863 F.3d at 649.

The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009).  The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir.

---

[1] The Court notes that Defendants filed a Response in Opposition to Plaintiffs' Motion for Summary Judgment and Cross-Motion for Summary Judgment, [Filing No. 314], but did not file a separate Cross-Motion for Summary Judgment as required by Local Rule 7-1(a).  S.D. Ind. L.R. 7-1(a) ("Motions must be filed separately," and "[a] motion must not be contained within a brief, response, or reply to a previously filed motion, unless ordered by the court.").  The Court construes Defendants' Response in Opposition to Plaintiffs' Motion for Summary Judgment and Cross-Motion for Summary Judgment to also be its Cross-Motion for Summary Judgment, but cautions counsel to file a separate motion to accompany its brief in the future.

2008).  It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder.  *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011).

Each fact asserted in support of or in opposition to a motion for summary judgment must be supported by "a citation to a discovery response, a deposition, an affidavit, or other admissible evidence."  S.D. Ind. L.R. 56-1(e).  And each "citation must refer to a page or paragraph number or otherwise similarly specify where the relevant information can be found in the supporting evidence."  *Id.*  The Court need only consider the cited materials and need not "scour the record" for evidence that is potentially relevant.  *Grant v. Trustees of Ind. Univ.*, 870 F.3d 562, 572-73 (7th Cir. 2017) (quotations omitted); *see also* Fed. R. Civ. P. 56(c)(3); S.D. Ind. L.R. 56-1(h).  Where a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact, the Court may consider the fact undisputed for purposes of the summary judgment motion.  Fed. R. Civ. P. 56(e)(2).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision.  A disputed fact is material if it might affect the outcome of the suit under the governing law.  *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009).  In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative.  *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005).  Fact disputes that are irrelevant to the legal question will not be considered.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"The existence of cross-motions for summary judgment does not . . . imply that there are no genuine issues of material fact."  *R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Eng'rs*, 335 F.3d 643, 647 (7th Cir. 2003).  Specifically, "[p]arties have different

burdens of proof with respect to particular facts, different legal theories will have an effect on which facts are material; and the process of taking the facts in the light most favorable to the non-movant, first for one side and then for the other, may highlight the point that neither side has enough to prevail without a trial." *Id.* at 648.

## II.
### STATEMENT OF FACTS

**A.    Defendants' Business Structures**

Rainbow is a corporation that buys, sells, and manages real estate.  [Filing No. 308-16 at 6.]  When properties are purchased for the RTB Program, Defendant James Hotka, who is the principal actor in connection with all of the Defendant entities, creates land trusts to which he deeds the newly-purchased properties ("the Individual Land Trusts").  [Filing No. 308-7 at 5.] Each Individual Land Trust is generally assigned one house.  [Filing No. 308-7 at 5.]  Each Named Plaintiff purchased a house through the RTB Program that Mr. Hotka had deeded to a different Individual Land Trust – Clifton Trust owned the house that is the subject of Ms. Gaspar's RTB Agreement; Musial Trust owned the house that is the subject of Ms. Tejeda's RTB Agreement; Degraff Trust owned the house that is the subject of Mr. Paz's RTB Agreement; Chief Trust owned the house that is the subject of Mr. Kamano's RTB Agreement; and Hanway Trust owned the house that is the subject of Mr. Spencer's RTB Agreement.  [Filing No. 196-48; Filing No. 196-49; Filing No. 309-1; Filing No. 309-2; Filing No. 309-3.]  Plaintiffs have not named Clifton Trust, Musial Trust, Degraff Trust, Chief Trust, or Hanway Trust as defendants in this lawsuit.

Defendant Empire Holding Corp. ("Empire") is the trustee for Defendants Sunshine Trust, Redskins Trust, Sporting Trust, Alley Cat Trust, and Sunflower Trust (collectively, "the Family Trusts") and for the Individual Land Trusts, and also has a bank account which is used for holding money when properties are bought and sold.  [Filing No. 308-5 at 7; Filing No. 308-7 at 5.]  Mr.

4

Hotka and his four children are each a beneficiary of one of the Family Trusts.  [Filing No. 308-10 at 8.]  Defendant Shore Waters Development, LLC ("Shore Waters") is the beneficiary of the Individual Land Trusts.  [Filing No. 308-16 at 28.]  Mr. Hotka's four children are the sole members of Shore Waters.  [Filing No. 308-10 at 30.]  Prior to the establishment of Shore Waters, the five Family Trusts performed the function that Shore Waters currently performs and the Family Trusts were beneficiaries of the Individual Land Trusts.  [Filing No. 308-10 at 8-9.]

Mr. Hotka is the sole shareholder, final decision-maker, and holder of every director-level position for both Rainbow and Empire.  [Filing No. 308-5 at 5; Filing No. 308-7 at 4; Filing No. 308-16 at 4.]  Mr. Hotka is also the registered agent, keeper of records, and sole decisionmaker for Shore Waters and, through Empire, controls the Family Trusts.  [Filing No. 308-16 at 22-24.]  Rainbow has "very little assets," does not "really own anything," and has no assets or income at all that is not related to Mr. Hotka's properties.  [Filing No. 308-16 at 16; Filing No. 308-16 at 42.]  Empire does not engage in any business that is not related to Rainbow and its associated properties and it has no assets, no investments, and no income.  [Filing No. 308-5 at 7; Filing No. 308-7 at 5; Filing No. 308-16 at 18-21.]  Shore Waters does not conduct any business other than with Rainbow and has no assets or income independent from its properties.  [Filing No. 308-10 at 31; Filing No. 308-16 at 23-25.]  Rainbow is the only one of these entities that has any employees, and any business carried out on the part of Empire and the Family Trusts takes place at either Rainbow's offices or Mr. Hotka's home.  [Filing No. 308-5 at 6; Filing No. 308-16 at 21; Filing No. 308-16 at 24.]

When Mr. Hotka identifies a property that he is interested in, he personally loans money – either from Rainbow's account or from his own account via Rainbow's account – to Shore Waters (or, previously, to one of the Family Trusts) by transferring it to Empire's account.  [Filing No.

308-10 at 8; Filing No. 308-16 at 17; Filing No. 308-16 at 22; Filing No. 308-16 at 28; Filing No. 308-16 at 42-43.]   Empire then writes a check to purchase the property, which is then deeded to an Individual Land Trust that has Shore Waters (or, in the past, one of the Family Trusts) as its beneficiary.   [Filing No. 308-16 at 17; Filing No. 308-16 at 23; Filing No. 308-7 at 5.]   When customers make payments pursuant to the RTB Agreements, they make them to Rainbow and the payments are then distributed to Shore Waters or the Family Trusts.   [Filing No. 308-10 at 8; Filing No. 308-10 at 21.]   Mr. Hotka uses that money to cover the expenses for all of the Defendant Entities and to pay each of his children $8,000 per month, with any remaining profits transferred to Mr. Hotka as repayment (plus interest) for the "loans" he extended to buy properties.   [Filing No. 308-5 at 7; Filing No. 308-10 at 8-9; Filing No. 308-10 at 30-31; Filing No. 308-16 at 16.] Mr. Hotka, his two sons, and his wife have full access to the bank accounts of all of the Defendant Entities with accounts.   [Filing No. 308-16 at 14; Filing No. 308-16 at 22.]

For example, for Ms. Gaspar's RTB transaction, Mr. Hotka created Clifton Trust – which is not a defendant in this case – for purposes of purchasing the property that was the subject of Ms. Gaspar's RTB Agreement.   [*See* Filing No. 308-7 at 5.]   Mr. Hotka then transferred money from Rainbow's account or his own personal account to Shore Waters or one of the Family Trusts for the property purchase.   [Filing No. 308-10 at 8; Filing No. 308-16 at 17.]   Empire, as the trustee for Clifton Trust, wrote the check to purchase the property that was the subject of Ms. Gaspar's RTB Agreement.   [Filing No. 308-16 at 17.]   Shore Waters or one of the Family Trusts – who are defendants in this case – was the beneficiary of Clifton Trust, and was then credited with future payments Ms. Gaspar made on the property.   [Filing No. 308-16 at 18-20.]

