UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| FAIR HOUSING CENTER OF CENTRAL INDIANA, INC., MORY KAMANO, NORMA TEJEDA, CORDELL SPENCER, MARIA GASPAR, and FRANKLIN PAZ, | ) ) ) ) |
| | ) |
| *Plaintiffs*, | ) |
| | ) |
| *vs.* | ) |
| | ) |
| RAINBOW REALTY GROUP, INC., EMPIRE HOLDING CORP., JAMES R. HOTKA, SUNSHINE TRUST, REDSKINS TRUST, SPORTING TRUST, ALLEY CAT TRUST, SHORE WATERS DEVELOPMENT, LLC, and SUNFLOWER TRUST, | ) ) ) ) ) |
| | ) |
| *Defendants*. | ) |

No. 1:17-cv-01782-JMS-TAB

## **ORDER**

Plaintiffs Fair Housing Center of Central Indiana, Inc. ("Fair Housing"), Mory Kamano, Norma Tejeda, Cordell Spencer, Maria Gaspar, and Franklin Paz have asserted various claims against Defendants Rainbow Realty Group, Inc. ("Rainbow"), Empire Holding Corp. ("Empire"), Shore Waters Development, LLC ("Shore Waters"), James Hotka, Sunshine Trust, Redskins Trust, Sporting Trust, and Alley Cat Trust related to agreements they entered into with Rainbow and other non-party entities to rent to buy properties in Indianapolis, Indiana ("the RTB Agreements"). Specifically, Plaintiffs have asserted various claims under the Equal Credit Opportunity Act, 15 U.S.C. § 1691, *et seq.* ("ECOA"), the Fair Housing Act, 42 U.S.C. § 3601, et seq. ("FHA"), the Truth in Lending Act, 15 U.S.C. § 1639 ("TILA"), and Indiana statutes.

The parties filed Cross-Motions for Summary Judgment, [Filing No. 308; Filing No. 314], and, after wading through 180 pages of briefs and over 1,000 pages of exhibits, the Court issued an Order on August 12, 2022 denying Plaintiffs' Motion and granting Defendants' Cross-Motion,

[Filing No. 332].  Plaintiffs have now filed a Motion to Clarify the Court's Summary Judgment Order ("Motion to Clarify"), [Filing No. 337], a Motion for Reconsideration of the Court's Order on the Parties' Cross-Motions for Summary Judgment ("Motion to Reconsider"), [Filing No. 338], and a Motion Requesting Oral Argument, [Filing No. 340], and the United States, also a non-party, has filed a Statement of Interest in support of Plaintiffs' Motion to Reconsider, [Filing No. 349]. Plaintiffs' motions and the Government's Statement of Interest are ripe for the Court's review and are discussed below.[1]

# I.
## THE COURT'S EXPECTATIONS

Before considering the pending motions, the Court finds it prudent to set out several expectations it has of the parties to this lawsuit, and to all lawsuits over which it presides.

First, the Court stresses the importance of party presentation.  This case presents numerous complicated legal issues and the Court relies upon the parties to present their claims, defenses, and arguments in a coherent and complete fashion.  As the Supreme Court has explained, "[i]n our adversarial system of adjudication, we follow the principle of party presentation, [which is] designed around the premise that parties represented by competent counsel know what is best for them, and are responsible for advancing the facts and argument entitling them to relief." *United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020) (quotations and citations omitted).  The Court will not make arguments for the parties, nor should the parties expect that the Court will

---

[1] Plaintiffs have also filed a Motion to Correct Plaintiffs' Motion to Clarify the Court's Summary Judgment Order, in which they seek leave to substitute a corrected version of their Motion to Clarify, which removes a sentence erroneously included in their initial motion.  [Filing No. 347.] The Court **GRANTS** the Motion to Correct to the extent that it will not consider the sentence omitted in the corrected version of the Motion to Clarify, [Filing No. 347-1], but the Court will continue to reference the original Motion to Clarify throughout this Order, [Filing No. 337], to avoid any confusion.

consider arguments that the parties could have made, but did not.  Further, federal judges are "busy generalists" who may not know counsels' "corner of the law."  Seventh Circuit Bar Association E-Mentoring Project, Judge Easterbrook – What is the Best Advice for Young Lawyers? https://vimeo.com/channels/usca7/23815036.  The parties should write their briefs with that fact in mind, and should assume that the Court will thoroughly read their briefs "from beginning to end, once" – not multiple times in order to "disambiguate any complications [the parties] leave them."  *Id.*; *see also Chicago Truck Drivers, Helpers & Warehouse Workers Union (Independent) Pension Fund v. CPC Logistics, Inc.*, 698 F.3d 346, 350 (7th Cir. 2012) ("Federal judges are generalists.").

Relatedly, "[a] litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is a good point despite a lack of supporting authority or in the face of contrary authority, forfeits the point."  *Mwangangi v. Nielsen*, --- F.4th ----, 2022 WL 4244594, at *12 (Sept. 15, 2022) (quotation and citation omitted).  And when a party does not respond to the other side's argument, it has waived that argument.  *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument…results in waiver.").  Further, arguments made in a motion to reconsider that were not raised in connection with the underlying motion will not be considered.  *Miller v. Safeco Ins. Co. of America*, 683 F.3d 805, 813 (7th Cir. 2012) (motions to reconsider are "not appropriately used to advance arguments or theories that could and should have been made before the district court rendered a judgment, or to present evidence that was available earlier") (quotation and citation omitted).

The Court's reliance on party presentation and the concept of waiver both serve to make the Court's consideration of pending motions more focused and efficient.  Focus and efficiency are critical to judges in the Southern District of Indiana.  As of March 2022, per judgeship, the United

3

States District Court for the Southern District of Indiana had the fourth highest number of pending

cases in the country and the ninth highest number of weighted filings.

http://www.uscourts.gov/statistics-reports/federal-court-management-statistics-march-2022

(United States District Courts – National Judicial Caseload Profile).  In both of those categories,

this District ranks the highest out of all District Courts within the Seventh Circuit.  *Id.*  It has more

than three times as many pending cases per judgeship as other Districts within the Seventh Circuit

and, in some cases, five times as many.  *Id.*  The undersigned is currently presiding over 401 civil

cases and 68 criminal cases with 97 defendants.  In those cases, 345 motions are currently pending.

All this to emphasize that the parties only get one chance to present their motions and supporting

arguments, or opposition to motions, to the Court.  *See* Standards for Professional Conduct Within

the Seventh Federal Judicial Circuit, Lawyers' Duties to the Court ("We will be considerate of the

time constraints and pressures on the court and court staff inherent in their efforts to administer

justice.").  When a party seeks additional chances, parties in other cases who may have adequately

briefed their motions on the first go-round may be left to wait, which is unfair.

And finally, the Court notes that the Standards for Professional Conduct Within the

Seventh Federal Judicial Circuit provide that counsel "will speak and write civilly and respectfully

in all communications with the court."  Some of the statements in support of Plaintiffs' Motion to

Reconsider come close to the line of violating that standard.  [*See, e.g.*, Filing No. 339 at 10

(arguing that the Court's conclusion that Rainbow is not a creditor under the ECOA is "clearly

incorrect" and then presenting legal authority which was never cited in summary judgment briefs);

Filing No. 339 at 13 (arguing that "[t]he Court's dismissal of Plaintiffs' claims has precisely the

opposite effect, rewarding and enabling Hotka's attempts to avoid liability and thwart valid

attempts to hold him accountable for legal violations").]  Counsel should keep in mind that the

Court is rendering decisions to the best of its ability, based on the facts and law presented by the parties' arguments. If an argument – or the omission of an argument – compels the Court to reach a finding foreclosing liability, that finding is legally proper.

The Court now considers the pending motions with these expectations in mind.

## II.
### STANDARD OF REVIEW

Since the Federal Rules of Civil Procedure do not provide a mechanism for filing a "Motion to Clarify," the Court treats Plaintiffs' Motion to Clarify as a Motion to Reconsider along with Plaintiffs' other Motion to Reconsider. Motions to reconsider orders other than final judgments are governed by Rule 54(b). *See Selective Ins. Co. of S.C. v. City of Paris*, 769 F.3d 501, 507 (7th Cir. 2014). "Federal Rule of Civil Procedure 54(b) provides that non-final orders 'may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.'" *Galvan v. Norberg*, 678 F.3d 581, 587 (7th Cir. 2012) (quoting Fed. R. Civ. P. 54(b)).