B.        **The RTB Agreements**

Defendants' RTB Agreements stated that the buyer shall pay a down payment "plus make

rental payments to the Landlord that are equal to the PITI Payment stated below," and that:

> The first rental payment shall be due upon the execution of this agreement.  Said
> payment shall apply to the current month.  The Buyer shall make like payments, as
> rent, on the 1st of each month.  Once the Buyer has made (24) twenty-four or more
> rental payments, the parties hereto shall execute a "Conditional Sales Contract"
> (Land contract) form embodying the terms contained herein.

[Filing No. 309-1 at 2; Filing No. 309-2 at 2; Filing No. 309-3 at 2.]

 Customers were given an amortization schedule of the first few years of payments, which

broke down month-by-month the part of the payment going to principal and interest, and the

balance remaining on the loan.  [Filing No. 308-2 at 22; Filing No. 308-4 at 12; Filing No. 308-4

at 19-20.]  RTB customers were also required to sign a "Purchase Agreement Declaration" ("the

Declaration") and check a box stating "[m]y intent is to purchase the property" and to reject a box

stating "[m]y intent is to rent the property."  [Filing No. 308-2 at 21; Filing No. 308-4 at 21-22;

Filing No. 309-5 at 2; Filing No. 309-6 at 2; Filing No. 309-7 at 2.]  The Declaration stated that if

a customer sells the home during the term of the RTB Agreement, the customer will be entitled to

any profits.  [Filing No. 309-5; Filing No. 309-6; Filing No. 309-7.]  It stated that the "[RTB

Agreement] is not a 'rent with an option to purchase,' buyer is required to purchase and seller is

required to sell under the agreed purchase price, down payment, and monthly payment."  [Filing

No. 309-5; Filing No. 309-6; Filing No. 309-7.]

The RTB Agreements included a Truth-in-Lending Disclosure ("TIL Disclosure") that

listed the fixed interest rate, finance charge, "amount financed" (the purchase price minus the down

payment), and each of the 360 payments the customer would make to purchase the home.  [Filing

No. 309-10; Filing No. 309-11; Filing No. 309-12.]  The TIL Disclosure stated that the home that

is the subject of the RTB Agreement secures the extension of credit from Defendants.  [Filing No. 308-4 at 19; Filing No. 309-10; Filing No. 309-11; Filing No. 309-12.]

The interest rates for the RTB transactions were very high, but beginning in July 2016, Defendants dropped the interest rates to avoid liability under TILA.  [Filing No. 308-16 at 34-35; Filing No. 308-16 at 39; Filing No. 308-16 at 46-47.]  Defendants set the price and interest rate so that customers would maintain the same monthly payment as in a pre-July 2016 sale.  [Filing No. 308-16 at 34.]

### C.  Defendants' Practices

Defendants do not provide customers with the disclosures required by TILA for high-cost mortgages.  [Filing No. 292 at 2.]  They do not require written certifications that RTB customers have obtained counseling prior to entering into an RTB transaction.  [Filing No. 292 at 2.] Defendants also do not provide appraisals of RTB properties to RTB customers.  [Filing No. 292 at 2.]

In determining whether to enter into RTB Agreements with customers, Defendants did not require information about customers' debts and expenses, alimony, or child support obligations. [Filing No. 308-2 at 4-12; Filing No. 308-12 at 27.]  When Defendants did happen to obtain information regarding customers' debts, they did nothing with the information.  [Filing No. 308-16 at 60.]  Defendants ignored certain information from credit reports, did not calculate each customer's debt-to-income ratio, and advertised "bad credit, no credit, no problem."  [Filing No. 308-12 at 14-15; Filing No. 308-12 at 24; Filing No. 308-16 at 60; Filing No. 308-35.]  Mr. Hotka estimated that 70% of the RTB Agreements fail in the first six months.  [Filing No. 308-7 at 6.]

### D.    The Named Plaintiffs' RTB Transactions

#### 1.    Maria Gaspar

Ms. Gaspar purchased a home through Defendants' RTB Program from one of the Individual Land Trusts, Clifton Trust, on June 1, 2016 for $16,902. [Filing No. 309-2.] The RTB Agreement provided for a 24-year term at an interest rate of 13.31% and a $249 monthly payment. [Filing No. 309-2.] Ms. Gaspar still lived in the house that was the subject of her RTB Agreement as of her April 16, 2019 deposition in this case. [Filing No. 308-6 at 16-18.]

#### 2.    Norma Tejeda

Ms. Tejeda purchased a home through Defendants' RTB Program from one of the Individual Land Trusts, Musial Trust, on September 7, 2016. [Filing No. 309-1.] The purchase price was $64,900, and Ms. Tejeda and her then-partner put down $300, leaving a $64,600 loan amount. [Filing No. 309-1 at 2.] The RTB Agreement provided for a 30-year term at an interest rate of 11.87% and a $699 monthly payment. [Filing No. 309-1 at 2.] Ms. Tejeda could not maintain the payments and Defendants eventually repossessed her home. [*See* Filing No. 309-13.]

#### 3.    Franklin Paz

Mr. Paz purchased a home through Defendants' RTB Program from one of the Individual Land Trusts, Degraff Trust, on May 31, 2017. [Filing No. 309-3.] The purchase price was $64,900. [Filing No. 309-3 at 2.] Mr. Paz put down $600, leaving a loan amount of $64,300. [Filing No. 309-3 at 2.] The RTB Agreement provided for a 30-year term at an interest rate of 9.87% and a $599 monthly payment. [Filing No. 309-3 at 2.] Mr. Paz still lived in the house that was the subject of his RTB Agreement as of his April 5, 2019 deposition in this case. [Filing No. 308-13 at 6.]

4. *Mory Kamano*

Mr. Kamano purchased a home through Defendants' RTB Program from one of the Individual Land Trusts, Chief Trust, on February 3, 2012. [Filing No. 196-48.] The purchase price was $19,508. [Filing No. 196-48 at 2.] Mr. Kamano put down $598, leaving a loan amount of $18,910. [Filing No. 196-48 at 2.] The RTB Agreement provided for a 30-year term at an interest rate of 18% and a $299 monthly payment. [Filing No. 196-48 at 2.] Mr. Kamano still lived in the house that was the subject of his RTB Agreement as of his April 5, 2019 deposition in this case. [Filing No. 196-14 at 7.]

5. *Cordell Spencer*

Mr. Spencer purchased a home through Defendants' RTB Program from one of the Individual Land Trusts, Hanway Trust, on May 23, 2012. [Filing No. 196-49.] The purchase price was $34,602. [Filing No. 196-49 at 2.] Mr. Spencer did not put down a downpayment. [Filing No. 196-49 at 2.] The RTB Agreement provided for a 30-year term at an interest rate of 14.8% and a $449 monthly payment. [Filing No. 196-49 at 2.] Mr. Spencer was ultimately evicted from the house that was the subject of his RTB Agreement. [Filing No. 139-41 at 35.]

**E.    The Lawsuit**

Plaintiffs initiated this lawsuit on May 30, 2017, [Filing No. 1], and filed the operative Third Amended Class Action Complaint on March 8, 2019, [Filing No. 100]. After the Court[2] granted summary judgment dismissing some of Plaintiffs' claims and ruled on Plaintiffs' Motion for Class Certification, remaining are: (1) individual and class claims for violation of the ECOA,

---

[2] Senior Judge Robert L. Miller, Jr. from the United States District Court for the Northern District of Indiana is designated to serve in the Southern District of Indiana to assist with this District's judicial emergency. Judge Miller managed this case through disposition of Defendants' initial Motion for Partial Summary Judgment, and the undersigned is grateful for his service.