"Motions to reconsider serve a limited function, to be used 'where the Court has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension.'" *Davis v. Carmel Clay Schs.*, 286 F.R.D. 411, 412 (S.D. Ind. 2012) (quoting *Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191 (7th Cir. 1990)) (additional quotations omitted). A court may grant a motion to reconsider where a movant demonstrates a manifest error of law or fact; however, a motion to reconsider is not an occasion to make new arguments. *Granite St. Ins. Co. v. Degerlia*, 925 F.2d 189, 192 n.7 (7th Cir. 1991).

In other words, "[m]otions to reconsider 'are not replays of the main event.'" *Dominguez v. Lynch*, 612 Fed. App'x 388, 390 (7th Cir. 2015) (quoting *Khan v. Holder*, 766 F.3d 689, 696 (7th Cir. 2014)). A motion to reconsider "is not an appropriate forum for rehashing previously

rejected arguments or arguing matters that could have been heard during the pendency of the previous motion." *Caisse Nationale de Credit Agricole v. CBI Indus.*, 90 F.3d 1264, 1269-70 (7th Cir. 1996).

## III.
### DISCUSSION[2]

Plaintiffs raise eight issues in connection with the Court's Order on the Cross-Motions for Summary Judgment, arguing that the Court: (1) did not address the ECOA claims of class members whose RTB Agreements were not terminated within the first two years "but either never signed a Conditional Sales Contract with [one of the Individual Land Trusts[3]] at all or entered into a Conditional Sales Contract with [one of the Individual Land Trusts] more than two years after entering into their RTB Agreements"; (2) should have identified Plaintiffs' class claims for disparate treatment under the FHA seeking compensatory and punitive damages as claims that remain for trial; (3) erroneously concluded that TILA and the ECOA do not apply to agreements considered leases for real property under state law; (4) erroneously concluded that Plaintiffs do not have standing, even if TILA or the ECOA apply to the RTB Agreements, because they have not sued the proper Defendants; (5) applied the wrong standard in analyzing whether Plaintiffs set forth a prima facie case of disparate impact under the FHA; (6) improperly resolved a factual dispute regarding whether Plaintiffs had met the robust causation requirement for their FHA disparate impact claim; (7) incorrectly assumed that Defendants could articulate a valid business justification for targeting low-value homes in connection with Plaintiffs' FHA disparate impact

---

[2] The Court relies upon the Statement of Facts set forth in its August 12, 2022 Order, [Filing No. 332], and will not repeat a recitation of those facts in this Order.

[3] As discussed in the Court's August 12, 2022 Order, the Individual Land Trusts owned the properties that are the subjects of the RTB Agreements, and are not named as Defendants in this case.  [*See* Filing No. 332 at 4.]

claim; and (8) erroneously relied on Defendants' supposed business justification in connection with the FHA disparate impact claim without assessing, or providing Plaintiffs the opportunity to present, evidence regarding alternative, less discriminatory means to achieve Defendants' business interests. [Filing No. 337; Filing No. 339.] The Court addresses each issue in turn.

### A.        The Government's Statement of Interest

At the outset, the Court addresses the Government's Statement of Interest, filed in support of Plaintiffs' Motion to Reconsider as it relates to the ECOA claims. [Filing No. 349.] The Government filed its Statement of Interest on the heels of Plaintiffs' Motion to Reconsider, setting forth several arguments that – as discussed below – Plaintiffs make for the first time on reconsideration, [Filing No. 349], and Defendants' filed a response, [Filing No. 357]. The Government's Statement of Interest – filed more than four months after briefing on the Cross-Motions for Summary Judgment concluded and only after the Court issued its decision on the Cross-Motions – is untimely and either raises arguments already raised by Plaintiffs and rejected by the Court, or raises arguments Plaintiffs did not raise on summary judgment but could have.[4] For those reasons, the Court declines to consider the Government's Statement of Interest. [Filing No. 349.] *See LSP Transmission Holdings, LLC v. Lange*, 329 F.Supp.3d 695, 703-04 (D. Minn. 2018) (declining to consider Government's Statement of Interest where it was filed two and a half months after briefing on motion was complete and Government offered no explanation for the delay, and noting that "[i]t is solely within the Court's discretion to permit or deny a statement of interest").

---

[4] The Court notes that Judge Miller found that Plaintiffs' counsel would adequately represent the class and, consequently, counsel should have raised the arguments that the Government now raises in Plaintiffs' original filings.

**B.      Identification of Remaining Claims**

Plaintiffs take issue with the Court's finding that the only class claims for disparate treatment under the FHA that the Court has identified as remaining for resolution are for declaratory and injunctive relief, arguing that they "have never abandoned their pursuit of [compensatory and punitive] damages and the Court has never ruled that these damages are unavailable." [Filing No. 337 at 2.] They assert that "[t]he class members' damages claims may require separate individual proceedings after a liability finding at trial, but these claims should nonetheless proceed because they have never been dismissed or abandoned." [Filing No. 337 at 3.]

Defendants argue in their response that the class claims for compensatory and punitive damages were not certified for class treatment, that having individual proceedings for class members after trial has never been discussed and is not warranted, and that any class claims for compensatory and punitive damages under the FHA have been abandoned because Plaintiffs did not set forth those claims in their Statement of Claims. [Filing No. 351 at 9-11.] Defendants also argue that Plaintiffs' class claims under the FHA for declaratory and injunctive relief are moot because Defendants terminated the RTB program in September 2019. [Filing No. 351 at 12-13.]

In their reply, Plaintiffs note that in his Order on Plaintiffs' Motion for Class Certification, Judge Miller stated that the class members' claims for damages under the FHA can proceed in individual proceedings after a finding of liability on Plaintiffs' class claims for injunctive relief. [Filing No. 356 at 3.] They assert that they are not contending that damages for individual class members should be determined at the trial in this case or that those claims have been certified, but rather that a damages determination can take place in some kind of individual proceeding based

8

on a liability finding at trial and that, if Plaintiffs are successful at trial on their FHA claim, individual class members would not be required to relitigate the question of Defendants' liability. [Filing No. 356 at 4.]   Plaintiffs also argue that they did not abandon their class claims for compensatory and punitive damages under the FHA in their Statement of Claims, and that they were not required to set forth which remedies they seek for each claim.  [Filing No. 356 at 7-8.] Plaintiffs do not address Defendants' argument that the FHA claims for declaratory and injunctive relief are moot.  [See Filing No. 356.]

At the outset, the Court clarifies a typographical error in Judge Miller's March 27, 2020 Order on Plaintiffs' Motion for Class Certification.  [Filing No. 176.]  At various points during this litigation, Plaintiffs and Defendants have agreed that there is a typographical error in the March 27, 2020 Order – specifically, that the reference to the FHA in item (5) on page 16 of the Order, [Filing No. 176 at 16], was a typographical error, and that Judge Miller meant to reference TILA instead.  [See, e.g., Filing No. 281 at 5-7 (Plaintiffs stating in their Notice of Plaintiffs' Statement Regarding Claims to be Tried their belief that Judge Miller intended to certify as a class question whether Plaintiffs were entitled to statutory damages under TILA, rather than under the FHA); Filing No. 351 at 9-10 (Defendants taking the same position).]  The Court agrees with the parties, and clarifies Judge Miller's March 27, 2020 Order on Plaintiffs' Motion for Class Certification by changing item (5) on page 16 of his Order to:

**(5)     Whether the plaintiffs are entitled to an award of statutory class damages under the Truth in Lending Act.**

Plaintiffs raise for the first time in their reply brief in support of their Motion to Clarify the argument that Judge Miller held in his March 27, 2020 Order that the claims of putative class members for disparate treatment under the FHA seeking actual, compensatory, and consequential damages will be resolved through individual proceedings (and as a part of this case) after liability

is determined at trial.  [Filing No. 356 at 5-6.]  This is another example of Plaintiffs failing to raise

an issue in an original filing, and the Court is puzzled as to why Plaintiffs did not raise this

argument in their initial brief in support of their Motion to Clarify.