15 U.S.C. § 1691(a)(1); (2) individual and class claims for disparate treatment and disparate impact under the FHA, 42 U.S.C. § 3604(a) and (b) and § 3605; (3) individual claims for violation of TILA (ability to repay), 15 U.S.C. § 1639c(a); (4) individual and class claims for violation of TILA (pre-loan counseling), 15 U.S.C. § 1639(u); (5) individual and class claims for violation of TILA (mandatory disclosure), 15 U.S.C. § 1639(a); (6) individual and class claims for violation of TILA (appraisal), 15 U.S.C. § 1639h; and (7) individual claims for violations of various Indiana Code provisions. [Filing No. 100; Filing No. 209.]  Plaintiffs Ms. Gaspar, Ms. Tejeda, and Mr. Paz move for summary judgment on their TILA claims.  [Filing No. 308.]  Defendants move for summary judgment on all of Plaintiffs' federal claims, except Plaintiffs' FHA disparate treatment claim. [Filing No. 314.]

## III.
### DISCUSSION

The Court addresses each federal claim in turn, beginning with the TILA claims.

### A.    TILA Claims

Plaintiffs set forth the following claims under TILA: (1) failure to comply with § 1639c(a)'s ability-to-repay provision on behalf of Ms. Gaspar, Ms. Tejeda, and Mr. Paz; (2) violation of § 1639(u)'s pre-loan counseling requirement on behalf of Ms. Gaspar and Ms. Tejeda; (3) violation of § 1639(a)'s mandatory disclosure requirement on behalf of Ms. Gaspar and Ms. Tejeda; and (4) violation of § 1639h's appraisal requirement on behalf of Ms. Tejeda and Mr. Paz.  [Filing No. 310

at 19.][3]  Before considering each claim, the Court discussed the nature of the RTB Agreements and whether TILA applies in the first instance.

### 1.   *Whether TILA Applies to the RTB Transactions*

In support of their Motion for Partial Summary Judgment, Plaintiffs argue that TILA applies to the RTB transactions because they are "consumer credit transactions extended by a creditor." [Filing No. 310 at 19.]  They argue that under the RTB Agreements, "the purchaser agreed to pay a set purchase price but deferred payment, making monthly payments that include both the 'Principal and Interest Payment' for a fixed period of thirty years beginning with the signing of the Purchase Agreement." [Filing No. 310 at 20.]  They assert that Defendants "acknowledge that the Purchase Agreement meets the TILA 'extension of credit' requirement," and that Defendants' employees represented to RTB customers that the RTB transactions constituted loans. [Filing No. 310 at 21.]  Plaintiffs point to the fact that RTB customers gained equity even if they never signed a Conditional Sales Contract, and that Defendants told RTB customers that they could prepay the principal on extensions of credit and therefore pay down their debts faster. [Filing No. 310 at 21.]  They contend that "[t]here is no evidence" that the RTB transactions had an initial two-year lease period during which no credit was extended and, instead, that the RTB Agreements are "immediately…thirty-year commitment[s] to purchase the house[s]." [Filing No.

---

[3] Neither the Third Amended Complaint, [Filing No. 100], nor Plaintiffs' Statement of Claims, [Filing No. 129], specify which Plaintiffs assert which TILA claims.  Instead, Plaintiffs set forth this information in their brief in support of their Motion for Partial Summary Judgment. [Filing No. 310 at 19.]  This lack of precision – which carries over to other aspects of the briefing on the Cross-Motions for Summary Judgment and to this case generally (as discussed in more detail below) – has made the Court's review of the motions unnecessarily cumbersome.  It is worth noting that the purpose of the Statement of Claims is to have a plaintiff "clarify the issues as trial approaches." *Jackson v. Regions Bank*, 838 Fed. App'x 195, 198 (7th Cir. 2021).  Plaintiffs' Statement of Claims does not provide that clarification.

31 at 22.]  In short, Plaintiffs argue that "[t]he language, presentation, and operation of the RTB Purchase Agreement establishes that it is an extension of credit." [Filing No. 310 at 23.]

In their response and brief in support of their Cross-Motion for Summary Judgment, Defendants argue that the Indiana Supreme Court in *Rainbow Realty Grp., Inc. v. Carter*, 131 N.E.3d 168 (Ind. 2019), "made clear that the RTB Agreements constitute a standard rental agreement – that is, a lease – until a land contract is entered," and that "a customer's monthly payment under the RTB Agreement was payment specifically and exclusively for that month's occupancy of the premises." [Filing No. 314 at 5.] Defendants assert that under *Carter*, "payments made until a land contract was signed are not finance charges, because the RTB Agreement was a straight rental (i.e., a regular cash transaction), and there was no extension of credit." [Filing No. 314 at 7.] Accordingly, they argue, TILA does not apply to the RTB transactions. [Filing No. 314 at 7.]

In their response, Plaintiffs argue that the RTB Agreements extend credit because: (1) they "defer payment of a set purchase price plus interest to monthly payments made over a fixed period of what is typically thirty years, beginning with the signing of the Purchase Agreement"; (2) Defendants "advertised options that are only compatible with an extension of credit for the purchase of a house," such as prepaying the principal on their extensions of credit, refinancing their debt to reduce interest rates, selling the property during the term of the RTB Agreement, and keeping profits above the amount paid out; and (3) they state that they are not "rent with an option to purchase" agreements, but rather the buyer is required to purchase and the seller is required to sell. [Filing No. 319 at 11-12.] Plaintiffs assert that the *Carter* court "assessed the RTB transaction exclusively from the perspective of Indiana residential landlord-tenant statutes and did not mention or analyze…any federal definition of 'credit.'" [Filing No. 319 at 13.] They contend that the RTB

Agreements can be subject both to Indiana habitability requirements for rental properties and federal regulations relating to extensions of credit, and that "Defendants borrowed elements of each type of transaction simply to benefit themselves." [Filing No. 319 at 15.] Plaintiffs note that Defendants argued in *Carter* that the RTB Agreements were sales transactions and not rental transactions. [Filing No. 319 at 16-17.]

In their reply in support of their Cross-Motion for Summary Judgment, Defendants point to several factors the *Carter* court considered, including that the RTB Agreements required a separate contract (the Conditional Sales Contract) to effectuate a sale; that if a tenant defaulted before executing the Conditional Sales Contract or if they failed to make payments, they were subject to eviction; that the landlord reserved the right to enter the premises; that the landlord restricted the use of the land; and that, upon default, the landlord evicted the individuals as if they were tenants and kept their rental payments. [Filing No. 323 at 7.] Defendants assert that the *Carter* court determined "the operation and legal effect of the RTB Agreements and found that no credit was extended," and that "the transaction…operated like any other residential lease." [Filing No. 323 at 8 (emphasis omitted).] Defendants argue that Plaintiffs cannot have it both ways, by arguing that the RTB Agreements are both rental agreements and sales agreements depending on which statute or legal theory they are relying upon. [Filing No. 323 at 10.] Defendants also assert that the RTB Agreements do not "extend credit," that "[u]ntil a renter/prospective purchaser completes the 2-year term of the RTB Agreement and signs a Conditional Sales Contract, no credit is or was extended," and that Plaintiffs "have confirmed that they have not filed suit with respect to the Conditional Sales Contract." [Filing No. 323 at 11-12.] Finally, Defendants argue that Rainbow is not a "creditor," but instead is the landlord in the RTB transactions, and that the

Individual Land Trusts are the sellers but have not been named as Defendants.  [Filing No. 323 at 12-14.]

TILA applies to transactions that extend credit, which is defined as "the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment." 15 U.S.C. § 1602(f).  The parties do not appear to dispute that if the RTB Agreements are considered leases, then TILA does not apply – and the Court agrees that is true.  *See Ferguson v. Park City Mobile Homes*, 1989 WL 111916, at *3 (N.D. Ill. 1989) ("The TILA apparently was not viewed as applicable to leases until the Consumer Leasing Act…was added as a subchapter of the TILA in 1976."); 15 U.S.C. § 1667(1) and (4) (Consumer Leasing Act only applies to consumer leases of personal property, and not to leases of real property).  Accordingly, the Court must determine the nature of the RTB Agreements – *i.e.*, whether they are lease agreements or sale agreements – a threshold question in this litigation.

The Court's analysis of the nature of the RTB Agreements begins and, partially, ends with the Indiana Supreme Court's decision in *Carter*.  While it is true that the *Carter* court did not consider whether the RTB Agreements extend credit such that they are subject to TILA, it did elucidate the nature of the RTB Agreements, which informs this Court's analysis of whether TILA applies.  And given the identity of some of the parties in this case and *Carter*, the *Carter* opinion is particularly relevant.