In any event, the Court does not read Judge Miller's holding in that way.  Judge Miller

stated:

> But the plaintiffs also seek actual, compensatory, and consequential damages.  All
> of their claims for actual, compensatory, and consequential damages would require
> individual calculations, with one exception.  They make a claim for class-wide
> statutory damages under [TILA], 15 U.S.C. § 1640(a)(2)(B).  Damages under that
> provision would flow directly to class members without individual calculations.
>
> Because those claims require individual damages calculations (with the exception
> of the claim under Section 1640(a)(2)(B)), they can't be certified under Rule
> 23(b)(2).  The damage claims wouldn't be incidental to the claims for injunctive or
> declaratory relief….  Similarly, those claims aren't suitable for certification under
> Rule 23(b)(3) because questions common to the class wouldn't predominate over
> the claims for individual damages….  The plaintiffs' claims can't all be certified
> under 23(b)(2) or 23(b)(3).
>
> The court has another option.  It can exercise its authority to certify claims that are
> appropriate for class resolution and leave others, such as those for individual
> damages, to be resolved in separate proceedings.  Under Fed. R. Civ. P. 23(c)(4),
> the court can maintain a class action "with respect to particular issues," certifying
> only those claims suitable for class resolution.  *See* McReynolds v. Merrill Lynch,
> Pierce, Fenner & Smith, Inc., 672 F.3d 482, 491 (7th Cir. 2012) (finding that the
> plaintiffs' claims for injunctive relief could be certified under Rule 23(b)(2) and
> 23(c)(4), and if the class won on those claims, its members could pursue damages
> claims in individual trials).  By exercising its authority to certify 'particular issues,'
> the court can resolve common claims as to all class members at once and promote
> judicial economy.  Id.; Phillips v. Sheriff of Cook Cty., 828 F.3d 541, 552 (7th Cir.
> 2016).
>
> Under Rules 23(b)(2) and 23(c)(4), the court can certify the plaintiffs' claims
> seeking declaratory and injunctive relief; an order enjoining Rainbow from future
> violations of the specified laws; and statutory class damages under 15 U.S.C. §
> 1640(a)(2)(B).  The court won't certify claims for individual actual, compensatory,
> and consequential damages.  Class members can bring those claims in individual
> proceedings.

[Filing No. 176 at 13-14.]

The Court does not read Judge Miller's March 27, 2020 Order as holding that the putative class members' claims for compensatory and punitive damages for disparate treatment under the FHA will be resolved by this Court in individual proceedings if liability on that claim is established.  Instead, Judge Miller specifically noted that class members "can bring those claims in individual proceedings," which the Court reads to mean proceedings other than this lawsuit. While the Court acknowledges that the procedure of certifying declaratory and injunctive claims to establish liability on a class-wide basis and then determining putative class member's damages through individual proceedings as part of the same lawsuit is permitted under Seventh Circuit law, it is not one that the Court will follow here.  The Court finds that if Judge Miller had intended to reserve those claims for individual damages determinations in this case, he would have explicitly said so.  To the extent Plaintiffs believe that this course of action is implied by Judge Miller's discussion of cases in which the courts took that approach, the Court **GRANTS** Plaintiffs' Motion to Clarify to the extent that it clarifies that it will not consider the individual claims of class members for compensatory and punitive damages for disparate treatment under the FHA as those claims were not certified for class treatment.  Those class members may bring individual claims for damages in individual lawsuits should they choose to do so and should a declaratory judgment imposing liability be issued.

### C.      The TILA and ECOA Claims

At the outset, the Court agrees with Plaintiffs that the effect of the Court's Order on the Cross-Motions for Summary Judgment was to split potential TILA and ECOA plaintiffs into three categories: (1) those individuals who did not make payments past the first two years of their RTB Agreements; (2) those individuals who made payments past the first two years of their RTB Agreements and signed a Conditional Sales Contract; and (3) those individuals who made

payments past the first two years of their RTB Agreements and did not sign a Conditional Sales Contract.  The Court addresses Plaintiffs' arguments regarding whether each category of plaintiff has a valid TILA or ECOA claim; if so, whether Rainbow is a creditor; and, if not, whether that category of plaintiff has standing.

       1.       *Individuals Who Did Not Make Payments Past the First Two Years of Their RTB Agreements*

          a.      <u>Whether TILA or the ECOA Apply to the Transactions</u>

In their Motion to Reconsider, Plaintiffs argue that the Court erred by considering whether the RTB Agreements qualify as leases rather than whether they "fit the criteria for credit transactions" when it concluded that TILA and the ECOA do not apply during the first two years of the RTB Agreements.  [Filing No. 339 at 4 (quotation omitted).]  They assert that whether an agreement is a lease under state law does not control whether TILA and the ECOA apply, and that "such a rule would lead to inconsistent application of these federal statutes from state to state." [Filing No. 339 at 4.]  Plaintiffs contend that the Court should have considered whether they incurred a debt or purchased property or services and whether the RTB Agreements allow customers to defer payment of that debt in order to determine whether TILA and the ECOA apply. [Filing No. 339 at 5.]  They argue that "[b]oth TILA and ECOA expressly recognize – and apply to – transactions that have characteristics of both leases and sales," and that the RTB Agreements extend credit because "the customer has committed upfront to purchase property or services, is bound to the agreement because the customer cannot terminate without a penalty, has in fact purchased the property upon completion of the agreement, and has deferred payment for the purchase of the property or services over time."  [Filing No. 339 at 5-6.]  They assert that an agreement can be both a lease under state law and extend credit for purposes of TILA and the ECOA, and rely upon several cases from outside of this Circuit as support.  [Filing No. 339 at 6-

8.] Finally, Plaintiffs argue that portions of TILA and the ECOA require an interpretation of state law for certain provisions, but do not when analyzing whether a transaction is a credit transaction. [Filing No. 339 at 8-9.]

Defendants respond that the Court properly determined that until a Conditional Sales Contract was signed, there was no extension of credit under *Rainbow Realty Group, Inc. v. Carter*, 131 N.E.3d 168, 173-74 (Ind. 2019). [Filing No. 352 at 4.] They assert that "[i]f an agreement is a lease, as opposed to a purchase agreement, TILA and ECOA do not apply because there is no extension of credit – regardless of the state." [Filing No. 352 at 5.] They note that "[t]here is no reference to state law to determine what is a lease because [TILA and the ECOA] do not apply to leases – they apply to transactions in which credit is extended." [Filing No. 352 at 5-6.] Defendants argue that Plaintiffs rehash the arguments they already made in support of their Motion for Summary Judgment, which is improper. [Filing No. 352 at 6.]

In their reply, Plaintiffs argue that the fact that TILA expressly includes leases of personal property "does not mean it categorially excludes leases of real property." [Filing No. 355 at 3.] They reiterate many of their arguments, and assert that a motion for reconsideration "is precisely the correct vehicle for addressing a court's application of an incorrect legal standard when resolving a question raised by the parties." [Filing No. 355 at 4.]

Plaintiffs argued on summary judgment that the RTB Agreements can implicate both rental and credit regulations, contending that Defendants knowingly created the RTB program so that it had elements of both a rental transaction and a credit transaction, that TILA and the ECOA do not require an analysis under state law when determining whether a transaction is a credit transaction, and that Defendants took the position in *Carter* that the RTB Agreements constituted sales of real

property and not leases.[5]   [Filing No. 310 at 46-49; Filing No. 319 at 15-17.]  The Court considered

Plaintiffs' arguments on summary judgment to support their position that TILA and the ECOA

apply to the RTB Agreements and found that because the RTB Agreements are considered leases

under state law for the first two years, they are not subject to TILA or the ECOA during that time.

Plaintiffs rehash many of the same arguments in their Motion to Reconsider, and the Court will

not consider them again.  *See Vesely v. Armslist LLC*, 762 F.3d 661, 666 (7th Cir. 2014) (a party

may not "rehash previously rejected arguments" in a motion for reconsideration) (quotation and

citation omitted).