In *Carter*, Rainbow and a land trust sued Katrina Carter and Quentin Lintner, a married couple, after the couple entered into the same RTB Agreement as those at issue in this case with Rainbow and the land trust, and ultimately fell behind on their payments.  The couple asserted various counterclaims against Rainbow and the land trust, including fraud, breach of contract, and failure to meet landlord obligations under Indiana statute. 131 N.E.3d at 172.  Among other things,

the trial court found Rainbow and the land trust liable for breach of the warranty of habitability, but the Indiana Court of Appeals reversed, finding that the RTB Agreement was not a residential lease and so was not subject to the Indiana habitability statutes.  *Id.*  The Indiana Supreme Court then reversed the Indiana Court of Appeals' decision, stating:

> We agree with [Rainbow and the land trust] that most of the transaction's terms and formal structure suggest this was a sale – albeit unorthodox – necessitated by the Couple's inability to afford a down payment for the House.  But the transaction's purported form and assigned label do not control its legal status.  For at least the first two years, the Agreement was a residential lease with a contingent commitment to sell.

*Id.* at 173.  The *Carter* court noted that the RTB Agreement "required a separate contract to effectuate a sale," and that "[d]uring the Agreement's twenty-four-month term, [Rainbow and the land trust] reserved for themselves a landlord's prerogative to enter the premises, restricted the Couple's use of the land, and, upon the Couple's default, evicted them as if they were tenants and kept their 'rental payments.'"  *Id.* at 174.  Consequently, the *Carter* court held that Rainbow and the land trust were required to comply with Indiana statutes related to habitability.  *Id.*

The fact that the *Carter* court did not specifically consider whether TILA applied to the RTB Agreements is of no moment.  The Court applies Indiana law in construing the contracts in this case and, in doing so, concludes that the RTB Agreements are leases at least for the first two years under *Carter*.  This holding means that any transactions that did not last longer than the initial two years are not subject to TILA.  This includes Ms. Tejeda, who signed the RTB Agreement on September 7, 2016 and was evicted from the property on November 28, 2016.  [Filing No. 309-13 at 2.]  Because her RTB Agreement lasted less than three months, it was considered a lease during that entire time and never became potentially subject to TILA.  The Court **DENIES** Plaintiffs' Motion for Partial Summary Judgment and **GRANTS** Defendants' Cross-Motion for Summary Judgment on all of Ms. Tejeda's TILA claims.

It appears from the record evidence that Ms. Gaspar and Mr. Paz still live in the houses that were the subject of their RTB Agreements. [*See* Filing No. 308-6 at 16-18 (Ms. Gaspar signed the RTB Agreement on June 1, 2016 and still lived in the house as of her April 16, 2019 deposition); Filing No. 309-3 at 1 (Mr. Paz signed the RTB Agreement on May 31, 2017); Filing No. 308-13 at 6 (Mr. Paz still lived in the house as of his April 5, 2019 deposition).]   The Court goes on to consider whether – assuming without deciding that TILA applies after the initial two years of the RTB Agreements – Plaintiffs have sued the correct Defendants for claims related to that time period.

### 2.   *Whether Plaintiffs Have Sued the Correct Defendants Under TILA*

Importantly, whether Plaintiffs are suing the defendants that have caused their alleged harm under TILA raises the question of whether Plaintiffs have standing.   Standing is a threshold issue, and the Court must discuss it at the outset in considering Plaintiffs' TILA claims.   *Bazile v. Finance System of Green Bay, Inc.*, 983 F.3d 274, 278 (7th Cir. 2020).   To have standing to sue in federal court under Article III, a plaintiff must establish: "(i) that he [or she] suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief."   *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).

"Because standing is an essential ingredient of subject-matter jurisdiction, it must be secured at each stage of the litigation."   *Bazile*, 983 F.3d at 278.   Although at the pleading stage "general factual allegations of injury resulting from the defendant's conduct may suffice," *Lujan*, 504 U.S. at 561, "[o]nce the allegations supporting standing are questioned as a factual matter – either by a party or by the court – the plaintiff must support each controverted element of standing

17

with 'competent proof,'" *Bazile*, 983 F.3d at 278 (quoting *McNutt v. Gen. Motors Acceptance Corp. of Ind.*, 298 U.S. 178, 189 (1936)).  "Competent proof" means "a showing by a preponderance of the evidence, or proof to a reasonable probability, that standing exists." *Retired Chi. Police Ass'n v. City of Chicago*, 76 F.3d 856, 862 (7th Cir. 1996).

Plaintiffs argue that Rainbow is the proper defendant for their TILA claims and that, if not, the Court should pierce the corporate veil to hold the remaining Defendants responsible under TILA.   The Court considers each of Plaintiffs' theories in turn.

### a.   Rainbow's Potential TILA Liability

In support of their Motion for Partial Summary Judgment, Plaintiffs argue that Rainbow is a proper defendant under TILA as the creditor in the RTB transactions because "under the [RTB Agreements'] own terms, Rainbow is the entity initially payable, and Rainbow owns the debt." [Filing No. 310 at 26.]  They assert that even though the RTB Agreements refer to Rainbow as the landlord and the Individual Land Trusts as the lender, the "terms used…are irrelevant" and "Rainbow is the entity initially payable, and Rainbow owns the debt."  [Filing No. 310 at 26.] Plaintiffs argue that Rainbow regularly extended credit, entering into between 183 and 293 RTB transactions each year from 2013 to 2018. [Filing No. 310 at 26.]  They also contend that the RTB Agreements extended credit that was both payable in more than four installments and subject to a finance charge.  [Filing No. 310 at 26-27.]

Defendants respond and argue in support of their Cross-Motion for Summary Judgment that even if TILA applies to the RTB Agreements, the Individual Land Trusts "were the only parties that could be found to constitute 'creditors.'"  [Filing No. 314 at 8-9.]  They note that the RTB Agreements show that the properties were each owned by an Individual Land Trust, and that

the Individual Land Trust is the "party to which any debt obligation would have been owed." [Filing No. 314 at 9.]

Plaintiffs argue in their response/reply that Rainbow was a party to the RTB Agreements; that the creditor in a traditional mortgage transaction is not usually the seller, but a third-party instead; and that customers were obligated to pay Rainbow, not the Individual Land Trusts. [Filing No. 319 at 17-18.]

In their reply, Defendants reiterate many of their arguments and also note that the RTB Agreements provide that "rental payments" shall be made to the landlord (Rainbow), and that once the buyer has made 24 or more rental payments, the parties will execute a Conditional Sales Contract. [Filing No. 323 at 13.] They also argue that Rainbow is not a party to the Conditional Sales Contract – only the Individual Land Trust that owns the property is – and that payments under the Conditional Sales Contract are made to the Individual Land Trust. [Filing No. 323 at 13-14.]

TILA defines "creditor" as follows:

The term "creditor" refers only to a person who both (1) regularly extends, whether in connection with loans, sales of property or services, or otherwise, consumer credit which is payable by agreement in more than four installments or for which the payment of a finance charge is or may be required, and (2) is the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness or, if there is no such evidence of indebtedness, by agreement…. Any person who originates 2 or more mortgages referred to in subsection (aa) in any 12-month period…shall be considered to be a creditor for purposes of this subchapter.

15 U.S.C. § 1602(g).

The RTB Agreements list Rainbow as the "landlord" and, while they do require that payment be made to Rainbow, that is just during the first 24 months of the RTB Agreements – which, as discussed above, is a lease arrangement under Indiana law. For example, Mr. Paz's RTB

Agreement, which is identical to the other Plaintiffs' RTB Agreements except for the amount of his monthly payment, provides:

> **B.   METHOD OF PAYMENT:**   "Rent to Buy"  The Buyer shall pay $600.00 down payment plus make rental payments to the Landlord that are equal to the PITI Payment stated below.  The 1st rental payment shall be due upon the execution of this agreement.  Said payment shall apply to the current month.  The Buyer shall make like payments, as rent, on the 1st of each month.  Once the Buyer has made (24) twenty-four or more rental payments, the parties hereto shall execute a 'Conditional Sales Contract' (Land Contract) form embodying the terms contained herein.