The Court notes, however, that the Indiana Supreme Court in *Carter* identified numerous

aspects of an RTB transaction that supported its conclusion that the RTB Agreement is a lease at

least for the first two years, and that those aspects also support this Court's conclusion that the

RTB Agreements do not extend credit at least for the first two years.  Those aspects include: that

the transaction "required a separate contract [the Conditional Sales Contract] to effectuate a sale";

that "[n]o equity accrued or accumulated during the first twenty-four months"; that "[i]f the

[consumer] defaulted before executing the [Conditional Sales Contract], or if they failed to make

payments or to close this latter transaction, they were subject to eviction and forfeiture of all

payments made"; and that during the first two years, Rainbow "reserved for themselves a landlord's

prerogative to enter the premises, restricted the [consumer's] use of the land, and, upon the

[consumer's] default, evicted them as if they were tenants and kept their 'rental payments.'"  *Carter,*

---

[5] Interestingly, Fair Housing filed an *amicus* brief in *Carter* in which it argued that the RTB Agreement "provides for a period of two years of rental that only matures into an ownership stake if Rainbow and the tenant execute an additional contract.  In other words, it is a term of rental followed by the option to purchase.  Indiana law is clear that such a relationship is considered a 'rental agreement,' in which…the landlord is subject to landlord-tenant requirements."  [Filing No. 322-1 at 5-6 (emphasis omitted).]

131 N.E.3d at 173-74.  The Court finds that it properly relied on *Carter* in determining whether TILA and the ECOA apply to the first two years of the RTB Agreements.  *See Wm. J. Lemp Brewing Co. v. Ems Brewing Co.*, 164 F.2d 290, 293 (7th Cir. 1947) ("The general rule is that the law of the State…in which a contract is made governs the contract, its nature, validity, obligation, interpretation and legal effect, and all matters of substance involved therein.").

In their Motion to Reconsider, Plaintiffs also expand on their original argument that the RTB Agreements are "hybrid" contracts with elements of a lease and a credit transaction under TILA and the ECOA, citing numerous cases and regulatory provisions that they did not cite in their summary judgment briefs.   [Filing No. 339 at 4-9.]   Specifically, in their Motion to Reconsider Plaintiffs cite to 12 C.F.R. § 1026.2(a)(16), which provides that under TILA:

> (16) Credit sale means a sale in which the seller is a creditor.  The term includes a bailment or lease (unless terminable without penalty at any time by the consumer) under which the consumer:
>
>> (i)  Agrees to pay as compensation for use a sum substantially equivalent to, or in excess of, the total value of the property and service involved; and
>>
>> (ii) Will become (or has the option to become), for no additional consideration or for nominal consideration, the owners of the property upon compliance with the agreement.

They also cite to 12 C.F.R. Pt. 1026, Supp. I, Part 3, cmt. 2 to 37(o)(1), which states that:

> In certain credit sale or loan transactions, a consumer may reduce the dollar amount of the payments to be made during the transaction by agreeing to make, at the end of the loan term, a large final payment based on the expected residual value of the property.  The consumer may have a number of options with respect to the final payment, including, among other things, retaining the property and making the final payment, refinancing the final payment, or transferring the property to the creditor in lieu of the final payment.  Such transactions may have some of the characteristics of lease transactions…, but are considered credit transactions where the consumer assumes the indicia of ownership, including the risks, burdens, and benefits of ownership, upon consummation.  These transactions are governed by the disclosure requirements of this part instead of Regulation M.

15

Plaintiffs also point to 50 F.R. 48018-01, 1985 WL 126616, at *48020 (Nov. 20, 1985),

the Official Staff Commentary to the revision of Regulation B of the ECOA, which states:

> The Board believes that the Congress did not intend the ECOA, which on its face
> applies only to credit transactions, to cover lease transactions unless the transaction
> results in a 'credit sale' as defined in [TILA] and Regulation Z.

Additionally, they cite to five previously unmentioned district court cases: *James v. Detroit*

*Property Exchange*, 2020 WL 4583946 (E.D. Mich. Aug. 10, 2020); *Taylor v. Timepayment Corp.*,

2019 WL 1375594 (E.D. Va. Feb. 5, 2019); *Gibson v. Confie Ins. Grp. Holdings, Inc.*, 2017 WL

2936219 (D. S.C. July 10, 2017); *Cisneros v. McDonald*, 2007 WL 9711700 (N.D. Ala. Nov. 20,

2007); and *Dorton v. Kmart Corp.*, 229 F.Supp.3d 612 (E.D. Mich. 2017).[6]

Inexplicably, Plaintiffs did not cite to or otherwise discuss any of these provisions or cases

in their original summary judgment briefs. As it must, the Court relies upon the parties for the

presentation of their case and must assume that if a party has not raised an argument, there is a

reason why. It is not the Court's responsibility to find legal authority for any party's positions.

Given that Plaintiffs did not point the Court to these provisions, it is difficult for the Court to see

how it was a manifest error of law for the Court not to have considered them.

Under the principle of party presentation, a party is afforded one opportunity to present,

and provide support for, the party's arguments. Plaintiffs' Motion to Reconsider re-states

arguments they already set forth on summary judgment and the Court already considered, but also

goes beyond to provide argument and authority that they did not previously provide but could

---

[6] Only one of these new cases cited by Plaintiffs involved real property. *See James*, 2020 WL
4583946. And *James* – which is not binding on this Court in any event – did not appear to involve
a situation where the relevant state court had considered the very contract at issue and had
determined that the contract is a lease for the first two years.

have.  The Court **DENIES** Plaintiffs' Motion to Reconsider to the extent that it finds that it properly looked to directly applicable state law (*Carter*), in light of the arguments set forth by Plaintiffs on summary judgment, in finding that the RTB Agreements are leases for the first two years and that TILA and the ECOA do not apply to the RTB Agreements during that time-frame.

       b. <u>Whether Rainbow is a Creditor</u>

   Because the Court has found that the RTB Agreements are not subject to TILA or the ECOA during the first two years, it need not consider its finding that Rainbow is not a creditor during that time period and **DENIES** Plaintiffs' Motion to Reconsider as it relates to that issue.

       c. <u>Standing</u>

   Because the Court has found that TILA and the ECOA do not apply during the first two years of the RTB Agreements, it need not reconsider its finding that Plaintiffs who did not pay past the initial two years do not have standing to assert TILA and ECOA claims and **DENIES** Plaintiffs' Motion to Reconsider as it relates to that issue.

     2. *Individuals Who Paid Past the Initial Two Years of the RTB Agreements and Signed a Conditional Sales Contract*

   Based on earlier representations by Plaintiffs, the Court concluded that Plaintiffs were not asserting claims on behalf of individuals who paid past the initial two years of the RTB Agreements and signed a Conditional Sales Contract.  This understanding is based on the following exchange at the December 16, 2021 final pretrial conference:

> THE COURT:   And so you're saying – of the named Plaintiffs, the class representatives, how many signed the conditional land contract?
>
> [PLAINTIFFS' COUNSEL]:  None.
>
> THE COURT:  None?  Okay.  But as the class is currently defined, some people did, correct?

[PLAINTIFFS' COUNSEL]:  No.  I believe the class excludes those individuals who signed a land contract.

THE COURT:  Okay.

[DEFENDANTS' COUNSEL]:  Judge, just if, if I can, to correct…. It excludes those who paid off their land contract.  So I think even if someone hasn't failed, they are still part of the class unless and until they have completed the land contract.

THE COURT:  Right.  Whoever entered the rent-to-buy – okay.  So the rent-to-buy agreement is the only agreement you are suing under?

[PLAINTIFFS' COUNSEL]:  That's right, that's right.

[Filing No. 304 at 7-8.]

To the extent Plaintiffs seek reconsideration of any decisions related to individuals who paid past the first two years of the RTB Agreement but signed a Conditional Sales Contract, the Court **DENIES** Plaintiffs' Motion to Reconsider as such individuals are beyond the scope of this action, according to the representations by counsel to the Court noted above.  Accordingly the Court will limit its consideration of additional claims to those who paid past two years and did not sign a Conditional Sales Contract.