[Filing No. 309-3 at 2.]  After the twenty-four months of rental/lease payments, the parties enter into the Conditional Sales Contract which lists the applicable Individual Land Trust as the "Seller" and is signed by Empire as the trustee of the Individual Land Trust.  [*See, e.g.*, Filing No. 322-2.] Rainbow is not a party to the Conditional Sales Contract.  [*See, e.g.*, Filing No. 322-2.]

Because the RTB Agreements are residential leases for the first two years, and since Rainbow is not a part of the transaction once those two years are up, the Court finds that Rainbow is not a "creditor" under TILA.  That does not end the Court's inquiry, however, because Plaintiffs also argue that the Court should pierce the corporate veil to hold all Defendants liable for the TILA violations.

b.   The Remaining Defendants' Potential TILA Liability

In their brief supporting their Motion for Partial Summary Judgment, Plaintiffs argue that "all Defendants are sufficiently intertwined with [Mr.] Hotka's RTB scheme to be liable for the TILA violations."  [Filing No. 310 at 49.]  Plaintiffs argue that the Court should use its equitable powers to pierce the corporate veil because "Rainbow, Empire, Shore Waters, and the Family Trusts do not operate independently of each other and have no function other than to facilitate [Mr.] Hotka's predatory scheme."  [Filing No. 310 at 50.]  They assert that the Defendant Entities "form a single business: the organizations' affairs and finances are completely intertwined, they do

no business outside of the business they do with each other, and they are all completely controlled by [Mr.] Hotka." [Filing No. 310 at 50.]  They also contend that "the undisputed evidence establishes that [Mr.] Hotka so controlled the enterprise that it is his 'mere instrumentality,' with no real existence separate from him," because "[t]he enterprise cannot purchase new properties until he 'loans' it money; he is completely responsible for every decision that the organization makes; and the enterprise serves as a conduit for his personal affairs, with its assets and finances so thoroughly intermingled that there really is no difference between the enterprise's money and that of [Mr.] Hotka and his family." [Filing No. 310 at 51.]  Plaintiffs discuss the factors considered by courts in determining whether to pierce the corporation veil, arguing that: (1) the Defendant Entities are undercapitalized to an extent where they cannot function as independent businesses; (2) Defendants "keep, at best, extremely superficial corporate records and almost completely ignore corporate formalities"; (3) Mr. Hotka has used the corporate form to "promote fraud, injustice, or illegal activity"; (4) "there is rampant commingling of assets and affairs among the entities, and between them and [Mr.] Hotka, as well as use of the entities to pay for individual obligations"; (5) Mr. Hotka controls all of the Defendant Entities; (6) the organizations "work together within the same enterprise, doing business relating to the same properties"; and (7) Rainbow and Empire do business out of Rainbow's offices and many of the businesses share mailing addresses.  [Filing No. 310 at 53-57.]

In response and in support of their Cross-Motion for Summary Judgment, Defendants argue that "Plaintiffs do not dispute that they failed to name as actual defendants the actual 'sellers' (the land trusts), as opposed to the 'landlords' in the RTB agreements." [Filing No. 314 at 19.]  They assert that it is Plaintiffs' burden to show that piercing the corporate veil is warranted, and that they have not presented sufficient evidence regarding the relationship between the Defendant Entities

to sustain their burden.  [Filing No. 314 at 20.]  Defendants contend that the Defendant Entities are not undercapitalized simply because they do not have assets, when they also do not have outstanding liabilities or expenses.  [Filing No. 314 at 21.]  As to the Defendant Entities' corporate records, Defendants argue that they file tax returns and track financial returns sufficient for an end-of-year accounting, that Shore Waters provides a financial report to its partners at the end of each year, and that Rainbow issues shares and has a board of directors.  [Filing No. 314 at 21.] Defendants contend that Plaintiffs have not shown a causal link between any failure to keep corporate records and "any injustice resulting from it."  [Filing No. 314 at 22 (quotation omitted).] They also argue that Plaintiffs have not shown through undisputed evidence that the Defendant Entities abused the corporate form to promote fraud, injustice, or illegal activities, and that the true owners of the properties were readily identifiable from the RTB Agreements.  [Filing No. 314 at 22.]  Defendants assert that Plaintiffs have not shown that any of the Defendant Entities either intermingled their assets or used one entity to pay the individual obligations of another, and that it is not uncommon for small business entities to operate from one bank account.  [Filing No. 314 at 22-23.]  They assert that the evidence does not show that funds were credited "arbitrarily" from Rainbow's account, but rather that they were credited "for each property where it goes."  [Filing No. 314 at 24.]  They contend that Mr. Hotka does not control all of the Defendant Entities and that, instead, his children are the beneficiaries of the Family Trusts, which make up Shore Waters. [Filing No. 314 at 24.]  They note that Mr. Hotka's two sons have had leadership positions within Rainbow in the past.  [Filing No. 314 at 24.]  Defendants argue that "[e]vidence demonstrating that entities are interrelated is not sufficient to show those entities carry out the same business purpose." [Filing No. 314 at 25.]  Finally, Defendants argue that Plaintiffs have not presented evidence of a joint venture either between the Defendants or between the Defendants and the unnamed

Individual Last Trusts because they have not shown that there was an agreement to share profits, a right of mutual control over the subject matter of the enterprise, or a contract providing for a joint venture.  [Filing No. 314 at 27-29.]

In their reply, Plaintiffs argue that Defendants have not substantively rebutted their argument that a failure to pierce the corporate veil would promote injustice and allow Mr. Hotka and the Defendant Entities to escape liability arising out of an operation conducted for the benefit of the overall enterprise.  [Filing No. 319 at 28-29.]  Plaintiffs argue further that Defendants have misused the corporate form because the Defendant Entities function as a single business enterprise which is completely controlled by Mr. Hotka, that the enterprise cannot function without Mr. Hotka's personal money, that Mr. Hotka "holds every director-level position at the organizations and does not maintain any safeguards to prevent him from running the enterprise as his instrumentality; the enterprise's affairs are completely commingled with those of [Mr.] Hotka and his family members; and [Mr.] Hotka and his family use enterprise assets for personal affairs." [Filing No. 319 at 30.]  Plaintiffs assert that "[t]he fact that the entities within the enterprise have different functions…is evidence of the 'excessive fragmentation' of a single enterprise into separate entities, a classic example of a misuse of the corporate form that is sufficient to establish a single business enterprise and, as a result, disregard the separateness of related entities." [Filing No. 319 at 31.]  They reiterate their arguments that Mr. Hotka's children are the beneficiaries of the Defendant trusts, which are controlled by Mr. Hotka; that the Defendant Entities are undercapitalized because they require cash infusions from Mr. Hotka in order to operate; that the Defendant Entities did not observe corporate formalities; that Mr. Hotka is using the corporate form to promote injustice because he does not want to purchase insurance and instead protects himself by "creating a web of organizations that would make it difficult for potential litigants to

identify him as the true owner of the properties"; that the Defendant Entities use the same bank account and commingle their money in that account; and that Mr. Hotka's family members used company funds to pay for a personal vacation.  [Filing No. 319 at 32-36.]  Plaintiffs also argue that they have presented sufficient evidence to allow a trier of fact to find that the Defendant Entities engaged in a joint venture because they shared profits and maintained control, through Mr. Hotka, over the RTB Program.  [Filing No. 319 at 36-39.]

In their surreply to Plaintiffs' Motion for Partial Summary Judgment, Defendants dispute many of the facts upon which Plaintiffs rely to support their piercing the corporate veil argument.  [Filing No. 324 at 2-3.]  They also argue that Plaintiffs' failure to raise their "excessive fragmentation" argument in their opening brief results in waiver of that argument and that, in any event, they have not presented evidence sufficient to show excessive fragmentation justifying piercing the corporate veil.  [Filing No. 324 at 3-6.]  In their reply in support of their Cross-Motion for Summary Judgment, Defendants argue that Plaintiffs have failed to "identify, cite and/or designate any admissible evidence establishing an 'agreement to share profits' or a 'right of mutual control over the subject matter of the [purported] venture.'"  [Filing No. 323 at 23.]