3.     *Individuals Who Paid Past the Initial Two Years of the RTB Agreements and Did Not Sign a Conditional Sales Contract*

a.     Whether TILA or the ECOA Apply to the Transactions

As to those class members who paid past the initial two years of the RTB Agreements but did not sign a Conditional Sales Contract, the Court stated in a footnote in its Order on the Cross-Motions for Summary Judgment that if Mr. Kamano and Mr. Spencer did not sign Conditional Sales Contracts (as Plaintiffs alleged in the Third Amended Complaint), this "would provide an additional reason why Mr. Kamano's and Mr. Spencer's ECOA claims fail as a matter of law – since there would be no contract underlying the alleged extension of credit." [Filing No. 332 at 30 n.6.]  Upon reconsideration of the parties' original briefs, the Court notes that the parties did not

address this issue on summary judgment, so the Court **VACATES** footnote 6 in its August 12, 2022 Order.

Plaintiffs' Motion to Clarify only seeks clarification of the ECOA claims of class members who paid for longer than two years but did not sign a Conditional Sales Agreement. It does not seek clarification as to the Court's finding that the TILA claims were foreclosed. [*See* Filing No. 337 at 3 ("Plaintiffs…ask the Court to clarify its ruling on the ECOA claims for class members who did not sign Conditional Sales Contracts at all or signed them more than two years after entering into the RTB Agreements.").] Again, because the Court relies upon the parties to frame their arguments and their case, the Court assumes that Plaintiffs are not asserting TILA claims for these individuals.

The parties did not address in their summary judgment briefing whether the ECOA would apply to payments after the initial two years of the RTB Agreements, but not pursuant to a Conditional Sales Contract. The parties should be prepared to address this issue, and the issue of whether any Named Defendants are creditors under the ECOA during this time period, at a hearing the Court sets for **October 19, 2022** at **9:30 a.m.**, along with additional issues addressed below.

### D.    Standing

The issue of whether Rainbow can be considered a creditor after the initial two years of the RTB Agreement where the plaintiff continued to pay but did not sign a Conditional Sales Contract is intertwined with the issue of standing. Put another way, have these Plaintiffs sued the entity that caused the injuries for which they seek redress? Although Plaintiffs are critical of the Court raising this issue *sua sponte* in its Order on the Cross-Motions for Summary Judgment, it is well-settled that standing is an issue that the Court not only can, but must, raise *sua sponte*. *Albert v. Oshkosh Corp.*, 47 F.4th 570, 577 (7th Cir. 2022) (courts "have an independent obligation to assure

19

that standing exists," and "standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek") (quotations and citations omitted); *MainStreet Org. of Realtors v. Calumet City, Ill.*, 505 F.3d 742, 747 (7th Cir. 2007) ("If there is no Article III standing, the court is obliged to dismiss the suit even if the standing issue has not been raised.").

The Court is perplexed by Plaintiffs' reluctance to deal with the issue of whether they have named the correct parties as defendants head-on – an issue that Defendants have raised multiple times and that was discussed as long ago as the December 16, 2021 final pretrial conference. If the Court finds that payment after the first two years of the RTB Agreements but not pursuant to a Conditional Sales Contract is a transaction covered by the ECOA, but that Rainbow is not considered a "creditor," Plaintiffs will be required to show cause at the October 19, 2022 hearing that they have standing to assert ECOA claims against one or more of the Named Defendants. To the extent that Plaintiffs plan to argue that the Individual Land Trusts can be considered creditors under the ECOA, now is the time to establish that the Named Defendants are somehow responsible for the actions of the Individual Land Trusts.

And further, as with numerous other aspects of this case, it is not clear which Named Plaintiffs – if any – paid past the first two years of the RTB Agreement but did not sign a Conditional Sales Contract. As of the dates of their depositions in this case, Ms. Gaspar, Mr. Paz, and Mr. Kamano all still lived in the houses that were the subject of their RTB Agreements. [Filing No. 196-14 at 7; Filing No. 308-6 at 16-18; Filing No. 308-13 at 6.] In their Motion to Clarify, Plaintiffs state that "more than 600 class members continued to pay [Rainbow] exclusively pursuant to the RTB Agreements…for more than two years. These class members include Named Plaintiffs Franklin Paz and Maria Gaspar. The vast majority of these class members never signed

a Conditional Sales Contract.  As of September 9, 2020, only eighty-two class members ever signed a Conditional Sales Contract." [Filing No. 337 at 2.]  Plaintiffs do not specify whether Mr. Paz and/or Ms. Gaspar signed or did not sign a Conditional Sales Contract, and do not address Mr. Kamano (who testified at his deposition that he still lived in the house that was the subject of his RTB Agreement).  This information is critical to the Court determining whether any Named Plaintiff could have viable ECOA claims.  Plaintiffs must be prepared to present admissible evidence regarding the status of Ms. Gaspar, Mr. Paz, and Mr. Kamano at the October 19, 2022 hearing.  In addition, Plaintiffs must be able to identify the number of class members who paid pursuant to an RTB Agreement beyond the first two years but who didn't sign a conditional sales contract.

### E.    Piercing the Corporate Veil/Joint Venture

Plaintiffs ask the Court to reconsider its finding that they did not present sufficient evidence from which the Court could determine the appropriateness of piercing the corporate veil to hold the Named Defendants liable for the actions of the Individual Land Trusts, because no party moved for summary judgment on that issue.  [Filing No. 339 at 9-10.]  They also argue that the Court did not resolve Plaintiffs' Motion for Summary Judgment on the issue of whether the Named Defendants can be held collectively liable through piercing the corporate veil and did not resolve Defendants' Motion for Summary Judgment relating to whether there is a joint venture among the Defendants.  [Filing No. 339 at 9.]

In response, Defendants argue that "Plaintiffs have provided absolutely no evidence to justify piercing the corporate veil aside from mere conjuncture and speculation, both of which are insufficient to survive summary judgment."  [Filing No. 352 at 9.]

21

Plaintiffs argue in their reply that they "have not previously addressed the question of whether the [Individual Land Trusts] were part of Defendant Hotka's single enterprise, nor have they waived the issue by failing to do so." [Filing No. 355 at 8.] They assert that they "filed the motion for summary judgment that Defendants constituted a single enterprise to simplify the presentation of evidence at trial," and that their motion "was not calculated to create a link between the named defendants and the [Individual Land Trusts]." [Filing No. 355 at 8.] They contend that nothing requires them to establish a link between the Individual Land Trusts and the Named Defendants at the summary judgment stage. [Filing No. 355 at 8-9.]

Some history of the piercing the corporate veil issue in this case is helpful. The parties should remember that at the December 16, 2021 final pretrial conference in this matter, the Court and the parties specifically discussed Defendants' belief that Plaintiffs had not named the correct parties as defendants and Plaintiffs' position that the Court could pierce the corporate veil to remedy that issue. [*See, e.g.*, Filing No. 304 at 26 (the Court discussing individual liability under wage payment laws and asking Plaintiffs' counsel if there are similar provisions in the FHA, the ECOA, and TILA to "hold an individual personally liable" for the acts of the Individual Land Trusts, and Plaintiffs' counsel stating "Plaintiffs should be offered the opportunity to establish that it is a joint venture or the corporate veil should be pierced as a factual matter").] Based on this discussion, as well as Plaintiffs' arguments in their initial summary judgment brief, the Court determined that Plaintiffs were attempting to pierce the corporate veil to hold Defendants responsible for the actions of the Individual Land Trusts, who are not named as Defendants.[7] It appears that Defendants assumed that as well, as they discussed their belief that Plaintiffs have

---

[7] Plaintiffs only moved for partial summary judgment on their TILA claims, and so could only have been raising the issue of the corporate veil in that context.

named the wrong parties in their response to Plaintiffs' arguments regarding piercing the corporate veil. [*See* Filing No. 314 at 19 (in subsection related to Plaintiffs' piercing-the-corporate-veil argument, Defendants stating "Plaintiffs do not dispute that they failed to name as actual defendants the actual 'sellers' (the land trusts), as opposed to the 'landlords' in the RTB agreements. Thus, unless Plaintiffs' alter ego arguments prevail, Plaintiffs['] TILA and ECOA claims must be rejected in their entirety").]