A court may pierce the corporate veil of an entity not named as a defendant to hold a sued entity liable for the unnamed entity's actions where the unnamed entity's form was "so ignored, controlled, or manipulated that [the sued entity] was merely the instrumentality of another, and that the misuse of the corporate form would constitute a fraud or promote injustice."  *Gurnik v. Lee*, 587 N.E.2d 706, 710 (Ind. Ct. App. 1992).  Under Indiana law, which the parties agree applies to this issue, a court should consider the following factors in determining whether to pierce the corporate veil: "(1) undercapitalization; (2) absence of corporate records; (3) fraudulent representation by corporate shareholders or directors; (4) use of the corporation to promote fraud,

injustice or illegal activities; (5) payment by the corporation of individual obligations; (6) commingling of assets and affairs; (7) failure to observe required corporate formalities; or (8) other shareholder acts or conduct ignoring, controlling, or manipulating the corporate form." *Beyers v. Consol. Ins. Co.*, 2020 WL 2539134, at *3 (S.D. Ind. May 19, 2020) (citing *Oliver v. Pinnacle Homes, Inc.*, 769 N.E.2d 1188, 1192 (Ind. Ct. App. 2002)); *see also Aronson v. Price*, 644 N.E.2d 864, 867 (Ind. 1994).

In order to properly analyze the parties' arguments, the Court looks again at the parties to the RTB Agreements and the parties who are named in this lawsuit.  Each RTB Agreement entered into by the Named Plaintiffs listed one of the Named Plaintiffs as the buyer and one of the Individual Land Trusts as the seller.  The Named Plaintiff then signed the RTB Agreement as the buyer, and Empire signed the RTB Agreement as the seller and as the trustee for the Individual Land Trust listed at the top of the RTB Agreement (by Mr. Hotka, as President of Empire). Rainbow signed the RTB Agreements as the landlord (by Mr. Hotka, as President of Rainbow). Plaintiffs name the Family Trusts and Shore Waters (who are the beneficiaries of the Individual Land Trusts), Empire, Rainbow and Mr. Hotka as Defendants.  Plaintiffs do not name as Defendants any of the Individual Land Trusts.

Plaintiffs do not explicitly address the fact that they did not name the Individual Land Trusts – the listed "sellers" of the properties – as Defendants, or explain why they failed to do so. Nor do they provide any caselaw supporting the proposition that the trustee and/or beneficiaries of a trust are the proper defendants in a case involving alleged violations of the TILA, ECOA, FHA, or Indiana statutes.  Instead, they argue that all of the Defendants – which do not include the Individual Land Trusts – should be collectively liable for each other's actions, and that the Court

should pierce the veil of the Defendant Entities to hold Mr. Hotka responsible for all of their actions.

But piercing the corporate veil involves holding a properly sued entity liable for another's actions, *Gurnik*, 587 N.E.2d at 710, and the link from the Individual Land Trusts to a named Defendant is missing in this case. For example, Plaintiffs have not set forth any arguments why Empire (as the trustee of the Individual Land Trusts) or the Family Trusts (as beneficiaries of the Individual Land Trusts) should be responsible for the Individual Land Trusts' potential liability as the "sellers" under the RTB Agreements. And Mr. Hotka signing the RTB Agreements in a representative capacity on behalf of Empire (who is in turn the trustee of the Individual Land Trust) does not mean that Mr. Hotka (or Empire) is an actual party to the RTB Agreement. Additionally, Plaintiffs do not ask the Court to attribute the actions of the Individual Land Trusts to Mr. Hotka or any other Defendant. Indeed, the only information they provide regarding the Individual Land Trusts – which appears in footnotes in their brief in support of their Motion for Partial Summary Judgment – is that Mr. Hotka "uses [them] to buy each individual property because 'we can't afford to carry insurance, so we don't carry insurance' and the land trusts add a 'layer' of 'anonymity there of who owns it,'" [Filing No. 310 at 16 (citing Filing No. 308-10 at 29; Filing No. 308-16 at 18; Filing No. 308-16 at 27-29)]; and that "[n]o entities other than the Defendant [E]ntities and the [Individual Land Trusts] participate in [Mr.] Hotka's enterprise," [Filing No. 310 at 17 (citing Filing No. 308-16 at 29)]. Further, the fact that Mr. Hotka controls the actions of the Individual Land Trusts, without more, does not mean that the Individual Land Trusts are not valid legal entities responsible for their own liabilities. *See Beyers*, 2020 WL 2539134, at *3 (setting forth multiple factors courts should consider in determining whether to pierce the corporate veil).

Plaintiffs have not provided evidence from which the Court can conclude that the Individual Land Trusts are sufficiently related to any named Defendant such that the corporate veil should be pierced to hold a named Defendant responsible for the Individual Land Trusts' actions as parties to the RTB Agreements.  Nor have they presented evidence that the Individual Land Trusts were engaged in a joint venture with a named Defendant, or pointed to case law indicating that they may sue one entity engaged in a joint venture to hold it responsible for the actions of a different unnamed entity.  Without this information, the Court finds it inappropriate to invoke the doctrine of piercing the corporate veil to somehow hold the named Defendants liable for the actions of the Individual Land Trusts.

After determining that Rainbow is not a creditor such that it can be held liable for TILA violations and that piercing the corporate veil does not apply to the circumstances of this case, the Court finds that Plaintiffs do not have standing to assert their TILA claims in this case. – *i.e.*, they are not suing the defendants to whom their claimed injury is "fairly traceable." *Lujan*, 504 U.S. at 560.

In sum, the Court finds that the RTB Agreements are lease agreements for the first two years and, consequently, TILA does not apply to them during that time period and Ms. Tejeda's TILA claims fail as a matter of law because her relationship with Defendants did not last past that two-year mark.  Further, the Court finds – assuming without deciding that TILA applies to the RTB Agreements after the initial two-year period – that Rainbow is not a "creditor" subject to TILA and the doctrine of piercing the corporate veil does not apply to the circumstances of this case, so Plaintiffs lack standing to assert their TILA claims because they have not sued the entities who could potentially be held liable under TILA.  Accordingly, the Court **DENIES** Plaintiffs'

Motion for Partial Summary Judgment and **GRANTS** Defendants' Cross-Motion for Summary Judgment on Plaintiffs' individual and class[4] TILA claims.[5]

### B.     ECOA Claims

Plaintiffs allege that Defendants have violated the ECOA because Plaintiffs are "applicants" and Defendants are "creditors" within the meaning of the ECOA, and Defendants' "acts, policies, and practices are intentionally discriminatory on the basis of race, color, and/or national origin with respect to aspects of credit transactions, [and] constitute reverse redlining," and "have a disparate impact on the basis of race, color, and/or national origin." [Filing No. 100 at 63-64.] Defendants move for summary judgment on this claim, but Plaintiffs do not.

Defendants argue in support of their Cross-Motion for Summary Judgment that the ECOA does not apply to them because the RTB Agreements are leases until a land contract is executed. [Filing No. 314 at 5.] They point to *Carter*, making the same arguments they make in connection with Plaintiffs' TILA claims, and assert that, in any event, Plaintiffs are not "applicants" and Defendants are not "creditors" under the ECOA. [Filing No. 314 at 17-18.]

In their response/reply, Plaintiffs address their TILA and ECOA claims together and set forth the same arguments that they relied upon to support their TILA claims. [*See* Filing No. 319 at 10-18.] Defendants do the same in their reply brief. [*See* Filing No. 323 at 5-14.]

---

[4] Because Plaintiffs' individual TILA claims – and other individual claims discussed below – fail as a matter of law, the Court finds that Plaintiffs cannot assert those claims on behalf of a class and that summary judgment on the class claims is warranted as well.