Upon further review of the Cross-Motions for Summary Judgment, the Court acknowledges that neither Plaintiffs nor Defendants moved for summary judgment on the issue of whether the corporate veil should be pierced to hold the Named Defendants liable for the actions of the Individual Land Trusts. Now that Plaintiffs have clarified that they merely sought to pierce the corporate veil among the Named Defendants "to simplify the presentation of evidence at trial," [Filing No. 355 at 8], the Court **GRANTS** Plaintiffs' Motion to Reconsider to the extent that it **VACATES** its finding that Plaintiffs do not have standing to assert their TILA or ECOA claims because they did not present sufficient evidence to justify piercing the corporate veil to hold the Named Defendants liable for the actions of the Individual Land Trusts.

The issue of whether there is a joint venture among the Named Defendants or between the Named Defendants and the Individual Land Trusts is another story, however. Defendants specifically moved for summary judgment on this issue as to all claims brought by Plaintiffs. [*See* Filing No. 314 at 28 ("Plaintiffs have not, and cannot present any evidence in support of a claim of a joint venture – either between the named Defendants, or between the named Defendants and the unnamed land trusts…. As such, Defendants are entitled to judgment as a matter of law that there was no joint venture between the named Defendants or between the Defendants and the unnamed land trusts.").]

23

As to whether there is a joint venture among the Named Defendants, Plaintiffs point to the same evidence they rely upon for their piercing-the-corporate-veil argument, including citations to the record contained in numerous footnotes.  [*See* Filing No. 319 at 38 (citing Filing No. 310 at 16-18 and Filing No. 310 at 55).]  But the appropriateness of piercing the corporate veil and the existence of a joint venture are separate issues – the former is an equitable remedy, and the latter is a legal relationship that requires an undertaking or agreement by the participants.  Simply citing back to the piercing-the-corporate-veil evidence and making conclusory statements unsupported by relevant legal precedent is not a meaningful response to Defendants' joint venture arguments.  Plaintiffs also confusingly argued that "the moving party… must…demonstrate an absence of evidence from which the non-moving party could make the requisite showing" of a joint venture.  [Filing No. 319 at 37 (emphasis omitted).]  This is incorrect.  Rather, once Defendants moved for a finding on summary judgment that the evidence did not support the existence of a joint venture among the Defendants on summary judgment, it was Plaintiffs burden to present evidence either that there was a joint venture, or that a genuine issue of material fact exists as to that issue.  *See Stockton v. Milwaukee Cnty.*, 44 F.4th 605, 614 (7th Cir. 2022) ("A party who fails to produce evidence sufficient to establish an element essential to that party's case on which they bear the burden of proof cannot survive a summary judgment challenge.").  To the extent that the Court did not rule on this issue on summary judgment, it acknowledges that it misapprehended the scope of Defendants' motion and finds on reconsideration that Plaintiffs did not sustain their burden of pointing to evidence that supports the existence of a joint venture among the Defendants or demonstrates that there is a genuine issue of material fact on that issue.

Additionally, Plaintiffs did not respond to Defendants' argument that there was not a joint venture between the Named Defendants and the Individual Land Trusts in their response to

Defendants' Cross-Motion for Summary Judgment.  [*See* Filing No. 319 at 36-39.]  The Court found – after considering the parties' briefs – that Plaintiffs had not "presented evidence that the Individual Land Trusts were engaged in a joint venture with a named Defendant."  [Filing No. 332 at 27.]  To the extent Plaintiffs seek reconsideration of this finding, the Court **DENIES** the Motion to Reconsider.  Plaintiffs had an opportunity to present argument and evidence on that issue in opposition to Defendants' Cross-Motion for Summary Judgment, and did not do so.

As to whether the corporate veil should be pierced to hold all Named Defendants liable for each other's actions, the Court agrees that it did not decide that issue on summary judgment. However, Plaintiffs only sought to pierce the corporate veil for purposes of their TILA claims. [*See* Filing No. 310 at 49 (Plaintiffs arguing that "all Defendants are sufficiently intertwined within Hotka's RTB scheme to be liable for the TILA violations").]   Because no viable TILA claims remain, the Court **DENIES** the Motion to Reconsider to the extent it asks the Court to determine whether it will pierce the corporate veil to hold all Defendants liable for any TILA violations.

To recap, upon reconsideration, the **GRANTS** summary judgment, and holds that Plaintiffs have failed to establish a joint venture either among the Named Defendants or among the Named Defendants and the Individual Land Trusts. The Court will decide whether the corporate veil should be pierced for any remaining claims and for any particular entities or individuals at the upcoming hearing.  The parties should be prepared to present their evidence on the corporate veil issue, in full, at or before the October 19 hearing.

### F.    The FHA Claims

Plaintiffs raise four manifest errors of law in connection with the Court's grant of summary judgment in favor of Defendants on Plaintiffs' disparate impact claims: (1) that the Court applied the wrong standard for assessing whether Plaintiffs adduced sufficient facts for a trier of fact to

find a prima facie case of disparate impact under the FHA; (2) that the Court "improperly resolved a factual dispute regarding Plaintiffs' ability to prove a robust causation between Defendants' policy and the observed disproportionate effect"; (3) that the Court "incorrectly assumed, based on no evidentiary support, that Defendants could articulate a valid business justification for targeting low-value homes"; and (4) that the Court "erroneously relied on Defendants' supposed business justifications to find against Plaintiffs without assessing, or ever providing Plaintiffs the opportunity to present evidence regarding, available alternative less discriminatory means to achieve [their] business interest." [Filing No. 339 at 2-3.]   The Court will address the last two issues first.

### 1.   *Business Justification Finding*

At the outset, the Court finds that it erred in considering whether Defendants had produced evidence sufficient to overcome a prima facie case of disparate impact by establishing that the RTB Program was justified by a valid business purpose.   Defendants moved for summary judgment only on whether Plaintiffs' disparate impact claim fails because Defendants did not cause the statistical disparity upon which Plaintiffs rely and had not established robust causation – essentially, that Plaintiffs could not make out a prima facie case of disparate impact.   [*See* Filing No. 314 at 29-32.]   The Court therefore **VACATES** the portion of its August 12, 2022 Order on the parties' Cross-Motions for Summary Judgment finding that even if Plaintiffs had set forth a prima facie case of disparate impact, Defendants had shown that the RTB program accomplished a valid, non-discriminatory business goal.   The Court goes on to consider whether it applied the wrong standard in finding that Plaintiffs had not set forth a prima facie case of disparate impact.

> 2.  *Whether Plaintiffs Presented Evidence To Support a Prima Facie Case of Disparate Impact*

In their Motion to Reconsider, Plaintiffs argue that the Court "focuses on the wrong disparity" in finding that their FHA disparate impact claim fails because Defendants are not responsible for the fact that lower-priced homes are more likely to exist in minority neighborhoods. [Filing No. 339 at 13.]  They contend that they "do not assert, and under the proper standard are not required to show, that Defendants caused low-value homes to be located in communities of color," and that their claim "is properly based on the assertion that Defendants caused a disproportionate number of predatory RTB agreements to be located in communities of color by implementing a program of only targeting homes listed for sale under $35,000 [or that] the harmful RTB product ends up in Black and Latino neighborhoods precisely because Defendants only bid on homes that are under the maximum Defendants set." [Filing No. 339 at 13 (emphasis omitted).] They argue that a disparate impact claim is "designed to address facially neutral policies (like the RTB program) that cause harm when applied in the context of existing racial imbalances (such as lower-valued homes in Black and Latino neighborhoods)." [Filing No. 339 at 13 (emphasis omitted).]  Plaintiffs assert that "Defendants are not responsible for the fact that affordable homes are disproportionately located in communities of color in Indianapolis, but when Defendants distribute a harmful product to people who purchase those affordable homes – and only those affordable homes – it is responsible for the fact that Black and Latino people disproportionately receive the harmful product." [Filing No. 339 at 15.]  They contend that the Court's holding is a departure from the Supreme Court's holding in *Tex. Dep't of Housing and Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519 (2015), and that they have shown that "Black and Latino people were the dominant groups harmed by the RTB program because Defendants targeted the program at low-value homes." [Filing No. 339 at 16.]