[5] The parties also discuss in their briefs whether the statute of limitations has expired on some of the Plaintiffs' TILA claims and whether the continuing violations doctrine tolls the statute of limitations. [*See* Filing No. 310 at 42-46; Filing No. 314 at 9-16; Filing No. 319 at 22-27; Filing No. 323 at 15-20.] Because the Court has found that Plaintiffs' TILA claims fail as a matter of law on other grounds, it need not and will not discuss the statute of limitations issue.

The Court notes yet another instance where Plaintiffs have imprecisely set forth their claims.  It is not clear from the Third Amended Complaint whether all of the Plaintiffs assert ECOA claims, or just Ms. Tejeda, Ms. Gaspar, and Mr. Paz.  [*See* Filing No. 100.]  This issue is not clarified in the Statement of Claims.  [*See* Filing No. 129.]  In the interest of thoroughness, the Court assumes that all of the named Plaintiffs assert ECOA claims.

The ECOA "bans discrimination against any applicant, with respect to any aspect of a credit transaction, on the basis of race." *Walton v. First Merchants Bank*, 772 Fed. App'x 349, 350 (7th Cir. 2019) (citing 15 U.S.C. § 1691(a)(1)).  It does not apply to residential leases. *Laramore v. Ritchie Realty Mgmt. Co.*, 397 F.3d 544, 547 (7th Cir. 2005).  As with her TILA claims, Ms. Tejeda's ECOA claims fail as a matter of law because she was evicted from her home within the two-year period that the RTB Agreement was a lease.

In connection with the remaining Plaintiffs, the Court considers whether the ECOA applies to Defendants.  In order for Defendants to be subject to the ECOA, they must be considered "creditors" and the RTB transactions must be considered "credit transactions." 15 U.S.C. § 1691(a) ("It shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction.").  The ECOA defines "credit" as "the right granted by a creditor to a debtor to defer payment of debt or to incur debts and defer its payment or to purchase property or services and defer payment therefor." 15 U.S.C. § 1691a(d).  It defines "creditor" as "any person who regularly extends, renews, or continues credit; any person who regularly arranges for the extension, renewal, or continuation of credit; or any assignee of an original creditor who participates in the decision to extend, renew, or continue credit." 15 U.S.C. § 1691a(e).

Similar to their TILA claims, any claims Plaintiffs assert under the ECOA fail as a matter of law because Rainbow is not a creditor and Plaintiffs have not named the only entities who could

29

potentially be considered creditors.  Rainbow is the landlord during the first two years of the RTB Agreements, when the Agreements are residential leases, and Rainbow's involvement in the RTB transactions ends at the conclusion of that two-year period.  Assuming without deciding that the ECOA would apply to the RTB transactions when the two years is up and the consumers sign Conditional Sales Contracts, the only entities that could arguably be considered creditors are the Individual Land Trusts as the sellers and parties to the Conditional Sales Contracts.[6]  As discussed above, Plaintiffs have not named the Individual Land Trusts as Defendants and have not met their burden of showing that it would be appropriate for the Court to pierce the corporate veil to somehow hold the named Defendants liable for the non-party Individual Land Trusts' actions. Accordingly, Plaintiffs' ECOA claims fails as a matter of law because they have not named the parties who have caused their alleged harm and the Court **GRANTS** Defendants' Cross-Motion for Summary Judgment on Plaintiffs' individual and class ECOA claims.

**C.    FHA Claims**

In their Cross-Motion for Summary Judgment, Defendants argue that Plaintiffs' FHA claims fail as a matter of law because, although the United States Supreme Court has recognized disparate impact claims under the FHA, the racial disparity must have been created by the defendant.  [Filing No. 314 at 29-32.]  Defendants assert that "despite their over-the-top allegations…and despite all of their bluster…Plaintiffs cannot escape the simple, unavoidable fact that Defendants do not control which of their offers [to purchase homes for the RTB Program] are

---

[6] Plaintiffs allege in the Third Amended Complaint that Mr. Kamano and Mr. Spencer did not even sign Conditional Sales Contracts.  [Filing No. 100 at 40; Filing No. 100 at 44.]  The parties do not provide any record evidence of this fact, however, and the Court will not "scour the record" to find such evidence.  *See Grant*, 870 F.3d at 572-73.  However, such evidence, if it exists, would provide an additional reason why Mr. Kamano's and Mr. Spencer's ECOA claims fails as a matter of law – since there would be no contract underlying the alleged extension of credit.

accepted." [Filing No. 314 at 31-32.]  They argue that they "make offers on all properties that are listed for under $30,000, offer one-third of the asking price, do little to no negotiation, and if those offers are accepted the property is purchased.  They cannot control which offers are accepted or where." [Filing No. 314 at 32 (citation omitted).]

In response, Plaintiffs argue that Defendants do not address their disparate treatment claim under the FHA, but focus only on their disparate impact claim. [Filing No. 319 at 39.]  Plaintiffs explain that they are challenging Defendants' policy of "creating an inventory of homes by purchasing dilapidated, unlivable properties at the cheapest price possible," and that the homes they purchase to carry out that policy "are disproportionately concentrated in neighborhoods with higher Black and Latino populations." [Filing No. 319 at 40-41.]  Plaintiffs point to their expert, Dr. Allan Parnell, who found that the RTB homes "are located in communities of color at much higher rates than if they had been randomly distributed throughout the nine counties where Defendants purchased homes for their RTB program." [Filing No. 319 at 41.]  They argue that they have presented evidence that the RTB Program "is predatory and harmful, resulting in customers being misled and ultimately losing significant amounts of money through the transaction." [Filing No. 319 at 42.]  Plaintiffs contend that the focus is on where Defendants place their bids for homes, not where those bids are accepted, and that Defendants "have provided no evidence suggesting that the observed disproportionate effect is caused by sellers in communities of color being more likely to accept Defendants' undervalued bids as compared to sellers in white communities." [Filing No. 319 at 45.]

In their reply, Defendants argue that Plaintiffs' FHA claim "essentially suggests that it is not permissible for a business to provide low-cost housing in Indiana, because minorities are more likely to purchase low-cost homes." [Filing No. 323 at 23-24.]  They contend that Plaintiffs

concede that every customer was treated the same.  [Filing No. 323 at 24.]  Defendants reiterate

their argument that they did not control where the houses listed below their price threshold were

located or which of their offers were accepted.  [Filing No. 323 at 24-25.]  They assert that

Plaintiffs' expert, Dr. Parnell, has merely found "a purported correlation between protected status

and inexpensive housing in some, but not all, of the counties in which the [Individual Land Trusts]

seek to purchase homes for the RTB program."  [Filing No. 323 at 25.]  Defendants argue that

"[w]hile Plaintiffs and their expert may have identified a statistical disparity with respect to the

RTB Program, they have wholly failed to put forth any evidence that the RTB Program, as opposed

to other societal factors, caused that disparity."  [Filing No. 323 at 27 (emphasis omitted).]  They

note that Dr. Parnell did not consider that Defendants also made offers in four additional counties

that were predominantly non-minority counties, and that Plaintiffs have not set forth any evidence

that Defendants caused or exacerbated any disproportionate effect of the RTB Program.  [Filing

No. 323 at 28.]

        Plaintiffs allege both a disparate treatment claim and a disparate impact claim under the

FHA.  [See Filing No. 100 at 64 (alleging that "Defendants' acts, policies, and practices are

intentionally discriminatory on the basis of race, color, and/or national origin and constitute reverse

redlining," and that "Defendants' acts, policies, and practices have an unjustified disparate impact

on the basis of race, color, and/or national origin").]  Plaintiffs argue that Defendants do not address

the disparate treatment claim in their Cross-Motion for Summary Judgment, and Defendants do

not dispute that assertion in their reply in support of their Cross-Motion.  [See Filing No. 323 at 3

(Defendants stating that they have moved for summary judgment on certain claims, including

"FHA…'Because Defendants do not control which offers are ultimately accepted, they are not

liable for any disparate impact under the FHA.'").]  Accordingly, Plaintiffs' disparate treatment

claim under the FHA will proceed as Defendants have not moved for summary judgment on that claim.

The Court considers Plaintiffs' disparate impact claim, which they bring under the following provisions:

- 42 U.S.C. § 3604(a), which provides that "it shall be unlawful – (a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin."