In their response, Defendants argue that Plaintiffs are merely rehashing arguments that they made on summary judgment.  [Filing No. 352 at 13.]  Defendants assert that Plaintiffs have not offered any evidence that the RTB program's policy of purchasing homes below a certain threshold "does anything to perpetuate racial imbalances, segregation, or other forms of discrimination that disparate-impact theory is intended to prevent, distinguishing this case from the *Inclusive Communities* decision."  [Filing No. 352 at 15.]  Defendants contend that the Supreme Court in *Inclusive Communities* only decided whether the FHA recognized a disparate impact claim and did not decide the merits of that claim.  [Filing No. 352 at 16.]  Finally, they argue that Plaintiffs have changed their theory from claiming that Defendants targeted minority neighborhoods in connection with the RTB program to claiming that Defendants targeted low-value homes.  [Filing No. 352 at 16-17.]

In their reply, Plaintiffs argue that "[t]he relevant question is whether Defendants caused the predatory RTB product to be disproportionately concentrated in communities of color" and that they "do not have to establish that Defendants intended to cause disproportionate harm to Black and Latino people, but instead can prove their claim by showing that a purely neutral policy – like only including low value homes in the Program – caused the disproportionate adverse impact on the protected classes."  [Filing No. 355 at 14.]

In their summary judgment briefing, Plaintiffs focused their disparate impact claim on the location of RTB homes.  They repeatedly argued on summary judgment that the disproportionate effect of the RTB program, which included making offers on homes below a certain price threshold, is that the RTB homes "are disproportionately concentrated in neighborhoods with higher Black and Latino populations."  [Filing No. 319 at 41; *see also* Filing No. 319 at 42 ("In sum, the facts adduced in this case establish that Defendants' RTB homes are disproportionately

located in communities of color."); Filing No. 319 at 44 ("RTB homes are located disproportionately in communities of color precisely because of Defendants' design of the program.").] Plaintiffs also framed their FHA disparate impact claim in this way in their Statement of Claims. [Filing No. 129 at 4 ("Defendants' policy of acquiring houses by targeting properties listed at $35,000 or under inherently focuses its properties in neighborhoods where there is a disproportionately high African-American and Latino population…."); Filing No. 129 at 5 ("Defendants' rent-to-own houses are more highly concentrated in neighborhoods that have a significant number of African-American and/or Latino residents than their bidding policy would suggest.").]   In focusing on this disparity, Plaintiffs discussed statistics adduced by their expert, Dr. Parnell, which showed that "the differences in the percentages of RTB homes in communities of color and in white communities are statistically significant." [Filing No. 319 at 41.] In short, Plaintiffs relied on Dr. Parnell's comparison of the make-up of neighborhoods where RTB homes are located versus the make-up of the county where RTB homes are located, not his comparison of the make-up of neighborhoods where Defendants made offers to purchase RTB homes versus the make-up of the county where they made offers.  These two comparisons are different.

Defendants argued in their Cross-Motion for Summary Judgment that the statistics upon which Plaintiffs rely – which compare the make-up of the neighborhoods where RTB homes are located versus the make-up of the county in which the RTB homes are located – cannot support a prima facie case of disparate impact under the FHA because Defendants do not control which of their bids are accepted. [Filing No. 314 at 31-32.] In response to that argument, Plaintiffs did not point to Dr. Parnell's analysis of the location where Defendants made offers, but instead focused exclusively on the location where Defendants ultimately purchased homes. [See Filing No. 319 at

40-42.]  Perhaps this is because, as Defendants noted in their reply, Dr. Parnell did not consider all of the counties in which Defendants made offers (but where no offers were accepted) in his analysis.  [*See* Filing No. 323 at 25.]

Based on the arguments presented by the parties, the Court found that the disparity shown by Dr. Parnell's statistics relating to where RTB homes are located – the only statistics discussed, and relied upon, by Plaintiffs on summary judgment – showed a disparity that Defendants did not create because they did not control who accepted their offers and also because the fact that homes that fell under Defendants' price threshold were disproportionately located in minority neighborhoods existed even before the RTB program.  The Court stands by that decision.  *See Inclusive Communities Project, Inc. v. Heartland Comm. Ass'n, Inc.*, 399 F. Supp.3d 657, 668 (N.D. Tex. 2019) (finding that plaintiffs had not set forth prima facie case of disparate impact under the FHA because "[t]he statistical racial disparities relied upon by [plaintiff] preexisted the enactment of the Policy and, therefore, cannot be shown to have been caused by it"); *Inclusive Communities Project, Inc.*, 135 S. Ct. at 2524 ("Courts should avoid interpreting disparate-impact liability to be so expansive as to inject racial considerations into every housing decision.").  The Court also notes the District Court's decision in *Inclusive Communities* upon remand from the Supreme Court, in which it found that the plaintiffs had not set forth a prima facie case of disparate impact because they were complaining about the results of the defendant's exercise of discretion, and not the existence of that discretion.  *Inclusive Communities Project, Inc. v. Texas Dept. of Housing and Comm. Affairs*, 2016 WL 4494322, at *7 (N.D. Tex. Aug. 26, 2016).  Here too, Plaintiffs complain of – and rely on statistics regarding – the results of the RTB program's policy of targeting homes under a certain price threshold:  *i.e.*, where the RTB homes are ultimately located.  This is more akin to a disparate treatment claim under the FHA.  *Id.* (claim is for disparate

treatment where plaintiffs "challenged the results of the [defendant's] application of the method to them") (citing *Johnson v. Metro. Gov't of Nashville & Davidson Cnty.*, 2008 WL 3163531, at *4-6 (M.D. Tenn. Aug. 4, 2008)).

The Court also noted that Dr. Parnell did not include in his analysis the unaccepted offers that Defendants had made on homes below the price threshold in Tipton, Henry, Hendricks, and Rush counties. In support of their Motion to Reconsider, Plaintiffs submitted a new Declaration from Dr. Parnell in which he states that he analyzed where RTB homes were actually purchased, so did not include the number of bids made in those four counties since the bids were not accepted, and that he "did not add the properties to the analysis of available properties under $35,000 and $50,000 because it was clear that analysis would not change the results." [Filing No. 338-2 at 2-3.] He further states that he then factored the number of bids into his analysis and that "there was still no substantive change in the results." [Filing No. 338-2 at 3.] Two factors compel the rejection of this declaration: (1) the opinion is new and the deadline for expert discovery has long since passed; and (2) the Court will not consider evidence submitted for the first time in support of a Motion to Reconsider, *Oto v. Metro. Life Ins. Co.*, 224 F.3d 601, 606 (7th Cir. 2000) ("A party may not use a motion for reconsideration to introduce new evidence that could have been presented earlier.").

And the fact that Dr. Parnell has performed this new analysis does not create a fact issue. Plaintiffs' time to put forth evidence supporting their disparate impact claim was when Defendants moved for summary judgment and argued that Plaintiffs had not put forth a prima facie case. *Weaver v. Champion Petfoods USA Inc.*, 3 F.4th 927, 938 (7th Cir. 2021) ("Summary judgment is the proverbial put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events.") (quotation and citation

omitted).  The Court rejects any argument by Plaintiffs that they had no reason to address this shortcoming in Dr. Parnell's analysis on summary judgment.

In sum, the Court finds that, on summary judgment, Plaintiffs relied on statistics related to the location of the RTB homes for their FHA disparate impact claim and the Court stands by its decision that these statistics do not support a prima facie case that Defendants' policy of making offers on homes below a certain price threshold caused that disparity.  To the extent that Plaintiffs rely in their Motion to Reconsider on statistics related to the location of the homes upon which Defendants made offers, the Court finds that those statistics also do not reliably establish a disparate impact because Dr. Parnell did not include offers made in the four additional counties in his original analysis.  The Court **GRANTS** Plaintiffs' Motion to Reconsider to the extent that it **VACATES** the portion of its August 12, 2022 Order finding that even if Plaintiffs had made out a prima facie case of disparate impact under the FHA, Defendants had presented a valid, non-discriminatory business goal to overcome the prima facie case.  The Court **DENIES** Plaintiffs' Motion to Reconsider to the extent that it reiterates its finding that the statistical disparity upon which Plaintiffs rely – that homes that are part of the RTB Program are disproportionately located in minority neighborhoods – is not sufficient to make a prima facie showing of disparate impact under the FHA.