- 42 U.S.C. § 3604(b), which provides that "it shall be unlawful – (b) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin."

- 42 U.S.C. § 3605, which provides that "[i]t shall be unlawful for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race, color, religion, sex, handicap, familial status, or national origin."

In order to prevail on a disparate impact claim, a plaintiff must show that the defendant's policy had a disproportionately adverse effect on minorities and that the defendant's policy caused that disparity. *Texas Dept. of Housing and Comm. Affairs v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 541-42 (2015). "Disparate-impact analysis looks at the effects of policies, not one-off decisions." *City of Joliet, Ill. v. New West, L.P.*, 825 F.3d 827, 830 (7th Cir. 2016). And when a plaintiff relies upon a statistical disparity to prove a disparate impact claim under the FHA, courts apply a "robust causality requirement," meaning that "racial imbalance…does not, without more, establish a prima facie case of disparate impact," and that defendants are not liable for "racial disparities they did not create." *Inclusive Communities Project, Inc.*, 576 U.S. at 542; *see also County of Cook, Illinois v. Wells Fargo & Co.*, 314 F.Supp.3d 975, 991 (N.D. Ill. 2018) (for disparate impact claim under the FHA, plaintiff must show "not only a statistical disparity, but

33

also that the defendant maintained a specific policy that caused the disparity").  Much like a Title VII claim, once a plaintiff demonstrates a prima facie case of disparate impact, a defendant then has a chance to show that its policy "is necessary to achieve a valid interest."  *Inclusive Communities Project, Inc.*, 576 U.S. at 541.

The statistical disparity upon which Plaintiffs rely – that the homes that are part of the RTB Program are disproportionately concentrated in neighborhoods with higher Black and Latino populations – is a disparity that Defendants did not create.  The fact that lower-priced homes are more likely to exist in minority neighborhoods is not of Defendants' making and existed before, and without, the RTB Program.  Additionally, even if Defendants had created the disparity (by purchasing the homes that are part of the RTB Program), the RTB Program is premised on Defendants' ability to acquire properties for below a certain threshold price.  Defendants bid on homes in the nine counties Dr. Parnell discussed, but also in Tipton, Henry, Hendricks, and Rush counties.  [Filing No. 314-2 at 31-32.]  The fact that bids were only accepted in the nine counties Dr. Parnell focused on is not the fault of Defendants.  The Court finds the desire to purchase homes below a certain price is a valid, non-discriminatory business goal.  *See Inclusive Communities Project, Inc.*, 576 U.S. at 541 ("[H]ousing authorities and private developers [must] be allowed to maintain a policy if they can prove it is necessary to achieve a valid interest…. Entrepreneurs must be given latitude to consider market factors…. The FHA does not decree a particular vision of urban development; and it does not put housing authorities and private developers in a double bind of liability, subject to suit whether they choose to rejuvenate a city core or to promote new low-income housing in suburban communities…. [D]isparate-impact liability does not mandate that affordable housing be located in neighborhoods with any particular characteristic.") (quotation and citation omitted); *Ricci v. DeStefano*, 557 U.S. 557, 587 (2009) (defendant "could be liable for

disparate-impact discrimination only if the [challenged practice was] not job related and consistent with business necessity").

Because Defendants did not create the statistical disparity upon which Plaintiffs rely, and since Defendants' business goal of purchasing homes below a certain threshold is a valid, non-discriminatory interest,[7] the Court **GRANTS** Defendants' Cross-Motion for Summary Judgment on Plaintiffs' individual and class FHA disparate impact claims.

## IV.
### REMAINING MOTIONS

Several motions and an objection remain pending in this case, including Defendants' Preliminary Objections to Plaintiffs' Potential Expert Testimony, [Filing No. 245]; Plaintiffs' Combined Motion *in Limine* to Exclude Certain Evidence From Admission at Trial, [Filing No. 253]; Defendants' Motions *in Limine*, [Filing No. 259]; and Plaintiffs' Motion for Leave to Amend Plaintiffs' Trial Witness List and Case-Specific Jury Instructions, [Filing No. 298]. The Court is mindful that this Order significantly changes the landscape of this case, and that these remaining motions may or may not be relevant in that new landscape. Accordingly, the Court **DENIES** the

---

[7] The cases Plaintiffs rely upon from within the Seventh Circuit to support their FHA disparate impact claim involved motions to dismiss and are inapposite, as the policies that were challenged allegedly specifically targeted minorities and caused statistical disparities. *See, e.g.*, *Nat'l Fair Housing Alliance v. Deutsche Bank Nat'l Trust*, 2019 WL 5963633 (N.D. Ill. Nov. 13, 2019) (plaintiff sufficiently alleged FHA disparate impact claim based on bank's program of maintaining foreclosed homes where national statistics showed that, under defendant's program, homes in white communities were maintained at a higher level than homes in minority communities); *Cnty. of Cook, Ill. v. Wells Fargo & Co.*, 314 F.Supp.3d 975, 994 (N.D. Ill. 2018) (plaintiff's allegations that defendant's policy of issuing predatory subprime mortgage loans to Cook County residents that went into default and drove properties into foreclosure resulted in statistical disparities such that "minority borrowers were disproportionately more likely, given their baseline rates of homeownership, to be subject to equity stripping than nonminority borrowers" adequately alleged disparate impact claim under FHA). Here, Plaintiffs argue that Defendants' RTB Program targets homes in minority neighborhoods, not that the policy targets minorities to enter into RTB Agreements. That distinction is significant.

remaining motions, [Filing No. 253; Filing No. 259; Filing No. 298], and **OVERRULES** the objection, [Filing No. 245], **WITHOUT PREJUDICE** to re-file them.  If a party wishes to re-file the motions or objection, it must do so no later than **September 10, 2022**.  Any responses are due no later than **September 17, 2022**.  No replies are necessary.

## V.
### CONCLUSION

For the foregoing reasons, the Court **DENIES** Plaintiffs' Motion for Partial Summary Judgment, [308], and **GRANTS** Defendants' Cross-Motion Motion for Summary Judgment, [314], to the extent it finds that summary judgment in favor of Defendants is appropriate on Plaintiffs' individual and class TILA claims, their individual and class ECOA claims, and their individual and class FHA disparate impact claims.  No partial final judgment shall issue.  The Court also **DENIES** Plaintiffs' Combined Motion *in Limine* to Exclude Certain Evidence From Admission at Trial, [253]; Defendants' Motions *in Limine*, [259]; and Plaintiffs' Motion for Leave to Amend Plaintiffs' Trial Witness List and Case-Specific Jury Instructions, [298], and **OVERRULES** Defendants' Preliminary Objections to Plaintiffs' Potential Expert Testimony, [245], **WITHOUT PREJUDICE** to re-file them by **September 10, 2022**.  Any responses must be filed by **September 17, 2022** and no replies are necessary.

Based on this ruling, the March 27, 2020 Opinion and Order on Plaintiffs' Motion for Class Certification, [Filing No. 176], and the March 10, 2021 Opinion and Order on Defendants' Motion for Partial Summary Judgment, [Filing No. 209], the following claims **SHALL PROCEED**:

- Plaintiffs' individual claims for disparate treatment under the FHA seeking declaratory, injunctive, and compensatory relief;

- Plaintiffs' class claims for disparate treatment under the FHA seeking declaratory and injunctive relief;

36

- Plaintiffs' individual claims under Ind. Code § 32-31-8-5 for failing to deliver homes in habitable conditions seeking declaratory, injunctive, and compensatory relief; and

- Plaintiffs' individual claims under Ind. Code § 24-9-3-7(c) for declaratory, injunctive, and compensatory relief related to:

  o Misrepresentations regarding the condition of homes in the RTB Program;

  o The standard contract terms being confusing, contradictory, and reviewed quickly at the time of signing the RTB Agreements so buyers did not understand the major provisions of the RTB Agreements; and

  o The provision regarding the rent-to-buy nature of the RTB Agreement being deceptive.

The Court requests that the Magistrate Judge confer with the parties as soon as practicable regarding the resolution of these remaining claims short of the October 17, 2022 trial in this matter.

Date: 8/12/2022

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record**