## IV.
### REMAINING CLAIMS

The chart below reflects the claims that are left in this case, after the rulings contained in this Order:

| CLAIM | INDIVIDUAL CLAIM LEFT AFTER RULING | CLASS CLAIM LEFT AFTER RULING |
|---|---|---|
| Count I – Violation of ECOA – discrimination related to credit transactions and reverse red-lining | UNDER ADVISEMENT for Ms. Gaspar, Mr. Paz, and Mr. Kamano – for actual, punitive, injunctive, and declaratory relief<br><br>NO for Mr. Tejeda and Mr. Spencer | UNDER ADVISEMENT for individuals who paid past the first two years of the RTB Agreement and did not sign a Conditional Sales Contract – only for injunctive and declaratory relief |
| Count II – Violation of FHA<br><br>(1) disparate treatment<br><br><br>(2) disparate impact | <br><br>(1) YES – compensatory, declaratory, and injunctive relief<br><br>(2) NO | <br><br>(1) YES – only for injunctive and declaratory relief<br><br>(2) NO |
| Count III – Violation of TILA (Ability to Repay) | NO | NO |
| Count IV – Violation of TILA (Pre-Loan Counseling) | NO | NO |
| Count V – Violation of TILA (Mandatory Disclosure) | NO | NO |
| Count VI – Violation of TILA (Appraisal) | NO | NO |
| Count VII – Violation of Indiana Code § 32-31-8-5 | YES | NO |
| Count VIII – Violation of Indiana Code § 24-9-3-7(c)<br><br>(1) failing to share rent-to-buy program's success rate with buyers<br><br>(2) misrepresentations on Sellers' Residential Real Estate Disclosure | <br><br><br>(1) NO<br><br><br>(2) YES | <br><br><br>(1) NO<br><br><br>(2) NO |

| (3) standard contract terms are confusing, contradictory, and reviewed quickly at time of signing | (3)  YES | (3)  NO |
| | | (4)  NO |
| (4) provision regarding RTB nature of contract is deceptive | (4)  YES | |

## V.
### FURTHER PROCEEDINGS

After the second round of summary judgment motions and Plaintiffs' Motion to Reconsider and Motion to Clarify, there are still several outstanding issues that the Court finds require clarification before a jury trial on the remaining claims takes place.  The Court is particularly concerned with the following statement in Plaintiffs' reply brief in support of its Motion to Reconsider:  "Plaintiffs could, of course, have asked the Court to consider the liability of all Defendants and [the Individual Land Trusts] collectively because they form a single business enterprise that is the alter ego of James Hotka (or for any other reason) at a later stage in the proceedings, even if the Court had denied its motion to do so with respect to the named defendants at the summary judgment stage."  [Filing No. 355 at 8.]  This approach is directly contradictory to the Court's and the parties' discussions at the final pretrial conference, where the Court instructed the parties to raise issues of law that could be resolved before a jury trial via summary judgment motions and informed the parties that it would not allow them to present evidence to a jury that relates to legal issues properly decided by the Court.  [*See* Filing No. 304 at 30-31; Filing No. 304 at 40.]

Additionally, the Court wonders what "later stage in the proceedings" Plaintiffs are referring to given that this case was set for an October 17, 2022 jury trial, the parties' briefing on the Cross-Motions for Summary Judgment was completed in May 2022, and the Court issued its

decision on August 12, 2022.  This case has been riddled with imprecision, including a failure to clearly set forth which claims are brought on behalf of which Plaintiffs and for what type of relief, and a failure to clearly and completely raise legal issues that the Court can and should decide before trial by jury.  At some point, saving issues to decide another day has to stop.  This case will not be ready for a jury trial until this imprecision and confusion is remedied.

To that end, at the October 19, 2022 hearing:

- The parties will be required to present argument regarding whether those who paid past the first two years of the RTB Agreements and did not sign a Conditional Sales Contract engaged in transactions covered by the ECOA and, if so, what entities or individuals, if any, are "creditors" under the ECOA;

- Those Plaintiffs who were still paying under the RTB Agreements after the initial two-year period and did not sign a Conditional Sales Contract will be required to show cause why they have standing to pursue ECOA claims – that is, show they have sued appropriate parties from whom they can seek redress. Plaintiffs will be required to provide evidence showing that Ms. Gaspar, Mr. Paz, and/or Mr. Kamano paid beyond two years without signing a Conditional Sales Contract.  The Court will hear argument and evidence, if necessary;

- The parties will be required to present evidence and argument regarding the issue of piercing the corporate veil to hold all Named Defendants responsible for the conduct of any Named Defendant or non-party;

- The parties will be required to present argument regarding whether Plaintiffs' FHA disparate treatment claims for injunctive and declaratory relief are moot;[8] and

- The parties will be required to raise any other issues the determination of which they believe would streamline a jury trial in this matter.

---

[8] Defendants argue in their response to Plaintiffs' Motion to Clarify that, because Defendants terminated the RTB Program in September 2019, any claim for declaratory and/or injunctive relief for disparate treatment under the FHA is moot.  [Filing No. 351 at 12-13.]  Defendants state that they "are considering potential procedural mechanisms for raising this issue for the Court's pretrial determination."  [Filing No. 351 at 13.]  This determination will take place after the Court hears argument on this issue at the October 19, 2022 hearing.

The Court **GRANTS** Plaintiffs' Motion Requesting Oral Argument, [340], to the extent that it will discuss those issues at the October 19, 2022 hearing.  The Court will not consider any further filings related to these issues.

## VI.
### CONCLUSION

For the foregoing reasons, the Court:

- **GRANTS** Plaintiffs' Motion to Correct Plaintiffs' Motion to Clarify the Court's Summary Judgment Order, [347], to the extent that it will not consider the sentence omitted in the corrected version of the Motion to Clarify, [Filing No. 347-1];

- **GRANTS IN PART** Plaintiffs' Motion to Clarify, [337], to the extent that it:

  o clarifies Judge Miller's March 27, 2020 Order to certify the question of whether Plaintiffs are entitled to an award of statutory class damages under TILA, rather than the FHA;

  o clarifies that any claims of class members for disparate treatment under the FHA seeking compensatory or punitive damages will not be determined as a part of this case; and

  o acknowledges that it did not determine the issue of whether Plaintiffs or class members who were still paying under an RTB Agreement after the initial two years and did not sign a Conditional Sales Contract have a valid ECOA claim;

- **DENIES IN PART** Plaintiffs' Motion to Clarify, [337], in all other respects including with respect to any additional issues that the Court has failed to discern as being raised in the Motion to Clarify;

- **GRANTS IN PART** Plaintiffs' Motion to Reconsider, [338], to the extent that it:

  o **VACATES** the portions of its August 12, 2022 Order, [332], finding that:

    ▪ TILA and the ECOA do not apply to Plaintiffs who paid past the initial two years of the RTB Agreements and did not sign a Conditional Sales Contract;

- ▪ Plaintiffs did not present sufficient evidence to justify piercing the corporate veil to hold the Named Defendants liable for the actions of the Individual Land Trusts; and

- ▪ Even if Plaintiffs have set forth a prima facie case of disparate impact under the FHA, Defendants have set forth a valid, non-discriminatory business interest to rebut that prima facie case; and

  - o **GRANTS** Defendants' Cross-Motion for Summary Judgment, [314], on the issue of joint venture both as to a joint venture among the Named Defendants and as to a joint venture between the Named Defendants and the Individual Land Trusts;

- **DENIES IN PART** Plaintiffs' Motion to Reconsider, [338], in all other respects including on any additional issues that the Court has failed to discern as being raised in the Motion to Reconsider;

- **DECLINES TO CONSIDER** the Government's Statement of Interest, [349]; and

- **GRANTS** Plaintiffs' Motion Requesting Oral Argument, [340], to the extent that it **SETS** a hearing for **October 19, 2022 at 9:30 a.m.** in which the parties will be required to address the issues the Court has set forth above. **The parties should be prepared for the October 19, 2022 hearing to continue into the following two days, if necessary**. The parties shall file witness and exhibit lists for the October 19, 2022 hearing on or before **October 12, 2022**.

Date: 10/7/2022

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record**